## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| WACHOVIA BANK, NATIONAL ASSOCIATION, successor by merger to SouthTrust Bank | ) ) ) | RECEIVED |
| | ) | 2007 NOV -5  P 1: 24 |
| Plaintiff, | ) ) | DEBRA P. HACKETT, CLK |
| v. | ) ) | Case No. CV 3:07cv993 - mht |
| | ) | U.S. DISTRICT COURT MIDDLE DISTRICT ALA |
| CABANA WEST, L.P., MILES E. HILL, JR. and RUDOLPH H. BEAVER, | ) ) ) | 3:07CV993-mht |
| | ) | |
| Defendants. | ) | |

---

## COMPLAINT

---

**COMES NOW** the plaintiff in this action, Wachovia Bank, National Association, in its capacity as successor by merger to SouthTrust Bank ("Wachovia" or "Plaintiff"), and for its complaint against defendants Cabana West, L.P. (the "Borrower"), and Miles E. Hill, Jr. and Rudolph H. Beaver (together, the "Guarantors," and collectively with the Borrower, the "Defendants"), states as follows:

### JURISDICTION AND VENUE

1.     Plaintiff Wachovia is a national banking association having its principal place of business in North Carolina.

2.     Defendant Cabana West, L.P. is a limited partnership organized and existing under the laws of the State of Alabama with its principal place of business in Lee County, Alabama.

3.     Defendant Miles E. Hill, Jr. is a citizen of the state of Alabama, and resides in Lee County, Alabama.

4.      Defendant Rudolph H. Beaver is a citizen of the state of Alabama, and resides in Marshall County, Alabama.

5.      The amount in controversy against each of the Defendants, exclusive of interest and costs, exceeds $75,000.00, and complete diversity exists between Wachovia on the one hand and the Defendants on the other.

6.      This Court has original jurisdiction of this case pursuant to 28 U.S.C. § 1332.

7.      Venue is proper pursuant to 28 U.S.C. § 1391(a).

## STATEMENT OF FACTS

8.      Wachovia made a construction loan available to the Borrower in the original principal amount of $18,000,000.00.  Said construction loan is governed by the terms of that certain Construction Loan Agreement dated as of December 23, 2004, between Wachovia and the Borrower (the "Construction Loan Agreement").  A true and correct copy of the Construction Loan Agreement is attached hereto as **Exhibit A** and is incorporated by reference.

9.      The Construction Loan Agreement was subsequently amended by that certain Amendment to Construction Loan Agreement dated as of September 29, 2006, between Wachovia and the Borrower (the "Construction Loan Amendment"), which, among other things, increased the stated principal amount of said construction loan to the sum of $27,500,000.00 (as so increased, the "Loan").  A true and correct copy of the Construction Loan Amendment is attached hereto as **Exhibit B** and is incorporated by reference.

10.     The Borrower's obligation to repay the Loan, with interest thereon, is evidenced by a Promissory Note dated December 23, 2004, payable by the Borrower to the order of Wachovia in the original principal amount of $18,000,000.00 (the "Note").  A true and correct copy of the Note is attached hereto as **Exhibit C** and is incorporated by reference.

11.     The Note was subsequently amended pursuant to that certain Note Modification Agreement dated as of September 29, 2006, between Wachovia and Borrower (the "Note Modification Agreement"), which, among other things, increased the stated principal amount of the Loan to the sum of $27,500,000.00 and modified the payment terms of the Loan.  A true and correct copy of the Note Modification Agreement is attached hereto as **Exhibit D** and is incorporated by reference.

12.     In addition to the Borrower's obligation to pay the principal of and interest on the Loan, the Construction Loan Agreement and the Note provide that the holder of the Note is entitled to recover its costs and expenses, including attorneys' fees, incurred in collecting the Note.

13.     In order to induce Wachovia to make the Loan to the Borrower, the Guarantors jointly, severally and unconditionally guaranteed payment of the Loan and all other sums due under the loan documents evidencing and securing the Loan.  This guaranty is evidenced by that certain Guaranty Agreement dated December 23, 2004 (the "Guaranty," and collectively with the Construction Loan Agreement, the Construction Loan Amendment, the Note and the Note Modification Agreement, the "Loan Documents").  A true and correct copy of the Guaranty is attached hereto as **Exhibit E** and is incorporated by reference.

14.     In addition to the Guarantors' obligations under the Guaranty to pay the principal of and interest on the Loan, the Guaranty provides that the Guarantors shall also be liable for costs and expenses, including attorney's fees, incurred in collecting the obligations due under the Loan Documents.

15.     The Defendants are in default in the performance of their respective obligations under the Loan Documents, including without limitation, the failure to pay all amounts when due

under the terms of the Loan Documents.  On July 26, 2007, Wachovia made written demand on the Defendants to fulfill their respective obligations under the Loan Documents and for payment of the entire unpaid balance of the Loan (the "Demand Letter").  A true and correct copy of the Demand Letter is attached hereto as **Exhibit F** and is incorporated by reference.

16.    The Defendants have failed to honor their respective obligations under the Loan Documents despite the Demand Letter.

17.    The Defendants' obligations under the Loan Documents include the principal sum of $27,500,000.00, unpaid interest thereon, late fees, expenses of collection, including attorneys' fees, and the costs of this action.

## COUNT I

## (BREACH OF CONTRACT BY BORROWER)

18.    Wachovia incorporates and re-alleges all preceding paragraphs as if fully set forth herein.

19.    The Borrower is in default of its obligations under the Loan Documents.

20.    Despite written demand, the Borrower has failed to pay Wachovia the amounts due under the terms of the Loan Documents.

**WHEREFORE**, Wachovia demands judgment against the Borrowers for the principal indebtedness outstanding under the Loan, plus accrued and accruing interest, late charges, and expenses of collection, including attorneys' fees in an amount equal to fifteen percent (15%) of the first $500.00 of principal and interest owing on the Loan and ten percent (10%) of the remaining principal and interest owing on the Loan, as permitted by O.C.G.A. § 13-1-11.

## COUNT II

### (BREACH OF CONTRACT BY GUARANTORS)

21.    Wachovia incorporates and re-alleges all preceding paragraphs as if fully set forth herein.

22.    The Guarantors are in default in the performance of their respective obligations under the Loan Documents.

23.    Despite written demand, the Guarantors have failed to pay Wachovia the amounts due under the terms of the Loan Documents.

**WHEREFORE**, Wachovia demands judgment against the Guarantors, jointly and severally, for the principal indebtedness outstanding under the Loan, plus accrued and accruing interest, late charges, and expenses of collection, including attorneys' fees in an amount equal to fifteen percent (15%) of the first $500.00 of principal and interest owing on the Loan and ten percent (10%) of the remaining principal and interest owing on the Loan, as permitted by O.C.G.A. § 13-1-11.

## COUNT III

### (ATTORNEYS' FEES)

24.    Wachovia incorporates and re-alleges all preceding paragraphs as if fully set forth herein.

25.    Under the terms of the Loan Documents, the Defendants are obligated to pay Wachovia's cost of collecting the amounts due under the Loan Documents, including attorneys' fees and other costs.

26.    The Loan Documents provide for the application of Georgia law.

27.    In the Demand Letter, Wachovia provided the statutory notice required by O.C.G.A. § 13-1-11 to inform the Defendants of their opportunity to pay all amounts due and

owing under the Loan Documents within ten (10) days without incurring any liability for attorneys' fees. The 10-day period under Georgia law has passed and the Defendants are now liable under the Loan Documents, and as provided in O.C.G.A. § 13-1-11, for the attorneys' fees and other costs incurred by Wachovia in collecting the amounts due from the Defendants.

**WHEREFORE**, Wachovia demands judgment against the Defendants, jointly and severally, for attorneys' fees in an amount equal to fifteen percent (15%) of the first $500.00 of principal and interest owing on the Loan and ten percent (10%) of the remaining principal and interest owing on the Loan, as permitted by O.C.G.A. § 13-1-11.

D. Christopher Carson (CAR099)
Jason D. Woodard (WOO095)
Jennifer A. Harris (HAR273)
Counsel for Wachovia Bank, N.A.

**OF COUNSEL:**
BURR & FORMAN LLP
420 North 20th Street
Suite 3400 - Wachovia Tower
Birmingham, Alabama 35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100

**Defendants' Addresses:**
Cabana West, LP
c/o Miles Hill, its Registered Agent
730 North Dean Road, Suite 200
Auburn, AL 36830

Miles E. Hill, Jr.
730 North Dean Road, Suite 200
Auburn, AL 36830

Rudolph H. Beaver
730 North Dean Road, Suite 200
Auburn, AL 36830

# EXHIBIT   A

| | | |
|---|---|---|
| 4.15 | No Reliance | 21 |
| 4.16 | Contracts with Affiliates | 21 |
| 4.17 | Lines of Business | 21 |
| 4.18 | Impositions | 21 |
| 4.19 | Compliance with Legal Requirements | 21 |
| 4.20 | Condemnation | 21 |
| 4.21 | Insurance | 21 |
| 4.22 | Separate Tax Parcel | 21 |
| 4.23 | Construction Documents | 22 |
| 4.24 | Utilities and Access | 22 |
| 4.25 | Independent Unit | 22 |
| 4.26 | Leases | 22 |
| 4.27 | Management and Leasing Agreements | 22 |

**ARTICLE 5.:     CONSTRUCTION MATTERS** ... 22

| | | |
|---|---|---|
| 5.1 | Construct Improvements | 23 |
| 5.2 | Storage of Materials | 23 |
| 5.3 | Change Orders | 23 |
| 5.4 | Contractors and Design Professionals | 23 |
| 5.5 | Assignment of Construction Documents | 23 |
| 5.6 | Ownership of Personalty | 24 |
| 5.7 | Use of Proceeds | 24 |
| 5.8 | Construction Consultant | 24 |
| 5.9 | Promotion | 24 |
| 5.10 | Legal Requirements | 24 |
| 5.11 | No Duty of the Part of Lender | 25 |

**ARTICLE 6.:     LEASING AND TENANT MATTERS** ... 25

| | | |
|---|---|---|
| 6.1 | Approval of Leases | 25 |
| 6.2 | Preservation of Leases | 25 |
| 6.3 | Effect of Lease Approval | 25 |
| 6.4 | Income from the Project | 26 |
| 6.5 | Security Deposit Information | 26 |

**ARTICLE 7.:     ADDITIONAL COVENANTS** ... 26

| | | |
|---|---|---|
| 7.1 | Maintain Existence | 26 |
| 7.2 | Operation and Separateness | 26 |
| 7.3 | Books and Records | 26 |
| 7.4 | Inspection Rights | 27 |
| 7.5 | Reports and Notices | 27 |
| 7.6 | Future Financial and Operating Statements | 27 |
| 7.7 | Appraisals | 28 |
| 7.8 | ERISA | 28 |
| 7.9 | Conduct of Business | 28 |
| 7.10 | Zoning Changes | 28 |
| 7.11 | Taxes and Insurance | 28 |
| 7.12 | Property Management | 28 |
| 7.13 | Compliance With Anti-Terrorism Orders | 29 |

7.14    Comply with Other Loan Documents ................................................... 29
7.15    Other Acts ........................................................................................... 29

**ARTICLE 8.:**        **EVENTS OF DEFAULT AND REMEDIES** ................................. 29

8.1    Events of Default .................................................................................. 29
8.2    Remedies .............................................................................................. 31

**ARTICLE 9.:**        **ADDITIONAL PROVISIONS** ................................................. 33

9.1    Indemnification ..................................................................................... 33
9.2    Lender's Expenses ................................................................................ 34
9.3    Assignability ......................................................................................... 34
9.4    Relationship of the Parties .................................................................... 34
9.5    Participation .......................................................................................... 35
9.6    Hedge Contracts .................................................................................... 35
9.7    Further Assurances ................................................................................ 35
9.8    Inducement to Lender ............................................................................ 35
9.9    Commercial Purpose ............................................................................. 36

**ARTICLE 10.:**        **DOCUMENT PROTOCOLS** ................................................. 36

10.1    General Rules of Usage ........................................................................ 36
10.2    Notices ................................................................................................. 36
10.3    Severability .......................................................................................... 36
10.4    Remedies Not Exclusive ...................................................................... 37
10.5    Liability ................................................................................................ 37
10.6    Binding Obligations; Covenants Run with the Land ............................. 37
10.7    No Oral Modifications .......................................................................... 37
10.8    Entire Agreement ................................................................................. 37
10.9    Waiver of Acceptance .......................................................................... 37
10.10    Jurisdiction, Court Proceedings ............................................................ 37
10.11    Waiver of Counterclaim ....................................................................... 38
10.12    Waiver of Jury Trial ............................................................................. 38
10.13    No Waivers by Lender .......................................................................... 38
10.14    Waiver of Notice .................................................................................. 38
10.15    Offsets, Counterclaims and Defenses ................................................... 38
10.16    Time of the Essence ............................................................................. 39
10.17    Governing Law ..................................................................................... 39
10.18    Sole Discretion of Lender ..................................................................... 39
10.19    Counterparts; Electronic Delivery ........................................................ 39
10.20    Exhibits Incorporated; Headings .......................................................... 39
10.21    Interpretation ....................................................................................... 39
10.22    Remedies of Borrower and Guarantor ................................................... 39
10.23    Release of any Party or Project ............................................................ 40
10.24    Attorneys' Fees .................................................................................... 40
10.25    Method of Payment .............................................................................. 40
10.26    True Copy ............................................................................................. 40

# CONSTRUCTION LOAN AGREEMENT

**THIS CONSTRUCTION LOAN AGREEMENT** (this "**Loan Agreement**") is made and entered into as of December 23, 2004, by and between **CABANA WEST, L.P.**, an Alabama limited partnership ("**Borrower**"), and **SOUTHTRUST BANK**, an Alabama banking corporation ("**Lender**").

### R e c i t a l s :

Borrower has acquired in fee simple approximately 18.12 acres of real estate located in Panama City Beach, Bay County, Florida (the "Land") and intends to build a 268-unit Class-A apartment complex and related amenities and improvements on the Land (the "**Improvements**"). The Land and Improvements (collectively, the "**Project**") shall be known as the "Cabana West Apartments."

Borrower has applied to Lender for a loan in the amount of up to Eighteen Million and No/100 Dollars ($18,000,000.00) (the "Loan") to finance a portion of the costs of developing the Project.

Lender has agreed to make the Loan to Borrower, and Borrower and Lender have entered into this Loan Agreement to establish the terms and conditions of the disbursement of the Loan and the rights and obligations of Borrower with respect to the Loan and the Project.

**NOW, THEREFORE,** in consideration of the premises and of the mutual covenants, agreements, and warranties hereinafter set forth and of the sum of Ten Dollars ($10.00) in hand paid by each party hereto to the other, Borrower agrees with Lender, and represents and warrants to Lender, and Lender agrees with Borrower, as follows:

## ARTICLE 1.: DEFINED TERMS AND RULES OF CONSTRUCTION

1.1    <u>Glossary of Defined Terms</u>. In addition to any other terms that are defined in this Loan Agreement, the following terms shall have the following meanings unless the context hereof otherwise indicates:

"**Access Laws**" is defined in <u>Section 5.10</u> hereof.

"**Advance**" shall mean a disbursement by Lender, whether by journal entry, deposit to the Loan Account or any other account of Borrower, check to third party or otherwise, of any of the proceeds of the Loan, any insurance proceeds, or any funds deposited into the Deficiency Reserve.

"**Advance Request**" is defined in <u>Section 2.3</u> hereof.

"**Affiliate**" shall mean, as to any Person, any other Person (i) who directly or indirectly controls, is controlled by, or is under common control with such Person, (ii) who is a substantial creditor, customer, or supplier of such Person, (iii) who is a director, officer, manager, partner, member, shareholder, employee, or employer of such Person, or (iv) who is a member of the immediate family of such Person. "**Control**," as used in this definition, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, including the power to elect a majority of the directors or trustees of a corporation or trust, as the case might be.

"**Architect**" shall mean each Person selected by Borrower from time to time to render architectural or other design services with respect to the Improvements, subject to Lender's prior written approval as provided in this Loan Agreement.

"**Assignment**" shall mean the Assignment of Leases and Rents of even date herewith executed by Borrower for the benefit of Lender with respect to the Project, as from time to time amended, replaced, restated, supplemented, or consolidated pursuant to the applicable terms thereof.

"**Authorized Representative**" shall mean the Person or Persons designated as such in the Disbursement Authorization. If more than one Person is designated as an Authorized Representative, then the provisions of this Loan Agreement relating to the Authorized Representative shall apply to each such Person individually and not jointly with any or all other Persons designated as the Authorized Representative.

"**Borrower**" is defined in the preamble of this Loan Agreement and shall include any successor obligor of the Loan or any other Obligations from time to time, subject to the provisions of this Loan Agreement restricting the assignment or rights and the delegation of obligations hereunder.

"**Business Day**" shall mean a day that is not a public holiday and on which banks in Atlanta, Georgia, are customarily open for business.

"**Closing Date**" shall mean the date on which the initial Advance is made by Lender to Borrower hereunder.

"**Collateral**" shall mean the Project, each Lease, and all other real and personal property now or hereafter furnished by Borrower or any other Person as security for the Obligations, as described in the Security Instrument, this Loan Agreement, or any other Loan Document, whether such property currently exists or is hereafter acquired or created.

"**Commitment Fee**" shall mean a fee in the amount of $90,000.00 payable by Borrower to Lender pursuant to Section 2.13 hereof.

"**Completion Deadline**" shall mean the earliest of (i) January 10, 2008, or (ii) the date required for the completion of the Improvements (or any portion thereof) pursuant to the terms of any Permit or other Legal Requirements.

"**Construction Contract**" shall mean, separately and collectively, each contract or agreement entered into between Borrower and a Contractor pertaining to the development, construction, and completion of the Improvements, subject to Lender's prior written approval as provided in this Loan Agreement.

"**Construction Documents**" shall mean, collectively, (i) the Project Budget, (ii) the Plans and Specifications, (iii) the Construction Contract (including the Schedule of Values and the Construction Schedule relating thereto), (iv) any and all contracts and agreements entered into with Architect or any other Design Professional pertaining to the Improvements, (v) the Permits, and (vi) all other documents and reports used in preparation for or in the actual construction of the Improvements.

"**Contingency Reserve**" is defined in <u>Section 2.7</u> hereof.

"**Contractor**" shall mean Charter Construction Company, Inc., an Alabama corporation, and any other Person with whom Borrower contracts at any time for the development, construction, installation, and completion of the Improvements or any portion thereof, separately and collectively, and any replacement contractor approved in writing by Lender in accordance with the applicable provisions of the Loan Documents.

"**Cost Category**" shall mean each category of construction or non-construction cost set forth in the Project Budget and, as to construction costs, each line item cost category in the Schedule of Values.

"**Default**" shall mean the occurrence of any event or circumstance that, but for only the giving of any notice by Lender or the passage of any cure period (or both) required under the terms of this Loan Agreement or any other Loan Document, would constitute an Event of Default.

"**Default Rate**" is defined in the Note.

"**Design Professional**" shall mean the Architect and any other Person with whom Borrower contracts at any time for the provision of planning, design, architectural, engineering, or other similar services relating to the Improvements, separately and collectively.

"**Disbursement Authorization**" shall mean the Disbursement Authorization of even date herewith executed by Borrower for the benefit of Lender, as from time to time amended, replaced, restated, supplemented, restated, or consolidated pursuant to the applicable provisions hereof.

"**Event of Default**" is defined in <u>Section 8.1</u> hereof.

"**Governmental Authority**" shall mean any court, board, agency, commission, office, or authority of any nature whatsoever for any governmental or quasi-governmental unit (federal, state, county, district, municipal, city, or otherwise), whether now or hereafter in existence.

"**Guarantors**" shall mean any and all present or future endorsers, guarantors, and sureties of the Obligations or any portion thereof, separately and collectively. The initial Guarantors are Miles E. Hill, Jr. and Rudolph H. Beaver.

"**Guaranty**" shall mean each agreement or instrument at any time executed by any Guarantor for the benefit of Lender with respect to the Obligations, as from time to time amended, replaced, restated, supplemented, or consolidated pursuant to the applicable terms thereof.

"**Improvements**" is defined in the recitals to this Loan Agreement and such term more specifically includes all buildings, structures (surface and subsurface), and other improvements, fixtures, and equipment now existing or to be constructed or installed on the Land in accordance with the Plans and Specifications. The Improvements shall consists generally of 268 apartment units contained in six (6) residential buildings, a

clubhouse/leasing facility, surface parking improvements, utility and storm water drainage lines and facilities, and other related amenities and improvements.

"**Hedge Contract**" shall mean any agreement (including terms and conditions incorporated by reference therein) at any time executed between Borrower and Lender (or an Affiliate of Lender) in the nature of (i) a rate swap agreement, basis swap, forward rate agreement, commodity swap, commodity option, equity or equity index swap, bond option, interest rate option, foreign exchange agreement, rate cap agreement, rate floor agreement, rate collar agreement, currency swap agreement, cross-currency swap agreement, currency option or any other similar agreement (including any option to enter into any of the foregoing), (ii) any combination of the foregoing, or (iii) a master agreement for any of the foregoing, together with all schedules, confirmations and other supplements thereto.

"**Land**" is defined in the recitals to this Loan Agreement and is more particularly described in the Security Instrument.

"**Lease**" shall mean any existing and future lease, sublease, rental agreement, or other occupancy agreement, whether oral or written and whether or not of record, for the use or occupancy of any portion of the Project, together with all amendments thereto and renewals and extensions thereof, and all guaranties with respect thereto, all work letter agreements, improvements agreements, and other agreements with any tenant, all default letters or notices, estoppel letters, rental adjustment notices, escalations notices, and other correspondence in regard thereto, and all credit reports and accounting records in regard thereto.

"**Legal Requirements**" shall mean, as the case might be, any one or more of all present and future laws, codes, ordinances, orders, judgments, decrees, injunctions, rules, regulations, and requirements, even if unforeseen or extraordinary, of every duly constituted Governmental Authority (but excluding those which by their terms are not applicable to and do not impose any obligation on Borrower or the Project), including, without limitation, the requirements and conditions of any Permits and all covenants, restrictions, and conditions now or hereafter of record that might be applicable to Borrower or the Project or to the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair, or reconstruction of the Project, even if compliance therewith (i) necessitates structural changes or improvements (including changes required to comply with Access Laws) or results in interference with the use or enjoyment of the Project or (ii) requires Borrower to carry insurance other than as required by the provisions of this Loan Agreement, any other Loan Document, or any Lease.

"**Lender**" is defined in the preamable of this Loan Agreement and shall include any successor holder of the Loan from time to time.

"**Lender's Consultant**" shall mean the Person designated as such from time to time by Lender.

"**Loan**" shall mean the loan in the maximum principal amount of $18,000,000.00 to be made by Lender to Borrower pursuant to the terms and conditions of this Loan Agreement, as evidenced by the Note.

"**Loan Account**" shall mean the depository account established by Borrower with Lender, as more particularly identified in the Disbursement Authorization.

"**Loan Agreement**" shall mean this Construction Loan Agreement, as from time to time amended, replaced, restated, supplemented, restated, or consolidated pursuant to the applicable provisions hereof.

"**Loan Documents**" shall mean collectively this Loan Agreement, the Note, the Security Instrument, the Assignment, the Guaranty, and any other document now or hereafter executed by Borrower, Guarantor, or any other Person that evidences, relates to, is executed in connection with, or secures the Loan.

"**Material Adverse Effect**" shall mean, with respect to any circumstance, act, condition, or event of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singly or in conjunction with any other event or events, act or acts, condition or conditions, or circumstance or circumstances, whether or not related, a material adverse change in or a materially adverse effect upon any of (i) the business, operations, property, or condition (financial or otherwise) of any Obligor, (ii) the present or future ability of any Obligor to perform the Obligations for which it is liable under the terms of any Loan Document, (iii) the validity, priority, perfection or enforceability of this Loan Agreement or any other Loan Document or the rights or remedies of the Lender under any Loan Document, or (iv) the value of, or the Lender's ability to have recourse against, the Project or any other Collateral.

"**Minimum Equity Contribution**" shall mean the contribution of equity required from Borrower to fund the excess of Project Costs, as stated in the Project Budget, over the maximum principal amount of the Loan.

"**Note**" shall mean each and every promissory note evidencing Borrower's promise to repay the Loan or any portion thereof, with interest thereon, as the same might hereafter be amended, extended, renewed, replaced, supplemented, restated, or consolidated pursuant to the applicable provisions thereof.

"**Obligations**" shall mean the aggregate of all principal and interest owing from time to time under the Note, and all expenses, charges, and other amounts from time to time owing under the Note, this Loan Agreement, or any other Loan Document, and all covenants, agreements, and other obligations from time to time owing to, or for the benefit of, Lender pursuant to the Note, this Loan Agreement, and any other Loan Document.

"**Obligor**" shall mean Borrower, each general partner of Borrower (if any), and each Guarantor.

"**Operating Statement**" shall mean each operating statement, including income and expense statement and statement of cash flows, to be delivered by Borrower to Lender with respect to the Project, which shall be prepared in accordance with generally accepted accounting principles consistently applied throughout the periods covered by such statement and shall fairly present the financial condition of Borrower and the Project as of the date thereof and the results of operations and changes in financing position of Borrower and the Project for the periods then ended. Each Operating Statement shall be

prepared on an accrual basis or, in the alternative, Borrower shall provide Lender all data necessary to constitute the adjustments necessary to convert such Operating Statement to an accrual basis Operating Statement.

"**Permit**" shall mean each license, permit, certificate, approval, authorization, or registration that, under Legal Requirements, are required to be obtained from any Governmental Authority or any other Person with respect to the ownership, construction, rental, operation, use, or occupancy of the Project, including, without limitation, building permits, environmental permits, the approval of owners' associations, architectural control committee, or other similar Persons, business licenses, zoning approvals and variances, liquor licenses, food and beverage service licenses, and licenses to conduct business, and all such other permits, licenses, and rights.

"**Permitted Encumbrances**" shall mean collectively (i) liens at any time existing in favor of Lender, (ii) statutory liens incurred in the ordinary course of business for the purchase of labor, services, materials, equipment, or supplies, or with respect to workmen's compensation, unemployment insurance, or other forms of governmental insurance or benefits, which are not delinquent or are paid or bonded and removed of record in a manner satisfactory to Lender, (iii) liens for real property taxes, assessments, or governmental charges or levies for the current year, the payment of which is not delinquent, (iv) any Lease approved (or deemed approved) by Lender pursuant to the terms of this Loan Agreement, and (v) any other matter affecting title to the Land approved by Lender in writing in Lender's sole discretion.

"**Person**" shall mean any individual, corporation, partnership, joint venture, association, trust, unincorporated organization, and any Governmental Authority.

"**Plans and Specifications**" shall mean the plans and specifications for the Improvements approved by Lender, as more particularly described in Exhibit C attached hereto and made a part hereof, as the same might be amended or supplemented from time to time in accordance with the provisions of this Loan Agreement.

"**Project**" is defined in the recitals to this Loan Agreement.

"**Project Budget**" shall mean the detailed budget of construction and non-construction costs to be incurred in connection with the Project attached hereto as Exhibit A, as the same might hereafter be amended or supplemented with the consent of Lender as provided in this Loan Agreement.

"**Qualified Stored Materials**" shall mean building materials purchased and stored in compliance with the provisions of Section 2.7.2 hereof.

"**Rent Roll**" shall mean each rent roll for the Project to be delivered by Borrower to Lender pursuant to this Loan Agreement, each of which shall include (i) a description of the demised premises under each Lease (by rentable square feet and location or unit number), (ii) the name of the current Tenant, (iii) the commencement and expiration dates of the original term of the Lease and any renewal terms thereof, (iv) the rents payable during the term thereof, (v) the amount and age of all delinquent rents, (vi) all rents prepaid by Tenant, (vii) all concessions, allowances, credits, and abatements granted to each Tenant, (viii) the security deposit given by each Tenant and interest accrued thereon, and (ix) the identification of any security given to secure each Tenant's

obligations including, without limitation, the identity of any guarantor of such Tenant's Lease.

"**Retainage**" means ten percent (10%) of the actual costs of the completed construction of the Improvements, as determined by Lender's Consultant, until the Improvements are fifty percent (50%) complete, as determined by Lender's Consultant, after which time there shall be no retainage. The Retainage shall in no event, and notwithstanding anything to the contrary set forth in this Loan Agreement, be less than the amount actually held back by Borrower pursuant to the Construction Contract or otherwise from Contractor or any other Person providing labor or materials for the Improvements.

"**Schedule of Values**" is defined in Section 2.3 hereof.

"**Security Documents**" refers collectively to the Security Instrument, the Assignment, this Loan Agreement, the Guaranty, and any other present or future Loan Document that is intended to secure the payment and performance of the Obligations or any portion thereof.

"**Security Instrument**" shall mean the Mortgage and Security Agreement of even date herewith executed by Borrower for the benefit of Lender with respect to the Project, as the same might hereafter be amended, extended, replaced, supplemented, restated, or consolidated pursuant to the applicable provisions thereof.

"**Tenant**" shall mean the tenant under any Lease, any guarantor of such tenant's obligations under such Lease, and their respective successors, heirs, personal representatives, and permitted assigns and sublessees.

"**Title Insurance Company**" shall mean the title insurance company (or, if Lender so requires, by multiple title companies on a re-insured or co-insured basis, at Lender's option) issuing the mortgagee's policy of title insurance with respect to the Loan, as approved by Lender in its discretion.

1.2   Rules of Construction. When used in this Loan Agreement or any other Loan Document, (i) references to a Person are, unless the context otherwise requires, also to such Person's heirs, executors, legal representatives, successors, and assigns, as applicable, (ii) the words "hereof", "herein", "hereunder", and comparable terms refer to the entire Loan Document in which such terms are used and not to any particular article, section, or other subdivision thereof or attachment thereto, (iii) references to any gender include, unless the context otherwise requires, references to all genders, and references to the singular include, unless the context otherwise requires, references to the plural, and vice versa, (iv) the words "shall" and "will" have equal force and effect, (v) references in a Loan Document to "Article," "Section," "paragraph" or another subdivision or to an attachment are, unless the context otherwise requires, to an article, section, paragraph, or subdivision of or an attachment to such Loan Document, (vi) all accounting terms not otherwise defined therein have the meanings assigned to them in accordance with generally accepted accounting principles, and (vii) the words "include", "includes", and "including" shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by such words or words of like import.

1.3   Date of Loan Documents. The date of this Loan Agreement or any other Loan Document is intended as a date for the convenient identification of this Loan Agreement or such other Loan

Document and is not intended to indicate that this Loan Agreement or such other Loan Document was executed and delivered on said date by any party hereto.

## ARTICLE 2.: THE LOAN

2.1    <u>Agreement to Lend and Borrow.</u>  Subject to the terms and conditions set forth in this Loan Agreement and the other Loan Documents, Borrower agrees to borrow from Lender, and Lender hereby agrees to lend to Borrower, the Loan.  The proceeds of the Loan shall be disbursed in periodic Advances as provided in this Article, which Advances shall not exceed in the aggregate the maximum principal amount of the Loan.  Lender's commitment to make Advances shall expire and terminate automatically upon the earliest of (i) the Completion Deadline, (ii) the date the Loan is prepaid in full, and (iii) the occurrence of an Event of Default.  Borrower acknowledges and agrees that the Loan is not a revolving credit facility, and Borrower shall not have the right to re-borrow any principal sums repaid under the Loan.  Each Advance made by Lender hereunder shall constitute an advance of principal under the Note, as and when such Advance is made.  Interest will accrue on all Advances outstanding from time to time at the rate or rates of interest stated in the Note.  Interest shall be calculated only on Advances that are actually disbursed by Lender (or deemed disbursed by Lender) hereunder and only from the dates of such actual or deemed disbursement.  Borrower shall pay the principal of, and accrued interest on, the Loan in accordance with the provisions of the Note.  Borrower's right to prepay the principal of the Loan shall be governed by the Note.  Each Advance, together with accrued interest thereon, and all other Obligations of Borrower under this Loan Agreement and the other Loan Documents, shall at all times be secured by the Security Documents without any further action on the part of Lender or any other Person.

2.2    <u>Use of Loan Proceeds.</u>  Borrower shall use the proceeds of the Loan solely and exclusively to pay the costs, expenses, and fees incurred, and to be incurred, by Borrower in respect to the Project and the Loan, if and to the extent that such costs are specifically included in the Cost Categories set forth in the Project Budget.  The Project Budget has been prepared by Borrower, and Borrower represents to Lender that the Project Budget includes all costs incident to the Loan and the Project through the maturity date of the Loan after taking into account the requirements of this Loan Agreement, including "hard" and "soft" costs, fees and expenses.  Unless approved by Lender in its sole discretion, no Advance shall be made (i) for the payment of any cost or expense not set forth in the Project Budget or (ii) subject to <u>Section 2.6</u> below, from any Cost Category set forth in the Project Budget that, when added to all prior Advances from that Cost Category, would exceed the lesser of (A) the actual costs incurred by Borrower under such Cost Category or (B) the total amount allocated under such Cost Category in the Project Budget.

2.3    <u>Advance Requests.</u>  Not less than five (5) Business Days prior to the date on which Borrower desires an Advance, Borrower shall submit to Lender a written request for the Advance in the form attached hereto as <u>Exhibit B</u> (an "**Advance Request**").  Each Advance Request must be accompanied by (i) the Contractor's written application for payment utilizing the American Institute of Architect's Forms G-702 and G-703, (ii) the Project Budget and the itemized schedule of values prepared by Contractor of the total "hard costs" of construction, as approved by Lender (the "**Schedule of Values**"), (iii) all costs incurred to the date of the Advance Request incident to the Loan, the Project, and the construction of the Improvements, which costs have been itemized under the applicable Cost Categories in the Project Budget and, as to construction costs, the Schedule of Values, and the percentage of completion of each Cost Category in the Project Budget and the Schedule of Values, (iv) **the written approval of Rudolph H. Beaver with respect to such Advance Request,** and (v) such schedules, affidavits, releases, waivers, statements, invoices, bills, and other documents as Lender may reasonably request.  The accuracy of the cost breakdown and the percentage of completion in the Advance Request must certified by Borrower and, with respect to construction costs, Architect and Contractor, and shall be subject to the review and approval of Lender's Consultant.  Prior to the funding of any Advance Request

that includes construction costs, Lender may require that such construction be reviewed and approved by the Architect and Lender's Consultant, who shall certify to Lender as to the approval of the construction, the cost of completed construction, the percentage of completion, and the compliance of the Improvements with the Plans and Specifications.

2.4     <u>Authorized Representative</u>.  Borrower appoints the Authorized Representative as its agent to submit Advance Requests.  Borrower represents and warrants that the Authorized Representative has authority, to prepare and submit Advance Requests and to collect or otherwise deal with any disbursement of an Advance, **provided, however, that each Advance Request submitted by the Authorized Representative shall be accompanied by the written approval of Rudolph H. Beaver with respect to such Advance.**  Lender may rely solely upon all certifications and representations made by the Authorized Representative with respect to any Advance Request.  The authority of an Authorized Representative may be revoked or modified only by a writing executed by Borrower and delivered to an officer of Lender.  Lender shall not be liable for any Advance made in good faith and at the request of the Authorized Representative or for any Advance made prior to Lender's actual receipt of notice from Borrower that the authority of the Authorized Representative has been revoked or modified.

2.5     <u>Calculation of Advance Amount</u>.  The amount of any Advance to be made by Lender pursuant to an Advance Request shall be limited to (i) the lesser of (A) the actual cost of the completed portion of the Improvements and (B) the scheduled value of each completed portion of the Improvements as set forth in the Schedule of Values, as certified by the Contractor and Architect and approved by Lender's Consultant, plus (ii) the costs of Qualified Stored Materials, minus (iii) the Retainage applicable to the amount determined pursuant to items (i) and (ii) above, plus (iii) allowable non-construction expenses actually incurred by Borrower within the applicable Cost Category set forth in the Project Budget, minus (iv) the aggregate amount of Advances previously disbursed by Lender.  Lender may reduce any Advance requested by Borrower or, on account of subsequently discovered evidence, withhold from a subsequent Advance requested by Borrower, or require Borrower to repay to Lender the whole or any part of any earlier Advance made to Borrower, to such extent as may be necessary to protect the Lender from loss on account of (i) defective work not remedied or requirements of this Loan Agreement not performed, (ii) duplicative work for which an Advance has already been made, (iii) liens filed or reasonable evidence indicating probable filing of liens, or (iv) failure of Borrower or any Contractor to make payments to subcontractors for material or labor.

2.6     <u>Reallocation Among Cost Categories</u>.  Lender reserves the right, in its sole discretion, either at the request of Borrower or, from and after the occurrence and during the existence of an Event of Default, at Lender's own accord, to make Advances for the payment of costs allocated to any Cost Category for such other purposes or in such different proportions as Lender may, in its sole discretion, deem necessary or advisable.  Borrower shall not be entitled to require that Lender reallocate funds among the Cost Categories, except with respect to (i) a Permitted Change Order, (ii) a reallocation from the Contingency Reserve following Lender's approval as provided in <u>Section 2.7.1</u> below, and (iii) a reallocation of any true cost savings realized within any completed Cost Category (as determined by Lender based upon such evidence that Lender might reasonably request to confirm that no additional costs shall be incurred under such Cost Category) to the Contingency Reserve.  Notwithstanding anything to the contrary in this Section or in Section 2.7 below, in no event will Borrower have the right to reallocate funds to any Cost Category that includes costs payable to Borrower or any Affiliate of Borrower, including, without limitation, development fees, general administrative or overhead expenses, or consulting fees payable to Borrower or any Affiliate of Borrower.

2.7     <u>Restrictions Applicable to Specific Advances</u>.  In addition to the restrictions applicable to Advances generally set forth in this Article, any Advance made for the purposes described below shall be subject to the following additional restrictions and conditions:

---

2.7.1    *Contingency Reserve*.  The Project Budget contains one or more Cost Categories designated as "Contingency", which represents Loan proceeds that have been allocated for disbursement by Lender, in Lender's discretion, to pay contingent costs and expenses of constructing, maintaining, leasing, and promoting the Project and such other costs or expenses as Lender shall approve (such allocated Loan proceeds being referred to herein as the **"Contingency Reserve"**).  Lender shall not unreasonably withhold its consent to the disbursement of funds from the Contingency Reserve, or the reallocation of funds from the Contingency Reserve to another Cost Category, so long as (i) no Event of Default has occurred and is continuing and (ii) Lender is satisfied that the undisbursed balance of the Contingency Reserve is sufficient taking into consideration the scope of the work remaining to be completed and all other relevant circumstances.

2.7.2    *Interest Reserve*.  The Project Budget contains a Cost Category designated as "Construction Period Interest", which represents the allocation of Loan proceeds for the payment of accrued interest on the Loan as and when due under the Note (such allocation being the **"Interest Reserve"**).  Lender may, in Lender's discretion, make an Advance from the Interest Reserve by journal entry to pay interest and financing costs, regardless of whether Borrower has included interest and such financing costs in an Advance Request, and any such Advance shall have equal footing with any other Advance made by Lender hereunder.  Advances from the Interest Reserve shall be made only to the extent that cash receipts from the Project for the Project of any nature are insufficient to pay such accrued interest, notwithstanding that the Interest Reserve has not been fully disbursed by Lender.  Interest will accrue on any Advance disbursed from the Interest Reserve in the same manner that interest accrues on any Advance made for any other purpose.  If at any time the Interest Reserve is reduced to an amount that is less than the total estimated amount of interest to accrue on the Loan until such time as the Project will generate sufficient net operating income to pay such interest, Borrower shall, within ten (10) days of written notice from Lender, deposit cash with Lender in the amount of such deficiency.

2.7.3    *Development Fee Reserve*.  The Project Budget contains a Cost Category designated as "Developer Fee/Overhead", which represents the allocation of a portion of the Loan proceeds for the payment of development fees and/or general overhead expenses incurred by Borrower or its Affiliate in connection with the Project (the **"Development Fee and Overhead Reserve"**).  Advances from the Development Fee and Overhead Reserve shall be made, following an appropriate Advance Request from Borrower, in amounts corresponding to the percentage-of-completion of the Improvements.  For example, if the Architect and the Contractor certify, and Lender's Consultant confirms, that the Improvements are forty percent (40%) complete, Borrower may request an Advance from the Development Fee and Overhead Reserve in an amount equal to (i) forty percent (40%) of the total amount originally allocated for development fees in the Project Budget, minus (ii) all prior Advances disbursed for development fees.

2.7.4    *Stored Materials*.  Lender shall not be obligated to make an Advance for the payment of building materials that have been delivered to Borrower but have not yet been used in the construction of the Improvements (**"Stored Materials"**), unless Lender receives satisfactory evidence that such building materials for which Borrower desires an Advance are either stored in a bonded warehouse approved by Lender and available for inspection by Lender's Consultant or stored at the Project in a locked and otherwise secure storage arrangement acceptable to Lender and insured in an amount acceptable to Lender.  In no event will Lender approve an Advance to pay for Stored Materials more

than ninety (90) days prior to the date such Stored Materials are to be used in the construction of the Improvements. Borrower shall provide Lender with a detailed listing of and invoices for all Stored Materials.

2.8    Lender's Right to Limit Total Advances.    Notwithstanding anything to contrary in this Loan Agreement, Lender reserves the right to limit the aggregate amount of Advances outstanding under the Loan at any time to an amount that, when deducted from the maximum principal amount of the Loan, leaves a balance to be advanced that is equal to the cost of completing the Improvements and remaining non-construction expenses relating to the Loan and the Improvements, as reasonably estimated by Lender, including, but not limited to, amounts to become due pursuant to any Design Service Contract or Construction Contract, amounts to complete the Improvements but not yet included in any Design Services Contract or Construction Contract, estimated interest costs, fees, and expenses of Lender and its counsel, estimated fees for Permits, estimated fees and expenses of Lender's Consultant, and estimated recording and title insurance costs, plus the Retainage applicable to the total amount of construction costs, all as reasonably determined by Lender from time to time.

2.9    Frequency and Delivery of Advances.    Lender shall not be obligated to make Advances more frequently that once each calendar month. Advances will originate at Lender's main office located in Birmingham, Alabama (or such other place as Lender might designate from time to time) and shall be deposited into the Loan Account. Borrow will make withdrawals from the Loan Account only for the purpose of paying costs included in a Advance Request approved by Lender and for no other purpose. Borrower shall furnish to Lender, upon Lender's request, a list of all disbursements from the Loan Account, including all Persons to whom disbursements are made and the amounts thereof to each.

2.10    Direct Advances.    Regardless of whether Borrower has submitted a Advance Request therefor, Lender may from time to time make Advances for payment of amounts that become due for non-construction expenses for which Borrower is responsible for payment, including, but not limited to, interest on the Loan. Such Advances may be made directly to parties to whom such amounts are due or to Lender to reimburse Lender for sums due to it. All such Advances to Persons other than Borrower shall be deemed Advances to Borrower hereunder and shall be included within the Obligations to the same extent as if they were made directly to Borrower.

2.11    Representations and Warranties.    Each submission by Borrower to Lender of an Advance Request will constitute Borrower's automatic representation and warranty to Lender that (i) all conditions to the Advance set forth in this Loan Agreement are satisfied, (ii) the completed construction of the Improvements is in accordance with the Plans and Specifications and Legal Requirements, (iii) no Default or Event of Default then exists, (iv) all representations and warranties of Borrower contained in this Loan Agreement and the other Loan Documents are true in all material respects as of the date of the Advance Request, and (v) the proceeds of all prior Advances have been used by Borrower as provided in the Advance Requests submitted with respect thereto and in conformity with the terms and conditions of this Loan Agreement.

2.12    No Implied Approval of Construction.    The making of an Advance by Lender will not constitute Lender's approval or acceptance of the construction of the Improvements theretofore completed. The inspection and approval by Lender or Lender's Consultant of the Plans and Specifications, the construction of the Improvements, or the workmanship and materials used therein will impose no liability of any kind on Lender, the sole obligation of Lender as the result of such inspection and approval being to make the Advances if, and to the extent, required by this Loan Agreement. Lender has not undertaken and disclaims any duty or responsibility to inspect the progress of construction or to monitor the proper application by Borrower, Contractor, or other Persons of funds disbursed pursuant hereto, and Borrower acknowledges and agrees that it must satisfy itself as to the status of construction,

the workmanship and materials used therein, and the application of moneys by Contractor or other Persons. Neither Contractor nor any other Person furnishing labor or materials for the Project is a third-party beneficiary of this Loan Agreement or any other Loan Documents.

2.13    Commitment Fee. The Commitment Fee shall be due and payable by Borrower on the Closing Date. The Commitment Fee shall not be subject to refund or rebate under any circumstance whatsoever, including, without limitation, the prepayment of the Loan. The Commitment Fee is intended to compensate Lender for the costs associated with the origination, structuring, processing, approving, and closing of the transactions contemplated by this Loan Agreement, including, but not limited to, administrative and general overhead, but not including any out-of-pocket or other expenses for which Borrower has agreed to reimburse Lender pursuant to any other provisions of this Loan Agreement or any of the Loan Documents. The Commitment Fee shall be in addition to any other fees or charges payable by Borrower or any other Person under this Loan Agreement or any other Loan Document.

2.14    Borrower's Minimum Equity Contribution; Borrower's Deposits.

2.14.1 *Minimum Equity Contribution.* Borrower shall inject the Minimum Equity Contribution into the Project in cash. In lieu of requiring Borrower to inject the entire Minimum Equity Contribution into the Project prior to any disbursement of the proceeds of the Loan, Borrower shall pledge and deposit with Lender a certificate of deposit, an irrevocable letter of credit, or a combination of the two, in an amount of not less than the Minimum Equity Contribution, the form, content and terms of which shall be acceptable to Lender in its sole and absolute discretion (the "**Equity Contribution Collateral**"). Thereafter, the required Minimum Equity Contribution amount shall be funded in cash by Borrower pari passu (based on the ratio or percentage of the total construction costs, estimated to be $21,319,680.00, represented by the Equity Contribution [$3,319,680 ÷ 21,319,680 = 15.57%) with each Advance of Loan proceeds. To the extent the required Equity Contribution has been funded in cash by Borrower as determined by Lender, Borrower shall be permitted from time to time (but not more than once every 3 months), as agreed between Borrower and Lender, to reduce the face amount of the Equity Contribution Collateral to an amount equal to the cash Minimum Equity Contribution remaining to be paid by Borrower.

2.14.2 *Borrower's Deposit.* In addition, if at any time Lender determines that the any undisbursed portion of the Loan is or shall be insufficient to pay the costs to be incurred in connection with the construction of the Improvements, including direct and indirect costs and work performed but for which payment has not been made, and to pay all non-construction costs, including interest accrued and to accrue on the Loan and any other sums due pursuant to the terms of this Loan Agreement, Borrower shall, within seven (7) days after written notice from Lender, deposit with Lender the amount of the deficiency ("**Borrower's Deposit**") in the Loan Account. Borrower's Deposit and the Loan Account are hereby pledged to Lender as additional security for the Loan, and Borrower hereby grants and conveys to Lender a security interest in all funds so deposited with Lender as additional security for the Loan. Prior to disbursing any Advance under the Loan, Lender may advance all or a portion of Borrower's Deposit in payment of construction and non-construction costs. Upon the occurrence of an Event of Default, Lender may (but shall have no obligation to) apply all or any part of Borrower's Deposit against the unpaid Obligations in such order as Lender determines.

2.15    No Waiver. The provisions of this Article are solely for the benefit of Lender. Lender may, at its election, make one or more advances of the Loan to Borrower upon written or oral disbursement requests not complying with the requirements of this Article. All such advances shall, in the absence of bad faith by Lender, conclusively be deemed to be Advances of the Loan to Borrower hereunder and shall be included within the Obligations to the same extent as if they were made in strict compliance with the requirements of this Article.

## ARTICLE 3.:  CONDITIONS TO LENDING

3.1    <u>Conditions Precedent to Initial Advance</u>.    The obligations of Lender under this Agreement, including, without limitation, the obligation of Lender to make the initial Advance to Borrower hereunder, are subject to Lender's receipt of the following items:

3.1.1    *Loan Documents*.  An original counterpart of this Loan Agreement, the Note, the Security Instrument, the Guaranty Agreement, and each other Loan Document, duly executed and delivered by Borrower and Guarantor, to the extent a party thereto;

3.1.2    *Payment of Fees and Expenses*.  Payment of the Commitment Fee and any other fees payable pursuant to the Loan Documents and payment or reimbursement of all expenses incurred by or due to Lender with respect to the Loan, the Loan Documents, and the Project, including, but not limited to, a tax service monitoring fee in the amount of $500.00, an appraisal review fee in the amount of $351.00, environmental review fee in the amount of $500.00, recording fees and taxes relating to the Loan Documents (including intangibles taxes and documentary stamp taxes), title insurance premiums, and fees and expenses of Lender's counsel and Lender's Consultant;

3.1.3    *Proceedings*.  Certified copies of the organizational documents of each Obligor who is not a natural Person (and, if required by Lender, each constituent entity of such Obligor), together with evidence that each such Obligor is qualified, registered, and in good standing in the state of its organization or formation and in the state where the Project is located (or evidence satisfactory to Lender and its counsel that such qualification and registration is not required under Legal Requirements), and certified resolutions of the governing body of each such Obligor authorizing the Loan, the execution and delivery of the Loan Documents to which it is a party, and the consummation or undertaking of all Obligations;

3.1.4    *Survey*.  A current survey of the Land prepared by a registered land surveyor in accordance with Lender's standard survey requirements and including the certification of the surveyor as to whether the Land or any portion thereof is within or without a special flood hazard area according to a FIA flood hazard boundary map issued by the Department of Housing and Urban Development Federal Insurance Administration, and following completion of the foundations of the Improvements, receipt by Lender of redated surveys with such additional matters included as Lender shall request;

3.1.5    *Title Insurance*.  A binding commitment from the Title Insurer for the issuance of a title insurance policy for the benefit of Lender in the amount of the Loan, in form and content acceptable to Lender, which insures that Lender holds a valid first security title and security interest in the Project pursuant to the Security Instrument, free and clear of all defects and encumbrances except the Permitted Encumbrances, and containing (i) full coverage against liens of mechanics, materialmen, laborers, and any other parties who might claim statutory or common law liens, (ii) no other "standard exceptions" to coverage, including survey exceptions, other than those approved by Lender, (iii) a "pending disbursement clause" in form and substance satisfactory to counsel for Lender, and (iv) any additional endorsements reasonably required by Lender;

3.1.6    *Lien Search*.  A certification from the Title Insurer or an attorney acceptable to Lender (which shall be updated from time to time at Borrower's expense

upon request by Lender) that a search of the public records disclosed no conditional sales contract, chattel mortgages, leases of personalty, financing statements, title retention agreements, tax liens, or judgment liens that affect the Collateral, except the Permitted Encumbrances;

3.1.7    *Appraisal.*  A written appraisal of the Project, which appraisal report is prepared by an appraiser selected by Lender and shall otherwise be acceptable to Lender in all respects, and based upon such appraisal report, Lender determines that the maximum principal amount of the Loan does not exceed seventy-three percent (73%) of the fair market value of the Project;

3.1.8    *Environmental Assessment.*  An environmental site assessment of the Land and any existing Improvements prepared in conformity with Lender's standard guidelines and otherwise acceptable to Lender in all respects;

3.1.9    *Insurance.*  Suitable policies of insurance against fire and other hazards in accordance with applicable requirements of this Loan Agreement, the Security Instrument, and Legal Requirements;

3.1.10    *Access and Utilities.*   Evidence satisfactory to Lender as to (i) the methods of access to and egress from the Land and nearby or adjoining public ways, meeting the reasonable requirements of projects that are similar to the Project and the status of completion of any required improvements to such access, (ii) the availability of storm and sanitary sewer facilities meeting the reasonable requirements of the Project, and (iii) the availability of all other required utilities, in location and capacity sufficient to meet the reasonable needs of the Project;

3.1.11    *Legal Requirements.*  Evidence satisfactory to Lender that (i) all requisite Permits relating to environmental matters, sanitary facilities, the Plans and Specifications, and any other matters that are subject to the jurisdiction of any Governmental Authority have been issued in favor of Borrower and are in full force and effect, and (ii) the Land and the intended use thereof is, and upon completion of the Improvements shall be, in full compliance with the zoning, subdivision, and all other applicable Legal Requirements;

3.1.12    *Construction Contract.*  A certified copy of a fixed-price or guaranteed maximum price Construction Contract with a Contractor acceptable to Lender and providing for fixed-price or guaranteed maximum price in an amount not greater than the amount allocated to construction in the Project Budget and otherwise containing terms and conditions acceptable to Lender, together with (i) Contractor's Completion Schedule and Schedule of Values, (ii) payment and performance bonds in the full amount of the Construction Contract issued by a surety company, and containing terms and conditions, acceptable to Lender, with a dual obligee rider in favor of Lender, and (iii) a certificate and agreement executed by Contractor in favor of Lender, in form and content satisfactory to Lender, whereby each Contractor (A) consents to Borrower's assignment to Lender of the Construction Contract and any other Construction Documents in which Contractor has an interest, (B) subordinates any lien that Contractor might at any time have against the Project or any part thereof to Lender's interest in the Project, and (C) addresses such other matters as Lender might required with respect to the Project and Contractor's obligations under the Construction Contract;

3.1.13  *Other Construction Documents.*  A certified copy of any contract or agreement with each Design Professional for the Project, in form and content acceptable to Lender, together with (i) a complete set of the Plans and Specifications and (ii) a certificate and agreement executed by each Design Professional in favor of Lender in form and content similar to that described above with respect to Contractor;

3.1.14  *Pre-Construction Review.*  A pre-construction review report prepared by Lender's Consultant of the Plans and Specifications and the other Construction Documents, which report (a) confirms to Lender for Lender's sole and exclusive benefit that, in the opinion of Lender's Consultant, (i) the Plans and Specifications appear to be complete and comply with Legal Requirements, (ii) the amounts set forth in the Project Budget allocable to the construction of the Improvements are reasonably sufficient to complete the Improvements and all amounts budgeted for other purposes in the Project Budget appear reasonably sufficient, (iii) all Permits for construction and completion of the Improvements have been obtained, and (iv) all other Construction Documents are in proper form, are sufficient to complete all material parts of the work in connection with the Improvements covered thereby in a timely manner prior to the Completion Deadline, and the amounts of all subcontracts executed to date are in the aggregate in line with the amounts contained in the Project Budget and the Schedule of Values, and (b) addresses such other construction issues as Lender might reasonably request;

3.1.15  *Equity Contribution Collateral.*  Borrower shall have pledged and deposited with Lender the Equity Contribution Collateral  in form and content as is satisfactory to Lender;

3.1.16  *Standard Lease.*  A certified copy of the standard form of Borrower's standard lease form for the Project, the terms and conditions of which must be satisfactory to Lender.

3.1.17  *Management Agreement.*  A certified copy of any property management agreement or leasing agreement, if any, relating to the Project, which contains terms and conditions, and is with a property manager or leasing agent, as the case might be, satisfactory to Lender, together with a subordination agreement, in form satisfactory to Lender, pursuant to which any property manager or leasing agent subordinates its rights under the property management agreement or leasing agreement, as the case might be, to the Loan and Lender's interest in the Project and addresses such other matters as Lender might request;

3.1.18  *Legal Opinions.*  An opinion of legal counsel for each Obligor in form and substance satisfactory to Lender's counsel;

3.1.19  *Advance Conditions.*  All conditions set forth in <u>Section 3.2</u> have been satisfied with respect to the initial Advance; and

3.1.20  *Other Matters.*  Such additional certificates, proceedings, instruments, and other documents required pursuant to Lender's standard underwriting requirements or as Lender or its counsel might reasonably request to evidence (i) Borrower's compliance with Legal Requirements, (ii) the truth and accuracy of the representations and warranties of Borrower or any other Obligor in any Loan Document, and (iii) the due performance or satisfaction by Borrower, at or prior to the date hereof, of all agreements required to be performed and all conditions required to be satisfied by Borrower pursuant hereto.

---

3.2    <u>Conditions Precedent to Construction Advances</u>.  Lender's obligation to make any Advance hereunder is subject to the performance by Borrower of its Obligations to be performed hereunder at or prior to the disbursement of such Advance and to the satisfaction of the following conditions at the time of (and after giving effect to) the making of such Advance:

3.2.1    *No Default*.  After giving effect to the Advance to be made, no Default or Event of Default has occurred or will occur as of the date of such Advance;

3.2.2    *Submission of Advance Request*.  Borrower has delivered to Lender a duly completed and executed Advance Request and all other documentation and information required under <u>Article 2</u> of this Loan Agreement;

3.2.3    *Accuracy of Representations and Warranties*.  All representations and warranties of Borrower and the other Obligors contained in the Loan Documents (other than those representations and warranties which are, by their terms, expressly limited to the date made or given) are true and correct in all material respects with the same effect as if those representations and warranties are made and republished on and as of the date of such Advance;

3.2.4    *No Adverse Events*.  As of the date of making such Advance, no event has occurred, nor does any condition exist, that could have a Material Adverse Effect;

3.2.5    *No Violations*.  The Advance to be made and the use thereof does not contravene, violate, or conflict with, or involve Lender in any violation of, any Legal Requirement;

3.2.6    *Casualty or Condemnation*.  The Improvements have not have been damaged and not repaired and are not be the subject of any pending or threatened condemnation or adverse zoning proceeding;

3.2.7    *Borrower's Equity*.  Borrower has made any required Minimum Equity Contribution and Borrower's Deposit in accordance with <u>Section 2.14</u> hereof;

3.2.8    *Subcontracts*.  Each subcontract or other contract for labor, materials, services and/or other work included in the Advance Request has been duly executed and delivered by all parties thereto and is effective, and Lender has received a true and complete copy of a fully executed copy of each such subcontract or other contract as Lender might have requested, together with performance and payment bonds securing such contracts and subcontracts, to the extent required by Lender, in form and substance satisfactory to Lender;

3.2.9    *No Mechanic's Liens*.  No mechanic's or materialmen's lien or other encumbrance has been filed and remains in effect against the Project, no stop notices has been served on Lender that has not been bonded by Borrower in a manner and amount satisfactory to Lender, and Borrower has furnished duly sworn and executed partial or interim lien waiver from Contractor and, if Title Insurer so requires, each subcontractor, laborer, supplier, or other Person who has furnished labor or materials to, or performed work on, the Improvements, in form satisfactory to Title Insurer, showing amounts paid and due to all such Persons shall have been obtained (and, to the extent required by Lender, copies thereof shall have been delivered to Lender);

3.2.10 *Title Update*.  Borrower has delivered, or has caused Title Insurer to deliver, to Lender, at Borrower's sole expense, an endorsement to Lender's title insurance policy insuring the priority of the Security Instrument that extends the effective date of such policy to the date of the Advance, acknowledges the amount of the Advance for purposes of any "pending disbursement" clause in such policy, and imposes no additional exceptions to coverage under such policy other than the Permitted Encumbrances;

3.2.11 *Approval of Construction*.  Lender has received written certification by Lender's Consultant and, if required by Lender, Architect, that to the best of such party's knowledge, information, and belief, construction is in accordance with the Plans and Specifications, the quality of the work for which the Advance is requested is in accordance with the Construction Contract, the amount of the Advance requested represents work in place based on on-site observations and the data compromising the Advance Request, the work has progressed in accordance with the Construction Contract and capable of being completed in accordance with the Plans and Specifications on or before the Completion Deadline, and Contractor is entitled to payment of the amount certified;

3.2.12 *Soil Compaction*.  Lender has received within ten (10) days after the compaction of any soil for construction a report satisfactory to Lender's Consultant of the results of soil tests;

3.2.13 *Foundations*.  Lender has received (i) a foundation survey made immediately after, but in no event later than ten (10) days after, the laying of the foundation of each building or structure of the Improvements satisfactory to Lender, (ii) a certificate of Architect stating that based on personal inspection the foundations have been completed in accordance with the Plans and Specifications and are satisfactory in all respects, and (iii) a bearing capacity test report with respect to the excavated footings and foundations, reviewed and approved by Lender's Consultant and the Architect; and

3.2.14 *Concrete Testing*.  Lender has received within ten (10) days after the pouring of concrete for any Improvements a report satisfactory to Lender's Consultant of the results of concrete tests made at the time the concrete is poured.

3.3    <u>Conditions Precedent to Final Advance</u>.  Lender's obligation to make the final Advance (including the release of Retainage withheld by Lender from prior Advances) is subject to the performance by Borrower of its Obligations to be performed hereunder at or prior to the disbursement of such Advance and to the satisfaction of the conditions set forth in Section 3.2 above and the delivery of the following items to Lender, each in form and content acceptable to Lender:

3.3.1    *Certificate of Substantial Completion*.  A certificate from the Architect and a notice from Lender's Consultant stating that the construction of the Improvements has been substantially completed in a good and workmanlike manner and in accordance with the Plans and Specifications (including, without limitation, the furnishing and fixturing of the Improvements and all clearing, landscaping, lighting, and paving of the Land) and in compliance with Legal Requirements, and addressing such other details concerning construction of the Improvements as Lender shall request;

3.3.2    *As-Built Survey*.  A current as-built survey showing the location of all the Improvements prepared in accordance with Lender's standard guidelines, which includes the certification of the surveyor that the Improvements have been constructed within the

established building and property lines and in compliance with any restrictions of records or ordinances relating to the location thereof;

3.3.3    *Required Approvals.* A unconditional, final certificate of occupancy for the Improvements, any required approval by the Board of Fire Underwriters or its equivalent acting in and for the locality in which the Project is situated, and any other approval required by the appropriate Governmental Authority to the extent that any such approval is a condition to the lawful use and occupancy of the Improvements and opening the same to the public;

3.3.4    *Final Lien Waivers.* A duly sworn and executed final lien waiver and affidavit from Contractor and, if requested by Lender, each subcontractor, laborer, materialman, or other Person who supplied labor or materials to, or performed work on, the Improvements, in form and content satisfactory to Lender, stating that all amounts due to such Persons have been paid in full (or upon the making of such Advance shall be paid in full);

3.3.5    *Insurance.* Evidence acceptable to Lender that Borrower has procured policies of insurance providing fire and extended coverage and business income interruption coverage in accordance with applicable requirements of this Loan Agreement, the Security Instrument, the Leases, and Legal Requirements; and

3.3.6    *Other Items.* Such other items, instruments, documents, and certificates as Lender or the Lender's Consultant might reasonably request with respect to the completion of the Improvements and the performance of the Obligations.

3.4    <u>No Waiver.</u> If Lender, at its option, elects to make one or more Advances prior to receipt and approval of all items required by this Article, such election shall not obligate Lender to make any subsequent Advance requested by Borrower. The closing of the Loan and execution of this Loan Agreement shall not be construed as approval by Lender of items submitted prior to closing or as a waiver of the right to require other items required by this Loan Agreement or corrections or additional items that might be necessary to Lender upon Lender's review of any items received after closing.

## ARTICLE 4.: BORROWER'S REPRESENTATIONS AND WARRANTIES

Borrower hereby represents and warrants to Lender, with knowledge that Lender shall materially rely upon each of the following representations and warranties in entering into this Loan Agreement and making each Advance hereunder, as follows:

4.1    <u>Due Organization and Qualification.</u> Borrower is duly organized, validly existing, and in good standing under the laws of the state of its formation as set forth in the heading of this Loan Agreement and is qualified to transact business and is in good standing in the state in which the Land is located and in each other jurisdiction where the failure to be so qualified and to be in good standing would adversely affect the conduct of its business or the validity of, the enforceability of, or the ability of Borrower to perform, the Obligations under this Loan Agreement and the other Loan Documents.

4.2    <u>Power and Authority.</u> Borrower has the requisite power and authority (i) to acquire, own, develop, construct, and operate the Project and to carry on its business as now conducted and as contemplated to be conducted in connection with the performance of the Obligations hereunder and under the other Loan Documents and (ii) to execute and deliver this Loan Agreement and the other Loan

Documents, to incur and perform the Obligations, and to carry out the transactions contemplated by this Loan Agreement and the other Loan Documents.

4.3     Due Authorization.  The execution, delivery, and performance of this Loan Agreement and the other Loan Documents have been duly authorized by all necessary action and proceedings by or on behalf of Borrower, and no further approvals or filings of any kind, including any approval of or filing with any Governmental Authority, are required by or on behalf of Borrower as a condition to the valid execution, delivery, and performance by Borrower of this Loan Agreement and the other Loan Documents.

4.4     Enforceability.  This Loan Agreement and the other Loan Documents to which Borrower is a party have been duly authorized, executed, and delivered by Borrower and constitute the legal, valid, and binding obligation of Borrower, enforceable against Borrower in accordance with their respective terms, except as such enforceability may be affected by applicable conservatorship, bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the enforcement of creditors' rights generally.

4.5     No Conflicts.  Neither the execution and delivery of this Loan Agreement and the other Loan Documents to which Borrower is a party, nor the fulfillment of or compliance with the terms and conditions of this Loan Agreement and such other Loan Documents, nor the performance of the Obligations (i) conflicts with or result in (or will conflict with or result in) any breach or violation of any Legal Requirement enacted or issued by any Governmental Authority or other agency having jurisdiction over Borrower or any portion of the Project, or any judgment or order applicable to Borrower, or to which Borrower or any portion of the Project is subject, (ii) conflicts with or result in (or will conflict with or result in) any material breach or violation of, or constitute a default under, any of the terms, conditions, or provisions of Borrower's organizational documents, any indenture, existing agreement, or other instrument to which Borrower is a party, or to which Borrower or any portion of the Project is subject, (iii) results in or requires (or will result in or require) the creation of any lien on all or any portion of the Project or any other Collateral, except for the Permitted Encumbrances, or (iv) requires (or will require) the consent or approval of any creditor of Borrower, any Governmental Authority, or any other Person except such consents or approvals that have already been obtained.

4.6     Pending Litigation or other Proceedings.  There is no pending or, to the best knowledge of Borrower, threatened action, suit, proceeding, or investigation, at law or in equity, before any court, board, body, or official of any Governmental Authority or arbitrator against or affecting the Project or any other portion of the Project or other assets of Borrower, which, if decided adversely to Borrower, would have, or may reasonably be expected to have, a Material Adverse Effect.  Borrower is not in default with respect to any order of any Governmental Authority.

4.7     No Contractual Defaults.  There are no defaults by Borrower or, to the knowledge of Borrower, by any other Person under any contract to which Borrower is a party relating to the Project, including any management, rental, service, supply, security, maintenance, or similar contract, other than defaults which do not permit the non-defaulting party to terminate the contract and which do not have, and are not reasonably be expected to have, a Material Adverse Effect.  Neither Borrower nor, to the knowledge of Borrower, any other Person, has received notice or has any knowledge of any existing circumstances in respect of which it could receive any notice of default or breach in respect of any contracts affecting or concerning any Project.

4.8     Non-Foreign Person.  Borrower is not a "foreign person" within the meaning of § 1445(f)(3) of the Internal Revenue Code.

4.9    ERISA. Neither Borrower nor any member of the "controlled group" of Borrower has established and is a party to an "employee benefit plan" within the meaning of Section 3(3) of Employee Retirement Income Security Act of 1974, as amended from time to time ("ERISA"), or any other option or deferred compensation plan or contract for the benefit of its employees or officers, pension, profit sharing or retirement plan, redemption agreement, or any other agreement or arrangement with any officer, director or owner, members of their families, or trusts for their benefit, and the assets of Borrower do not and shall not constitute "plan assets" of one more such plans for purposes of ERISA.

4.10    Ownership. The ownership of all interests in Borrower have been accurately disclosed to Lender in writing. There are no outstanding warrants, options, or rights to purchase any ownership interests of Borrower, nor does any Person have a Lien upon any of the ownership interests of Borrower.

4.11    Investment Company Act. Borrower is not (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended, (ii) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended, or (iii) subject to any other federal or state law or regulation that purports to restrict or regulate its ability to borrow money.

4.12    Financial Information. The financial projections relating to Borrower and delivered to Lender on or prior to the date hereof, if any, were prepared on the basis of assumptions believed by Borrower, in good faith at the time of preparation, to be reasonable, and Borrower is not aware of any fact or information that would lead it to believe that such assumptions are incorrect or misleading in any material respect; provided, however, that no representation or warranty is made that any result set forth in such financial projections shall be achieved. The financial statements of Borrower and any rent rolls for the Project which have been furnished to Lender are complete and accurate in all material respects and present fairly the financial condition of Borrower and the leasing status of the Project, and there are no liabilities, direct or indirect, fixed or contingent, as of the respective dates of such financial statements which are not reflected therein or in the notes thereto or in a written certificate delivered with such statements. The financial statements of Borrower have been prepared in accordance with generally accepted accounting principles consistently applied. Since the date of the most recent of such financial statements delivered to Lender, no event has occurred which would have, or may reasonably be expected to have, a Material Adverse Effect, and there has not been any material transaction entered into by Borrower other than transactions in the ordinary course of business. Borrower has filed all federal, state, and local tax returns that are required to be filed and has paid, or made adequate provision for the payment of, all taxes that have or may become due pursuant to such returns or to assessments received by Borrower.

4.13    Accuracy of Information. No information, statement, or report furnished in writing to Lender by Borrower in connection with this Loan Agreement or any other Loan Document, or in connection with the consummation of the transactions contemplated hereby and thereby, contains any material misstatement of fact or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances under which they were made, not misleading.

4.14    No Conflicts of Interest. To the best knowledge of Borrower, no officer, agent, or employee of Lender has been or is in any manner interested, directly or indirectly, in that Person's own name, or in the name of any other Person, in the Loan Documents, Borrower, or the Project, in any contract for property or materials to be furnished or used in connection with the Project, or in any aspect of the transactions contemplated by the Loan Documents.

4.15   No Reliance.  Borrower acknowledges, represents, and warrants that it understands the nature and structure of the transactions contemplated by this Loan Agreement and the other Loan Documents, that it is familiar with the provisions of all of the documents and instruments relating to such transactions, that it understands the risks inherent in such transactions, including the risk of loss of the Project or a part thereof, and that it has not relied on Lender for any guidance or expertise in analyzing the financial or other consequences of the transactions contemplated by this Loan Agreement or any other Loan Document or otherwise relied on Lender in any manner in connection with interpreting, entering into, or otherwise in connection with this Loan Agreement, any other Loan Document, or any of the matters contemplated hereby or thereby.

4.16   Contracts with Affiliates.  Except as otherwise approved in writing by Lender, Borrower has not entered into and is not a party to any contract, lease, or other agreement with any Affiliate of Borrower for the provision of any service, materials, or supplies to the Project (including any contract, lease, or agreement for the provision of property management services, cable television services or equipment, gas, electric or other utilities, security services or equipment, laundry services or equipment or telephone services or equipment).

4.17   Lines of Business.  Borrower is not engaged in any businesses other than the acquisition, ownership, development, construction, leasing, financing, or management of multifamily residential properties, and the conduct of these businesses does not violate the organizational documents pursuant to which it is formed.

4.18   Impositions.  Borrower has filed all property and similar tax returns required to have been filed by it with respect to the Project and has paid and discharged, or caused to be paid and discharged, all installments for the payment of all taxes due to date, and all other material Impositions imposed against, affecting, or relating to the Project other than those which have not become due, together with any fine, penalty, interest, or cost for nonpayment pursuant to such returns or pursuant to any assessment received by it.  Borrower has no knowledge of any new proposed tax, levy, or other governmental or private assessment or charge in respect of the Project which has not been disclosed in writing to Lender.

4.19   Compliance with Legal Requirements.  Borrower has obtained all Permits are necessary for the construction and installation of the Improvements according to the Plans and Specifications, and all such Permits have been issued in the name of Borrower and are in full force and effect.  The Improvements, when completed according to the Plans and Specifications, will comply with Legal Requirements.  Borrower has no knowledge of the pendency or threat of any action or proceeding regarding the non-compliance or non-conformity of the Project with any Legal Requirements.

4.20   Condemnation.  No proceedings are pending or, to the best of Borrower's knowledge, threatened to acquire by power of condemnation or eminent domain any portion of the Project, or any interest therein, or to enjoin or similarly prevent the construction or use of the Improvements.

4.21   Insurance.  Borrower has delivered to Lender a duly executed certificate(s) of insurance with respect to all insurance policies currently in effect with respect to the Project.  To Borrower's knowledge, each insurance policy described in such certificate(s) complies in all material respects with the requirements set forth in the Security Instrument.

4.22   Separate Tax Parcel.  The Project constitutes a separate tax lot or lots with a separate tax assessment or assessments for the Land and Improvements, independent of those for any other lands or improvements, or will be so separately assessed pursuant to the ordinary assessment procedures of the applicable taxing authority within one (1) calendar year from the date hereof.

4.23    <u>Construction Documents</u>.  Borrower has delivered to Lender (or Lender's Consultant) a true, correct, and complete copy of the Construction Documents, and such Construction Documents have not been modified, altered, or amended except as disclosed to Lender in writing.  The Construction Contract and each contract and agreement with any Design Professional are in full force and effect and constitute the complete agreement among the parties named therein with respect to the subject matter thereof.  Other than as stated in the Construction Documents, no contractors, architects, or engineers have been retained by Borrower in connection with the design or construction of the Improvements.  No default, event of default, or event that, but for the giving of notice or the passage of time (or both), would constitute a default or event of default under the Construction Documents has occurred or is continuing.  The Plans and Specifications are in final form, and no material change or addition to the Plans and Specifications (i) has been requested or demanded by Borrower, Contractor, any Governmental Authority, the tenant under any Lease, or any other Person or (ii) is necessary to bring the Plans and Specifications in conformity with Legal Requirements.  The Construction Contract was entered into on the basis of, and accurately describes, the final Plans and Specifications.

4.24    <u>Utilities and Access</u>.    All utility and sanitary sewage services necessary for the construction and use of the Improvements are available to the Project at the boundary of the Land, and Borrower has received permission to make such use thereof as is necessary for construction and to make permanent connections thereto upon completion.  Upon completion of the Improvements, the Project shall be adequately serviced by public water, sewer systems, and utilities.  The Project is either contiguous to, or benefits from an irrevocable unsubordinated easement permitting access from the Project to, a physically open, dedicated public street and has all necessary permits for ingress and egress.

4.25    <u>Independent Unit</u>.  The Project is an independent unit that does not rely on any drainage, sewer, access, parking, structural, or other facilities located on any property not included in either the Project or on public or utility easements for the (i) fulfillment of any zoning, building code, or other requirement of any Governmental Authority that has jurisdiction over the Project, (ii) structural support, or (iii) the fulfillment of the requirements of any contract or agreement affecting the Project.  Borrower, directly or indirectly, has the right to use all easements, public or private utilities, parking, access routes, or other items necessary for the intended development and use of the Project. No building or other improvement not located on the Land relies on any part of the Project to fulfill any zoning requirements, building code, or other requirement of any Governmental Authority that has jurisdiction over the Project for structural support or to furnish to such building or improvement any essential building systems or utilities.

4.26    <u>Leases</u>.  Borrower is and shall be the owner and holder of the landlord's interest under the Leases, and there are no prior outstanding assignments of any Lease, or any portion of the rents, additional rents, charges, issues, or profits due and payable or to become due and payable thereunder.  The premises demised under each Lease is or shall be occupied by the tenant thereunder as a tenant only, and no Lease contains any option or right to purchase, right of first refusal, or any other similar provisions.

4.27    <u>Management and Leasing Agreements</u>.  Borrower has delivered to Lender a true and correct copy of any property management agreement, leasing agreement, or brokerage agreement in effect with respect to the Project or any portion thereof.  Each such agreement has not been modified, altered, or amended except as disclosed to Lender in writing, and constitutes the complete agreement among the parties named therein with respect to the subject matter thereof.  Except as stated in any such agreement delivered to Lender, no Person has any right or claim to any fees, commissions, compensation, or other remuneration in connection with or arising out of the use, occupancy, and operation of the Project.

## ARTICLE 5.:  CONSTRUCTION MATTERS

5.1   Construct Improvements.   Borrower shall commence the construction of the Improvements of the Land, if such construction has not already begun, within thirty (30) days of the Closing Date.  Borrower shall cause such construction to proceed continuously in accordance with the Construction Documents and in compliance with Legal Requirements and shall cause the construction of the Improvements to be substantially completed in accordance with the Plans and Specifications by the Completion Deadline, time being of the essence.  Borrower shall furnish to Lender within thirty (30) days of Lender's request a foundation survey and an as-built survey, each in form satisfactory to Lender, showing the extent of construction of the Improvements without violation of Legal Requirements and showing no encroachments or other conditions that could adversely affect the value and utility of the Project.

5.2   Storage of Materials.   Borrower shall cause all materials supplied for, or intended to be utilized in the construction of the Improvements, but not yet affixed to or incorporated into the Improvements or the Land, to be (i) stored on the Land with adequate safeguards to prevent loss, theft, damage or commingling with materials for other projects or (ii) segregated, specifically identified as owned by Borrower and held in a warehouse in a segregated area insured by the contractor's risk insurance.  Borrower shall not purchase or order materials for delivery more than sixty (60) days prior to the scheduled incorporation of such materials into the Improvements.

5.3   Change Orders.   Borrower shall not enter into or permit any change order relating to any Construction Document or any other material amendment, modification, assignment, termination, or cancellation of any Construction Document without the prior written consent of Lender, any Governmental Authority having jurisdiction over such action, and any other Person to the extent such approval is required by Legal Requirements.  Notwithstanding the foregoing, Borrower may enter into a change order that (i) does not increase or decrease the costs of the Project (nor cause a reallocation of costs within the Project Budget) by $25,000.00 or more (or, in combination with all prior change orders deemed approved by Lender hereunder, by $100,000.00 or more), (ii) does not materially change the structural components, the exterior elevations, or the façade of the Improvements, or materially lessen the quality of any materials used in the construction or equipping of the Improvements, (iii) does not decrease the rentable area of the Improvements or otherwise diminish the revenue generation capabilities of the Improvements, (iv) does not cause the Project to be in violation of any Legal Requirements, (v) is described in a written notice delivered to Lender and Lender's Consultant no later than ten (10) days following its implementation, and (vi) has been approved by, to the extent required, each Governmental Authority with jurisdiction over the Project.

5.4   Contractors and Design Professionals.   Borrower shall not enter into any contract or agreement with any contractor, architect, or engineer relating to the Project without the prior written consent of Lender.  Borrower shall duly perform, observe, and comply with its obligations under the Construction Documents and enforce and protect the rights and remedies of Borrower thereunder.  Upon Lender's written request, Borrower shall notify Lender promptly of the names and addresses of all contractors, subcontractors, and materialmen who are employed in connection with the design or construction of the Improvements but whose names and addresses were not heretofore supplied to Lender.  Borrower shall notify Lender of the occurrence of any material dispute, event of default, or repudiation by any party under the Construction Documents.

5.5   Assignment of Construction Documents.   Borrower hereby transfers and assigns to Lender, and grants to Lender a security interest in, all of Borrower's right, title, and interest, but not its liability, in, under, and to the Construction Documents, whether now existing or hereafter created or existing.  Borrower agrees to deliver to Lender from time to time upon Lender's request such consents to the foregoing assignment from parties contracting with Borrower as Lender may require. Neither this assignment nor any action by Lender shall constitute an assumption by Lender of any obligation under

any Construction Document, and Borrower shall continue to be liable for all obligations of Borrower with respect thereto. Lender shall have the right at any time (but shall have no obligation) to take in its name or in the name of Borrower such action as Lender may determine to be necessary to cure any default under any or relating to any Construction Document or to protect the rights of Borrower or Lender with respect thereto. Borrower irrevocably constitutes and appoints Lender as Borrower's attorney-in-fact, which power of attorney is coupled with an interest and irrevocable, to enforce in Borrower's name or in Lender's name all rights of Borrower under or with respect to any Construction Document. Lender shall incur no liability if any action so taken by it or on its behalf shall prove to be inadequate or invalid. Borrower indemnifies and holds Lender and Lender's agents harmless against and from any loss, cost, liability or expense (including, but not limited to, consultants' fees and expenses and reasonable attorneys' fees and expenses) incurred in connection with Borrower's failure to perform such Construction Document or any action taken by Lender. Lender may use the Plans and Specifications for any purpose relating to the Improvements.

5.6    <u>Ownership of Personalty</u>. Borrower shall furnish to Lender, if Lender so requests, the contracts, bills of sale, receipted vouchers, and agreements, or any of them, under which Borrower claims title to the materials, articles, fixtures, and other personal property used or to be used in the construction or operation of the Improvements.

5.7    <u>Use of Proceeds</u>. Borrower shall use the proceeds of each Advance made by Lender solely and exclusively for the payment of costs and expenses included in the related Advance Request, as approved by Lender. Borrower shall pay all fees, closing costs, and other non-construction expenses relating to the Loan, the construction of the Improvements, or the discharge of Borrower's obligations under this Loan Agreement, the Leases, and Legal Requirements as Lender has approved or may from time to time approve.

5.8    <u>Construction Consultant</u>. Lender may retain the services of Lender's Consultant, whose duties may include, among others, reviewing the Plans and Specifications and any proposed changes to the Plans and Specifications, performing construction cost analyses, observing work in place and reviewing Advance Requests. The duties of Lender's Consultant run solely to Lender, and Lender's Consultant shall have no obligations or responsibilities whatsoever to Borrower, any Design Professional, Contractor, or any of their agents or employees. Unless prohibited by applicable law, all fees, costs, and expenses of Lender's Consultant shall be paid by Borrower. Borrower shall cooperate with Lender's Consultant and will furnish to Lender's Consultant such information and other material as Lender's Consultant considers necessary or useful in performing its duties.

5.9    <u>Promotion</u>. During the course of construction of the Improvements, Borrower shall erect and maintain, at Borrower's expense, a sign on the Land in size and content acceptable to Lender that identifies Lender as construction lender for the Project and otherwise name Lender as construction lender in Borrower's publicity and promotion relating to the Project.

5.10    <u>Legal Requirements</u>. Borrower shall comply with all Legal Requirements in all respects. Borrower shall procure and continuously maintain in full force and effect, and will abide by and satisfy all material terms and conditions of, all Permits. Without limiting the generality of the foregoing covenant, Borrower specifically agrees that the Project will at all times strictly comply, to the extent applicable, with the requirements of the Fair Housing Amendments Act of 1988, the Americans with Disabilities Act of 1990, all state and local laws and ordinances related to handicapped access and all rules, regulations, and orders issued pursuant thereto including, without limitation, the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (collectively **"Access Laws"**). Notwithstanding any provisions set forth herein or in any other document regarding Lender's approval of alterations of the Project, Borrower shall not alter or permit the Project to be altered in any manner which would increase

Borrower's responsibilities for compliance with the applicable Access Laws without the prior written approval of Lender. Lender may condition any such approval upon receipt of a certificate of Access Law compliance from an architect, engineer, or other person acceptable to Lender. Borrower agrees to give prompt notice to Lender of the receipt by Borrower of any complaints related to violation of any Access Laws and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

5.11    No Duty of the Part of Lender. Notwithstanding any approvals or consents by Lender, Lender has no obligation or responsibility whatsoever for the adequacy, form, or content of the Plans and Specifications, the Project Budget, any Permit, any other Construction Document, any change order, or any other matter incident to the Project or the construction of the Improvements. Lender's acceptance of an assignment of the Plans and Specifications for the benefit of Lender shall not constitute approval of the Plans and Specifications. Any inspection or audit of the Project or the books and records of Borrower, or the procuring of documents and financial and other information, by or on behalf of Lender shall be for Lender's protection only and shall not constitute an assumption of responsibility to Borrower or any other Person with regard to the condition, construction, maintenance, or operation of the Project, or relieve Borrower of any of Borrower's obligations. Borrower has selected all Design Professionals, Contractors, and other Person furnishing services or materials to the Project. Lender has no duty to supervise or to inspect the Project or the construction of the Improvements nor any duty of care to Borrower or any other Person to protect against, or inform Borrower or any other Person of the existence of, negligent, faulty, inadequate, or defective design or construction of the Improvements.

## ARTICLE 6.: LEASING AND TENANT MATTERS

6.1    Approval of Leases. Borrower shall not enter into any Lease unless satisfactory to or deemed satisfactory to Lender prior to execution. Borrower's standard form of tenant lease and any revisions thereto must have the prior written approval of Lender. Lender's prior written consent shall not be required for any Lease that (i) is written on the standard form lease approved by Lender, with no deviations except as satisfactory to Lender, (ii) is entered into in the ordinary course of business with a bona fide unrelated third party tenant, and Borrower, acting in good faith and exercising due diligence, has determined that the Tenant is financially capable of performing its obligations under the Lease, (iii) reflects an arms-length transaction at then current market rate for comparable space, (iv) is for a term for greater than six months and less than two years, (v) contains no right to purchase the Project or any present or future interest therein, and (vi) is expressly subordinate to the Security Instrument. If requested by Lender, Borrower shall provide to Lender a correct and complete copy of each Lease, including any exhibits, and each guarantee thereof (if any). Borrower shall, throughout the term of this Loan Agreement, pay all reasonable costs incurred by Lender in connection with Lender's review and approval of Leases and each guarantee thereof (if any), including reasonable attorneys' fees and costs.

6.2    Preservation of Leases. Borrower shall observe and perform all the obligations imposed upon the landlord under the Leases and shall not do or permit to be done anything to impair the value of the Leases or any guaranty of any Lease as a security for the Obligations. Borrower shall, in the ordinary course of its business, enforce all of the terms, covenants, and conditions contained in the Leases upon the part of tenants thereunder to be observed or performed.

6.3    Effect of Lease Approval. No approval of any Lease by Lender shall be for any purpose other than to protect Lenders' security and to preserve Lenders' rights under the Loan Documents. No approval by Lender shall result in a waiver of any default of Borrower. In no event shall any approval by Lender of a Lease be a representation of any kind, with regard to the Lease or its adequacy or enforceability, or the financial capacity of any tenant or guarantor.

6.4    Income from the Project.  Borrower shall first apply all income from leases, and all other income derived from the Project, to pay costs and expenses associated with the ownership, maintenance, development, operating, and marketing of the Project, including all amounts then required to be paid under the Loan Documents, before using or applying such income for any other purpose.

6.5    Security Deposit Information.  Upon the Lender's request, Borrower shall furnish an accounting of all tenant security deposits held in connection with the Project, including the name and identification number of the accounts in which such security deposits are held, the name and address of the financial institutions in which such security deposits are held and the name and telephone number of the person to contact at such financial institution, along with any authority or release necessary for Lender to access information regarding such accounts.

## ARTICLE 7.:  ADDITIONAL COVENANTS

7.1    Maintain Existence.  Borrower shall maintain its existence in good standing under the laws of the state of its formation.  Borrower shall continue to be duly qualified to do business in each jurisdiction in which such qualification is necessary to the conduct of its business and where the failure to be so qualified would adversely affect the validity of, the enforceability of, or the ability to perform, its obligations under this Loan Agreement or any other Loan Document and its qualification to conduct business in the state in which the Project is located.  Borrower shall not change or convert its form of business organization, nor permit any material amendment or modification of its organizational documents, without obtaining the prior written consent of Lender.  Borrower shall not dissolve or liquidate in whole or in part, or merge or consolidate with any Person.  Borrower shall not change the location of its chief executive office without first giving Lender at least thirty (30) days prior written notice thereof and promptly providing Lender such information as Lender may request in connection therewith.

7.2    Operation and Separateness.  Borrower shall (i) engage in no business or activity other than the ownership, management, and operation of the Project, (ii) enter into no contract or agreement with any Affiliate except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than such Affiliate, (iii) make no loan or advance to any Person (including any Affiliate) and acquire no obligations or securities of an Affiliate, (iv) make any dividend, distribution, or payment to any member, partner, or shareholder, or purchase, redeem, or otherwise acquire or retire any ownership interest in Borrower or any Affiliate, (v) hold itself out to the public as a legal entity separate and distinct from any other Person (including any Affiliate), (vi) conduct business in its own name and shall maintain and utilize separate stationery, invoices, and checks, (vii) maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations, (viii) maintain its assets in such a manner that it shall not be costly or difficult to segregate, ascertain, or identify its individual assets from those of any Affiliate or any other Person.

7.3    Books and Records.  Borrower shall keep and maintain at all times complete and accurate books of accounts and records in sufficient detail to correctly reflect (i) all of Borrower's financial transactions and assets (including, without limitation, the receipt and disbursement of any Advance), (ii) the construction of the Improvements, and (iii) the results of the operation of the Project, which books and records shall reflect the consistent application of accepted accounting methods, and copies of all written contracts, Leases, and other instruments that affect the Project (including all bills, invoices and contracts for electrical service, gas service, water and sewer service, waste management service, telephone service, and management services). Borrower shall make such books and records available at reasonable times for inspection and copying by Lender or its agent.  Borrower shall not change its methods of accounting without the prior written consent of Lender.

7.4    <u>Inspection Rights</u>.  Borrower shall permit, and require Contractor to permit, Persons designated by Lender to visit and inspect the Project, to examine and make excerpts from the books and records of Borrower and Contractor, and to discuss the business affairs, finances, and accounts of Borrower and Contractor with respect to the Project with representatives of Borrower and Contractor, as designated by Lender, all in such detail and at such times as Lender may reasonably request.

7.5    <u>Reports and Notices</u>.  Borrower shall furnish promptly to Lender such information as Lender requests concerning costs, progress of construction, marketing, and such other factors as Lender requires.  Borrower shall promptly inform Lender in writing of any of the following (and shall deliver to the Lender copies of any related written communications, complaints, orders, judgments, and other documents relating to the following) of which Borrower has actual knowledge:  (i) The occurrence of any Default or Event of Default under this Loan Agreement or any other Loan Document; (ii) the commencement or threat of, or amendment to, any proceedings by or against Borrower in any federal, state, or local court or before any Governmental Authority, or before any arbitrator, which, if adversely determined, would have, or at the time of determination may reasonably be expected to have, a Material Adverse Effect; (iii) the commencement or threat of any condemnation or similar proceedings with respect to the Project or of any proceeding seeking to enjoin the intended use of the Project or any portion thereof; (iv) the occurrence of any material change in Legal Requirements; (v) the commencement of any proceedings by or against Borrower under any applicable bankruptcy, reorganization, liquidation, insolvency, or other similar law now or hereafter in effect or of any proceeding in which a receiver, liquidator, trustee, or other similar official is sought to be appointed for it; (vi) the receipt of notice from any Governmental Authority having jurisdiction over Borrower that (A) Borrower is being placed under regulatory supervision, (B) any license, Permit, charter, membership, or registration material to the conduct of Borrower's business or the Project is to be suspended or revoked, or (C) Borrower is to cease and desist any practice, procedure, or policy employed by Borrower, as the case may be, in the conduct of its business, and such cessation would have, or may reasonably be expected to have, a Material Adverse Effect; and (v) the occurrence of any act, omission, change, or event which has a Material Adverse Effect.

7.6    <u>Future Financial and Operating Statements</u>.  Borrower shall furnish or cause to be furnished to Lender within the time periods specified, the following financial reports and information:

      7.6.1    *Annual Financial Statements.*  As soon as available, but in no event later that ninety (90) days after the end of each fiscal year of Borrower, unaudited financial statements of Borrower for the year just ended, prepared in accordance with sound accounting principles consistently applied and including a balance sheet and Operating Statement, and changes in financial position;

      7.6.2    *Interim Financial Statements (Pre-Stabilization).*  As soon as available, but in no event later than twenty (20) days after the end of each calendar month until such time as the Project has achieved a stabilized occupancy level, as determined by Lender, an unaudited balance sheet and Operating Statement for such month and year-to-date, with a comparison with the same month and year-to-date in the prior fiscal year, and a Rent Roll;

      7.6.3    *Interim Financial Statements (Post-Stabilization).*  As soon as available, but in no event later than forty-five (45) days after the end of each fiscal quarter (or portion thereof) occurring after the Project has achieved a stabilized occupancy level, as determined by Lender, an unaudited balance sheet and Operating Statement for such month and year-to-date, with a comparison with the same quarter and year-to-date in the prior fiscal year, and a Rent Roll; and

7.6.4 *Additional Information*. Such additional financial information (including tax returns, detailed cash flow information, and contingent liability information) of Borrower at such times as Lender shall deem necessary.

The accuracy and completeness of all financial statements, Operating Statements, and Rent Rolls must be certified in writing to be correct by the chief financial officer or equivalent of Borrower. If required by Lender following the occurrence of an Event of Default, all annual financial statements must be audited statements certified by a certified public accountant acceptable to Lender. Borrower must certify with delivery of each of its financial statements that (i) Borrower has complied with and is in compliance with all terms, covenants and conditions of this Loan Agreement, (ii) no Default or Event of Default exists or, if such is not the case, that one or more specified Defaults or Events of Default have occurred, and (iii) the representations and warranties contained in this Loan Agreement are true with the same effect as though made on the date of such certificate.

7.7     Appraisals. Borrower shall permit Lender and its agents, employees, or independent contractors, at any time (but not more often than once in any calendar year so long as no Event of Default has occurred), while the Obligations remain outstanding, to enter upon and appraise the Project, and Borrower shall cooperate with and provide any information requested in connection with such appraisal. Borrower shall pay the costs of any such appraisal (i) if an Event of Default has occurred and is continuing or (ii) if such appraisal is required by external regulatory authorities having jurisdiction over Lender.

7.8     ERISA. Borrower shall engage in no transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under this Loan Agreement or any of the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under the ERISA. Borrower shall deliver to Lender such certifications or other evidence from time to time, as requested by Lender in its sole discretion, that the representations and warranties of Borrower contained in Section 4.9 above are true and correct.

7.9     Conduct of Business. Upon completion of the Improvements, Borrower shall cause the operation of the Project to be conducted at all times in a first-class manner. Without limiting the foregoing, Borrower shall (i) operate the Project in a prudent manner in compliance with Legal Requirements, (ii) maintain sufficient equipment and supplies of types and quantities at the Project to enable Borrower or Property Manager adequately to perform the operation of the Project and Borrower's obligations under the Leases, and (iii) keep all Improvements in good repair, working order and condition, reasonable wear and tear excepted, and from time to time make all needed and proper repairs, renewals, replacements, additions, and improvements thereto to keep the same in good condition.

7.10     Zoning Changes. Borrower shall not initiate or consent to any zoning reclassification of the Project or seek any variance under any zoning ordinance or use or permit the use of the Project in any manner that could result in the use becoming a nonconforming use under any zoning ordinance or any other applicable land use law, rule, or regulation.

7.11     Taxes and Insurance. Borrower shall pay promptly when due and before the accrual of penalties thereon all taxes, including all real and personal property taxes and assessments levied or assessed against Borrower or the Project (or any portion thereof), and provide Lender with receipted bills therefor if requested by Lender. Borrower shall acquire and maintain in effect all insurance policies required by the Security Instrument and Legal Requirements.

7.12     Property Management. Borrower shall not enter into any management agreement for the Project, unless Borrower first notifies Lender and provides Lender a copy of the proposed management

agreement, obtains Lender's written consent thereto and obtains and provides Lender with a subordination agreement in form satisfactory to Lender from such manager subordinating to all rights of Lender. Borrower shall not terminate, amend, modify, or extend any property management agreement approved by Lender, or consent to any such action on the part of the property manager, without the prior written consent of Lender, which consent may be withheld or granted in Lender's sole discretion.

7.13    Compliance With Anti-Terrorism Orders.    Borrower will not permit any interest in Borrower to be owned by any Person (or any beneficial owner of such Person) who is listed on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Asset Control, Department of the Treasury pursuant to Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) and/or any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of the Office of Foreign Asset Control, Department of the Treasury or pursuant to any other applicable Executive Orders (such lists are collectively referred to as the "OFAC Lists"). Borrower will not knowingly enter into a Lease with any party who is listed on the OFAC Lists. Borrower shall immediately notify Lender if Borrower has knowledge that any member or beneficial owner of Borrower or any other Obligor is listed on the OFAC Lists or is indicted on, or arraigned and held over on, charges involving money laundering or predicate crimes to money laundering. Borrower shall immediately notify Lender if Borrower knows that any tenant of the Project is listed on the OFAC Lists or is convicted on, pleads nolo contendere to, is indicted on, or is arraigned and held over on charges involving money laundering or predicate crimes to money laundering.

7.14    Comply with Other Loan Documents.    Borrower shall perform and observe all its obligations under the Note, the Security Instrument, and the other Loan Documents.

7.15    Other Acts.    At Lender's request, Borrower shall execute and deliver to Lender all further documents and perform all other acts that Lender reasonably deems necessary or appropriate to perfect or protect its security for the Obligations.

## ARTICLE 8.:  EVENTS OF DEFAULT AND REMEDIES

8.1    Events of Default.    The occurrence or existence of any one or more of the following events, whether voluntary, involuntary, or effected by operation of law, shall constitute an "**Event of Default**" under this Loan Agreement:

8.1.1    *Non-Payment of Obligations.*    The failure of Borrower to pay to Lender the principal of and accrued interest on the Loan as and when due under the Note, whether at stated maturity, acceleration, or otherwise, or the failure of Borrower to pay or reimburse Lender for any other sum due under the terms of this Loan Agreement, the Note, or any other Loan Document, as and when due hereunder or thereunder;

8.1.2    *Unauthorized Assignment.*    The assignment or attempted assignment by Borrower of this Loan Agreement, any rights hereunder, or any Advance to be made hereunder to any Person, or the voluntary or involuntary transfer of Borrower's interest in or rights under this Loan Agreement to any Person, by operation of law or otherwise, including, without limitation, such transfer by Borrower as debtor-in-possession or by a trustee for Borrower under the United States Bankruptcy Code, whether or not the Obligations are assumed by such Person;

8.1.3    *Voluntary Bankruptcy Proceedings.*    The filing by any Obligor of a voluntary petition in bankruptcy, or the adjudication of any Obligor as bankrupt or insolvent, or the filing by any Obligor of a petition or answer seeking or acquiescing in

any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief for such Obligor under any present or future federal, state, or other statute, law, or regulation relating to bankruptcy, insolvency, or other relief for debtors, or any Obligor seeks or consents to, or acquiesces in, the appointment of any trustee, receiver, or liquidator of such Obligor or of all or any substantial part of such Obligor's property or of any or all of the rents, revenues, issues, earnings, profits, or income thereof, or any Obligor makes any general assignment for the benefit of creditors or admits in writing an inability to pay such Obligor's debts generally as they become due;

8.1.4    *Involuntary Bankruptcy Proceedings.*    The entry by a court of competent jurisdiction of an order, judgment, or decree approving a petition filed against any Obligor seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal, state, or other statute, law, or regulation relating to bankruptcy, insolvency, or other relief for debtors, which order, judgment, or decree remains unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive) from the date of entry thereof, or the appointment of any trustee, receiver, or liquidator for any Obligor or of all or any substantial part of such Obligor's property or of any or all of the rents, revenues, issues, earnings, profits, or income therefrom, which appointment remains unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive);

8.1.5    *Fraud or Misrepresentation.*    Any certificate, statement, audit, representation, or warranty, whether written or unwritten, heretofore or hereafter made, published, or furnished (or deemed made, published, or furnished pursuant to the terms of this Loan Agreement or any other Loan Document) by or on behalf of any Obligor pursuant to or in connection with such Obligor, any other Obligor, the Loan, or the Project, or as an inducement to Lender to extend any credit to or to enter into this or any other agreement with Borrower proves to have been false in any material respect at the time as of which such certificate, statement, audit, representation, or warranty was made, published, or furnished to Lender or any Person acting on Lender's behalf, or proves to have omitted any material fact or substantial contingent or unliquidated liability or claim against any Obligor, or if on the date that any Advance is made hereunder any Materially Adverse Change has occurred with respect to any of the facts previously disclosed by any such certificate, statement, audit, representation, or warranty and such Material Adverse Change was not disclosed to Lender in writing at or prior to the time of such Advance;

8.1.6    *Failure to Complete.*    The failure of Borrower to complete the construction of the Improvements and satisfy the conditions set forth in Section 3.3 of this Loan Agreement on or before the Completion Deadline, or the cessation of work on the construction of the Improvements for any period of ten (10) consecutive days; provided that any delays in construction caused by acts of God, acts of war, embargo, riots, strikes, labor disturbances, unavailability or materials or labor not caused by Borrower, or the order of any court or tribunal, shall extend the Completion Deadline pro tanto;

8.1.7    *Invalidity of Loan Documents.*    Any provision of this Loan Agreement or any other Loan Document, or the security title, lien, and security interest purported to be created hereunder or thereunder shall at any time for any reason cease to be valid and binding in accordance with its terms on any Obligor who is a party thereto, or shall be declared to be null and void, and as a result thereof, Lender would be precluded from enforcing any material obligation upon any Obligor or from exercising any material right

or remedy provided hereunder or thereunder that would otherwise be available to Lender, or the validity or enforceability of this Loan Agreement or any other Loan Document, or the validity or priority of the security title, lien, and security interest created hereunder or thereunder shall be contested by any Obligor seeking to establish the invalidity or unenforceability hereof or thereof, or any Obligor shall deny that it has any further liability or obligation hereunder or thereunder;

8.1.8  *Failure to Comply.*  The failure of Borrower to comply with any requirement of any Governmental Authority applicable to the Project within thirty (30) days after written notice of such requirement has been given to Borrower by such Governmental Authority;

8.1.9  *Change in Ownership or Form.*  The occurrence of any change in the composition, form of business association, management, or ownership of Borrower or any other Obligor without the prior written consent of Lender, which consent may be granted or refused by Lender in its sole discretion, provided that the death or incompetency of Miles E. Hill, Jr. shall not constitute an Event of Default so long as Rudolph H. Beaver is alive, legally competent and continues in his capacity as Limited Partner of Borrower and as a Guarantor of the Loan, and the development and operation of the Project continues to comply in all other respects with the Loan Documents and the Plans and Specifications;

8.1.10  *Death or Incompetency of Guarantor.*  The death or incompetency of any individual Guarantor, provided that the death or incompetency of Miles E. Hill, Jr. shall not constitute an Event of Default so long as Rudolph H. Beaver is alive, legally competent and continues in his capacity as Limited Partner of Borrower and as a Guarantor of the Loan, and the development and operation of the Project continues to comply in all other respects with the Loan Documents and the Plans and Specifications; or

8.1.11  *Events of Default under Other Loan Document.*  The occurrence or existence of any "Event of Default" denominated in any other Loan Document (other than those specified elsewhere in this Section); or

8.1.12  *Breach of Other Covenants.*  The failure of Borrower to properly and timely perform or observe any other covenant or condition set forth in this Loan Agreement that is not cured within any applicable cure period as set forth herein or, if no cure period is specified therefor, is not cured within thirty (30) days of Lender's notice to Borrower thereof.

8.2  <u>Remedies</u>.  Upon the occurrence of any Event of Default, Lender may, at its option and without further notice to or demand upon Borrower or any other Obligor, exercise any or all of the following rights and remedies:

8.2.1  *Accelerate Indebtedness.*  Declare the entire unpaid principal of the Obligations to be, and the same will thereupon become, immediately due and payable, without presentment, protest, or further demand or notice of any kind, all of which are hereby expressly waived (provided that in the event of the occurrence of an Event of Default under <u>Section 8.1.3 or 8.1.4</u> above, the Obligations shall become immediately due and payable automatically without further action by Lender).

8.2.2 *Institute Legal Proceedings.* Proceed to protect and enforce its rights by action at law (including, without limitation, bringing suit to reduce any claim to judgment), suit in equity, and other appropriate proceedings, including, without limitation, a action for specific performance of any covenant or condition contained in this Loan Agreement or any other Loan Document.

8.2.3 *Apply Funds Held by Lender.* Apply any sums then held in escrow or otherwise by or on behalf of Lender in accordance with the terms of this Loan Agreement or any other Loan Document to the payment of the Obligations in such order, priority, and proportions as Lender deems appropriate in its discretion; and

8.2.4 *Take Possession of the Project.* Take immediate possession of the Project, as well as all other property to which title is held by Borrower, as is necessary to fully complete all onsite and offsite Improvements and do anything in Lender's sole judgment to fulfill the obligations of Borrower hereunder, including availing itself of and procuring performance of the Construction Documents, amending the same, or entering into new Construction Documents with the same contractors or others and employment of watchmen to protect the Project from injury. Without restricting the generality of the foregoing and for the purposes aforesaid, Borrower hereby appoints and constitutes Lender its lawful attorney-in-fact with full power of substitution in the premises to (i) complete construction and equip the Improvements, (ii) use undisbursed Loan proceeds or funds that Borrower has deposited with Lender, or advance funds in excess of the Loan amount, to complete the Improvements and to perform Borrower's obligations under Legal Requirements (and Borrower agrees to reimburse Lender for any costs of such completion that exceed the Loan amount), (iii) pay all taxes and assessments on the Project when due and to add the amounts of any such payments to the Obligations, (iv) make changes in the Plans and Specifications that Lender deems necessary or desirable to complete the Improvements, (v) retain or employ new Contractors, subcontractors, architects, engineers, or inspectors as Lender deems necessary or desirable to complete the Improvements, (vi) pay, settle, or compromise all bills and claims that might be incurred in connection with constructing and equipping the Improvements, (vii) purchase any fixtures, equipment, machinery, furniture, or any other personal property as Lender deems necessary or desirable for the completion of the construction and equipping of the Improvements or for the clearance of title to the Land, (viii) execute all applications and certificates in the name of Borrower that might be required, (ix) prosecute and defend all actions or proceedings in connection with the Project, and (xi) do any act that Borrower might do in its own behalf relating to the Project, it being understood and agreed that this power of attorney is a power coupled with an interest and cannot be revoked. All reasonable sums expended or advanced by Lender for any of the foregoing purposes, whether or not in excess of the Loan amount, shall be deemed to have been requested by and paid to Borrower, will constitute additional Obligations of Borrower immediately due and payable, shall be evidenced and secured by the Loan Documents, and shall bear interest at the Default Rate retroactive to the date such sums are expended by Lender; and

8.2.5 *Exercise Setoff Right and Banker's Lien.* Exercise the rights and remedies of setoff and/or banker's lien against the interest of Borrower in and to every account (whether time or demand, general or special, provisionally credited or finally credited, or otherwise) now or hereafter maintained by Borrower for its own account with Lender and any branch, subsidiary, or affiliate of Lender, or any Person who then owns a participating interest in the Loan, to the extent of the full amount of the Obligations; and

8.2.6   *Exercise Other Remedies.*   Exercise any and all rights and remedies contained in the other Loan Documents and afforded by the laws of the United States, the state in which the Project is located, or any other appropriate jurisdiction as might be available for the collection of debts and enforcement of covenants and conditions such as those contained in this Loan Agreement and the other Loan Documents, all of which rights and remedies shall be cumulative and non-exclusive.

## ARTICLE 9.:  ADDITIONAL PROVISIONS

9.1     <u>Indemnification</u>.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release, and hold harmless the Indemnified Parties (defined below) from and against any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, diminutions in value, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement, or punitive damages, of whatever kind or nature (including, but not limited to attorney's fees and other costs of defense) (the **"Losses"**) imposed upon or incurred by or asserted against any Indemnified Party (but excluding Losses arising out of Lender's gross negligence or willful misconduct) and directly or indirectly arising out of or in any way relating to (i) Lender's interest in the Project or Lender's relationship with any Obligor by virtue of Lender's ownership of the Loan, the Note, the Security Instrument, or any other Loan Document, (ii) any amendment to, or restructuring of, the Loan or any Loan Document; (iii) any and all lawful action that may be taken by Lender in connection with the enforcement of the provisions of this Loan Agreement, the Security Instrument, or any other Loan Document, whether or not suit is filed in connection with same, or in connection with Borrower, Guarantor, and/or any member, partner, joint venturer, or shareholder of Borrower becoming a party to a voluntary or involuntary federal or state bankruptcy, insolvency or similar proceeding, (iv) any accident, injury to or death of persons, or loss of or damage to property occurring in, on, or about the Project or any part thereof or adjacent parking areas, streets, or ways, (v) any use, non-use, or condition in, on, or about the Project or any part thereof or on the adjoining sidewalks, curbs, adjacent property, or adjacent parking areas, streets, or ways, (vi) any failure on the part of Borrower to perform or be in compliance with any of the terms of this Loan Agreement, the Security Instrument, or any other Loan Document, (vii) performance of any labor or services or the furnishing of any materials or other property in respect of the Project or any part thereof, (viii) the failure of any Person to file timely with the Internal Revenue Service an accurate Form 1099-B, Statement or Recipients of Proceeds from Real Estate, Broker and Barter Exchange Transactions, which may be required in connection with the Loan, or to supply copy thereof in a timely fashion to the recipient of the proceeds of the Loan, (ix) any failure of the Project to be in compliance with any Legal Requirement, (x) the enforcement by any Indemnified Party of the provisions of this Section, (xi) the payment of any commission, charge, or brokerage fee to any Person that might be payable in connection with the funding of the Loan, or (xii) any misrepresentation made by Borrower in this Loan Agreement or in any of the other Loan Documents.  Additionally, if any taxes (excluding taxes imposed upon or measured by the net income of Lender, but including, without limitation, any intangibles tax, stamp tax, recording tax, or franchise tax) shall be payable by Lender on account of the execution or delivery of this Loan Agreement, or the execution, delivery, issuance, or recording of any other Loan Document, or the creation of any of the Obligations, by reason of any existing or hereafter enacted federal, state, foreign, or local statute, rule, or regulation, Borrower shall pay (or will promptly reimburse Lender for the payment of) all such taxes and will indemnify and hold Lender harmless from and against liability in connection therewith.  Any amounts payable to Lender by reason of the application of this Section shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Lender until paid.  For purposes of this Section, the term **"Indemnified Parties"** shall mean Lender and any Person who is or will have been involved in the origination or administration of the Loan, any Person in whose name the encumbrance created by the Security Instrument is or will have been recorded, Persons who may hold or acquire or will have held a full or partial interest in the Loan (including, but not limited

to investors or prospective investors who hold or have held a full or partial interest in the Loan for the benefit of third parties) as well as the respective directors, officers, shareholders, members, partners, employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors, and assigns of any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan or the Project, whether during the term of the Loan or as a part of or following a foreclosure of the Loan and including, but not limited to any successors by merger, consolidation, or acquisition of all or a substantial portion of Lender's assets and business. The indemnity obligation of Borrower under this Section and any other provision of this Loan Agreement shall survive the payment in full of the Obligations.

9.2    Lender's Expenses. Without limiting the provisions of Section 9.1 above, if at any time or times prior or subsequent to the date of this Loan Agreement, regardless of whether or not an Event of Default then exists or any of the transactions contemplated hereunder are concluded, Lender employs counsel for advice or other representation, or incurs legal expenses or other costs or out-of-pocket expenses, in connection with (i) the negotiation, preparation, and execution of this Loan Agreement or any other Loan Document, any amendments, waivers, or consents relating to this Loan Agreement or any other Loan Document, and any workout or restructuring relating to the Loan, (ii) the administration of the Loan, this Loan Agreement, or any other Loan Document and the transactions contemplated hereby and thereby, (iii) periodic audits and appraisals performed by Lender, (iv) any litigation, contest, dispute, suit, proceeding, or action (whether instituted by Lender, Borrower, or any other Person) in any way relating to the Loan, the Project, this Loan Agreement, any other Loan Documents, or Borrower's affairs, including, without limitation, any litigation, contest, dispute, suite, proceeding, action relating to the death, legal incompetency, bankruptcy, or insolvency of any Obligor, (v) any attempt to enforce any rights or remedies of Lender against Borrower, any Guarantor, or any other Person that might at any time be obligated to Lender by virtue of this Loan Agreement or any other Loan Document, or (vi) any attempt to inspect, verify, protect, preserve, restore, collect, sell, liquidate, or otherwise dispose of or realize upon the Project, then, in any such event, the reasonable attorneys' fees arising from such services, and all expenses, costs, charges, and other fees of such counsel or of Lender or relating to any of the events or actions described in this Section, shall be payable **on demand** by Borrower to Lender and shall be additional Obligations hereunder secured by the Project. Without limiting the generality of the foregoing, such expenses, costs, charges, and fees may include attorney, paralegal, and law clerk fees and disbursements (including, without limitation, fees and disbursements at the pre-trial, trial, and appellate levels); the fees, costs, and expenses of accountants, appraisers, or expert witnesses retained or consulted by Lender; costs and expenses incurred by Lender's loan administration staff, audit staff, and appraisal staff; court costs and expenses; photocopying and duplicating expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges; telegram charges; and expenses for travel, lodging, and food paid or incurred in connection with the performance of such legal services. Borrower acknowledges and agrees that legal counsel to Lender does not represent Borrower as Borrower's attorney, that Borrower has retained counsel of its own choice and has not and will not rely upon any advice from Lender's counsel, and that Borrower's reimbursement of expenses pursuant to this Agreement (even if effected by payment directly by Borrower to Lender's counsel) shall not be deemed to establish any attorney-client relationship between Borrower and Lender's counsel.

9.3    Assignability. Neither this Loan Agreement, nor any rights or obligations hereunder, nor any Advance to be made hereunder, is assignable by Borrower. The rights of Lender under this Loan Agreement are assignable in part or wholly, and any assignee of Lender will succeed to and be possessed of the rights of Lender hereunder to the extent of the assignment made, including the right to make Advances to Borrower or any approved assignee of Borrower in accordance with this Loan Agreement.

9.4    Relationship of the Parties. Borrower agrees that its relationship with Lender is solely that of debtor and creditor. Nothing contained in this Loan Agreement or in any other Loan Document

shall be deemed to create a partnership, tenancy-in-common, joint tenancy, joint venture, or co-ownership by or between Borrower and Lender, or make Lender the agent or representative of Borrower. Lender shall not be in any way liable or responsible for any debts, losses, obligations, or duties of Borrower with respect to the Project or otherwise, including, without limitation, any debts, obligations, or duties owed at any time to materialmen, contractors, craftsmen, laborers, or others for goods delivered to or services performed by them in relation to the Project, it being understood that no contractual relationship, either expressed or implied, exists between Lender and any materialmen, subcontractors, craftsmen, laborers, or any other person supplying any work, labor, or materials for the Project. Borrower, at all times consistent with the terms and provisions of this Loan Agreement and the other Loan Documents, shall be free to determine and follow its own policies and practices in the conduct of its business.

9.5    <u>Participation</u>. Lender may, at its option, sell participation interests in the Loan to other participating lenders, provided, however, that Borrower shall continue to be entitled to deal with Lender as though no such participations had been sold. Each participant shall be entitled to receive all information received by Lender regarding the creditworthiness of Borrower, any of its principals and any Guarantor, including (without limitation) information required to be disclosed with a participant pursuant to Banking Circular 181 (Rev., August 2, 1984), issued by the Comptroller of the Currency (whether the participant is subject to the circular or not). Borrower agrees with all present and future such participants that if an Event of Default occurs, each participant will have all of the rights and remedies of Lender with respect to any deposit due from any participant to Borrower, including, without limitation, the right to set off such deposits against Borrower's obligations hereunder. The execution by a participant of a participation agreement with Lender and the execution by Borrower of this Loan Agreement, regardless of the order of execution, with a copy to Borrower, will evidence an agreement between Borrower and such participant in accordance with the terms hereof.

9.6    <u>Hedge Contracts</u>. Lender (or an Affiliate of Lender) may offer to Borrower the opportunity to enter into one or more Hedge Contracts in order to offer protection against fluctuations in interest rates. Hedge Contracts shall be documented on standard documentation used by Lender or its Affiliate, and Borrower's obligations under the Hedge Contracts shall be secured by the Collateral and guaranteed by Guarantor. Lender shall not be entitled to terminate or unwind any Hedge Contract except pursuant to the express provisions thereof. Borrower hereby assigns to Lender, and grants to Lender a security interest in, any credit, refund, rebate, profit or other interest that may inure to Borrower at any time under any Hedge Contract, and Borrower agrees that Lender may, at any time that an Event of Default has occurred and is continuing, set off any such amount against Borrower's obligations hereunder.

9.7    <u>Further Assurances</u>. Borrower shall, upon Lender's request, (i) promptly correct any defect, error or omission in any Loan Document; (ii) execute, acknowledge, deliver, procure, record or file such further instruments and do such further acts as Lender deems necessary, desirable or proper to carry out the purposes of the Loan Documents and to identify and subject to the liens and security interest of the Loan Documents any property intended to be covered thereby, including any renewals, additions, substitutions, replacements, or appurtenances to the Project; (iii) execute, acknowledge, deliver, procure, file or record any document or instrument Lender deems necessary, desirable, or proper to protect the liens or the security interest under the Loan Documents against the rights or interests of third persons; and (iv) provide such certificates, documents, reports, information, affidavits and other instruments and do such further acts deemed necessary, desirable or proper by Lender to comply with the requirements of any agency having jurisdiction over Lender.

9.8    <u>Inducement to Lender</u>. The representations and warranties contained in this Loan Agreement and the other Loan Documents (i) are made to induce Lender to make the Loan and extend any other credit to or for the account of Borrower pursuant hereto, and Lender is relying thereon and will continue to rely thereon, (ii) shall survive the execution and delivery of this Loan Agreement and any

bankruptcy proceedings involving Borrower, or the Project, foreclosure, or conveyance in lieu of foreclosure, and (iii) shall automatically be remade and republished by reference in each Advance Request submitted by Borrower, unless Borrower specifically notifies Lender of any change therein.

9.9    Commercial Purpose.  Borrower warrants that the Loan is being made solely to acquire or carry on a business or commercial enterprise and Borrower is a business or commercial organization. Borrower further warrants that all of the proceeds of this Loan shall be used for commercial purposes and stipulates that the Loan shall be construed for all purposes as a commercial loan and is made for other than personal, family, household or agricultural purposes.

## ARTICLE 10.: DOCUMENT PROTOCOLS

This Loan Agreement and each of the other Loan Documents shall be governed by the following protocols (the **"Document Protocols"**), unless any Loan Document expressly states that the Document Protocols will not apply to such Loan Document in whole or in part:

10.1    General Rules of Usage.  These Document Protocols will apply to such Loan Document as from time to time amended, modified, replaced, restated, extended or supplemented, including by waiver or consent, and to all attachments thereto and all other documents or instruments incorporated therein.

10.2    Notices.    All notices, consents, approvals, statements, requests, reports, demands, instruments or other communications to be made, given or furnished pursuant to, under or by virtue of such Loan Document (a **"notice"**) shall be in writing and shall be deemed given or furnished if addressed to the Person intended to receive the same at the address set forth below under such Person's signature to this Loan Agreement (or, if such Person is not a party to this Loan Agreement, to any other Loan Document to which such Person is a party) (i) upon receipt when personally delivered, (ii) three (3) Business Days after the same is deposited in the United States mail as first class registered or certified mail, return receipt requested, postage prepaid, (iii) one (1) Business Day after the date of delivery of such notice to a nationwide, reputable commercial courier service, charges prepaid, or (iv) upon transmission, when sent by telecopy or other similar facsimile transmission (with such telecopy or facsimile promptly confirmed by delivery of a copy by personal delivery, United States Mail, or overnight courier service as otherwise provided in this Section.  Any party may change the address to which any notice is to be delivered to any other address within the United States of America by furnishing written notice of such change at least fifteen (15) days prior to the effective date of such change to the other parties in the manner set forth above, but no such notice of change shall be effective unless and until received by such other parties.  Rejection or refusal to accept, or inability to deliver because of changed address or because no notice of changed address was given, shall be deemed to be receipt of any such notice.  Any notice to an entity shall be deemed to be given on the date specified in this Section without regard to when such notice is delivered by the entity to the individual to whose attention it is directed and without regard to the fact that proper delivery may be refused by someone other than the individual to whose attention it is directed.  If a notice is received by an entity, the fact that the individual to whose attention it is directed is no longer at such address or associated with such entity will not affect the effectiveness of such notice.  Notices may be given on behalf of any party by such party's attorneys.

10.3    Severability.    Whenever possible, each provision of such Loan Document shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of such Loan Document shall be prohibited by or invalid or unenforceable under the applicable law of any jurisdiction with respect to any Person or circumstance, such provision shall be ineffective to the extent of such prohibition, invalidity or unenforceability, without invalidating the remaining provisions of such Loan Document or affecting the validity or enforceability of such provisions in any other jurisdiction or

with respect to other Persons or circumstances.  To the extent permitted by applicable law, the parties to such Loan Document thereby waive any provision of law that renders any provision thereof prohibited, invalid or unenforceable in any respect.

10.4    <u>Remedies Not Exclusive</u>.  No remedy therein conferred upon or reserved to Lender is intended to be exclusive of any other remedy or remedies available to Lender under such Loan Document, at law, in equity or by statute, and each and every such remedy shall be cumulative and in addition to every other remedy given thereunder or now or hereafter existing at law, in equity or by statute.

10.5    <u>Liability</u>.  If Borrower or Guarantor consists of more than one Person, the obligations and liabilities of each such Person under such Loan Document shall be joint and several, except as expressly provided to the contrary in such Loan Document.

10.6    <u>Binding Obligations; Covenants Run with the Land</u>.  Such Loan Document shall be binding upon Borrower or Guarantor, as the case may be, and the successors, assigns, heirs and personal representatives of Borrower or Guarantor, as the case may be, and will inure to the benefit of Lender and all subsequent holders of such Loan Document and their respective officers, directors, employees, shareholders, agents, successors and assigns.  Nothing in such Loan Document, whether express or implied, shall be construed to give any Person (other than the parties thereto and their permitted successors and assigns and as expressly provided therein) any legal or equitable right, remedy or claim under or in respect of such Loan Document or any covenants, conditions or provisions contained therein.  If such Loan Document is to be recorded, all of the grants, covenants, terms, provisions, covenants and conditions of such Loan Document will run with the land.

10.7    <u>No Oral Modifications</u>.  Such Loan Document, and any of the provisions thereof, cannot be altered, modified, amended, waived, extended, changed, discharged or terminated orally or by any act on the part of Borrower, Guarantor, or Lender, but only by an agreement in writing signed by the party against whom enforcement of any alteration, modification, amendment, waiver, extension, change, discharge or termination is sought.  Without limiting the generality of the foregoing, any payment made by Lender for insurance premiums, impositions or any other charges affecting the Project will not constitute a waiver of Borrower's or any Guarantor's default in making such payments and will not obligate Lender to make any further payments.

10.8    <u>Entire Agreement</u>.  Such Loan Document, together with the other applicable Loan Documents, constitutes the entire agreement of the parties thereto with respect to the subject matter thereof and supersedes all prior written and oral agreements and understandings with respect to such subject matter.

10.9    <u>Waiver of Acceptance</u>.  Borrower and Guarantor hereby waive any acceptance of such Loan Document by Lender in writing, and such Loan Document will immediately be binding upon Borrower or Guarantor, as the case may be.

10.10   <u>Jurisdiction, Court Proceedings</u>.  Each of Lender, Borrower, and Guarantor, to the fullest extent permitted by law, hereby knowingly, intentionally, and voluntarily, with and upon the advice of competent counsel, (i) submits to personal, nonexclusive jurisdiction in the State of Georgia with respect to any suit, action, or proceeding by any person arising from, relating to, or in connection with such Loan Document or the Loan, (ii) agrees that any such suit, action, or proceeding may be brought in any state or federal court of competent jurisdiction sitting in the State of Georgia, and (iii) submits to the jurisdiction of such courts.  Each of Borrower and Guarantor, to the fullest extent permitted by law, hereby knowingly, intentionally, and voluntarily, with and upon the advice of competent counsel, further agrees that it will not bring any action, suit, or proceeding in any forum other than in the state or federal courts of

the State of Georgia (but nothing herein will affect the right of Lender to bring any action, suit, or proceeding in any other forum), and irrevocably agrees not to assert any objection which it may ever have to the laying of venue of any such suit, action, or proceeding in any federal or state court located in Georgia and any claim that any such action, suit, or proceeding brought in any such court has been brought in an inconvenient forum.

10.11  <u>Waiver of Counterclaim</u>.  Borrower and Guarantor each hereby knowingly waives the right to assert any counterclaim, other than a compulsory or mandatory counterclaim, in any action or proceeding brought against either of them by Lender.

10.12  <u>Waiver of Jury Trial</u>.  Borrower, Guarantor, and Lender, to the full extent permitted by law, each hereby knowingly, intentionally, and voluntarily, with and upon the advice of competent counsel, waives, relinquishes, and forever forgoes hereby the right to a trial by jury in any action or proceeding, including, without limitation, any tort action, brought by any of them against the other based upon, arising out of, or in any way relating to or in connection with such Loan Document, the Loan, or any course of conduct, act, omission, course of dealing, statements (whether verbal or written) or actions of any Person (including, without limitation, such Person's directors, officers, partners, members, employees, agents or attorneys, or any other Persons affiliated with such Person), in connection with the Loan or such Loan Document, including, without limitation, in any counterclaim which Borrower or Guarantor may be permitted to assert thereunder or which may be asserted by Lender against Borrower or Guarantor, whether sounding in contract, tort, or otherwise.  This waiver by Borrower and Guarantor of their right to a jury trial is a material inducement for Lender to make the Loan.

10.13  <u>No Waivers by Lender</u>.  No delay or omission of Lender in exercising any right or power accruing upon any default under such Loan Document will impair any such right or power or shall be construed to be a waiver of any default under such Loan Document or any acquiescence therein, nor will any single or partial exercise of any such right or power or any abandonment or discontinuance of steps to enforce such right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  Acceptance of any payment after the occurrence of a default under such Loan Document shall not be deemed to waive or cure such default under such Loan Document; and every power and remedy given by such Loan Document to Lender may be exercised from time to time as often as may be deemed expedient by Lender.  Borrower and Guarantor hereby waive any right to require Lender at any time to pursue any remedy in Lender's power whatsoever.

10.14  <u>Waiver of Notice</u>.  Neither Borrower nor Guarantor shall be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which such Loan Document specifically and expressly provides for the giving of notice by Lender to Borrower or Guarantor, as the case may be, and except with respect to matters for which Borrower or Guarantor, as the case may be, is not, pursuant to applicable legal requirements, permitted to waive the giving of notice.  Each of Borrower and Guarantor hereby expressly waives the right to receive any notice from Lender with respect to any matter for which such Loan Document does not specifically and expressly provide for the giving of notice by Lender to Borrower or Guarantor, as the case may be.  Any provision of such Loan Document which expressly provides for the giving of notice by Lender to Borrower or Guarantor shall be deemed eliminated *ab initio* if Lender is prevented from giving such notice by bankruptcy or other applicable law.

10.15  <u>Offsets, Counterclaims and Defenses</u>.  Any assignee of such Loan Document from Lender or any successor or assignee of Lender will take the same free and clear of all offsets, counterclaims, or defenses that are unrelated to such Loan Document which Borrower or Guarantor may otherwise have against any assignor of such Loan Document, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower or Guarantor in any action or proceeding brought by any such assignee upon such Loan Document, and any such right to interpose or assert any such unrelated

offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower and Guarantor.

10.16    Time of the Essence.  Time shall be of the essence in the performance of all obligations of Borrower and Guarantor under such Loan Document.

10.17    Governing Law.    Such Loan Document shall be governed by, and construed in accordance with, the laws of the State of Georgia.

10.18    Sole Discretion of Lender.  Wherever pursuant to such Loan Document, Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide that arrangements or terms are satisfactory or not satisfactory shall be in the sole discretion of Lender exercised in subjective good faith and shall be final and conclusive, except as may be otherwise specifically provided therein.  In addition, Lender will have the right to refuse to grant its consent, approval or acceptance or to indicate its satisfaction whenever such consent, approval, acceptance or satisfaction shall be required under such Loan Document, subject to the applicable standard of discretion.

10.19    Counterparts; Electronic Delivery.  To facilitate execution, such Loan Document may be executed in as many counterparts as may be convenient or required.  It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all Persons required to bind any party, appear on each counterpart.  All counterparts shall collectively constitute a single instrument.  It shall not be necessary in making proof of such Loan Document to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties thereto.  Any signature to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.  Delivery of an executed counterpart of such Loan Document by telefacsimile or any other form of electronic transmission shall be equally as effective as delivery of an original executed counterpart of such Loan Document. Any party delivering an executed counterpart of such Loan Document by telefacsimile or other electronic means also shall deliver an original executed counterpart of such Loan Document, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of such Loan Document.

10.20    Exhibits Incorporated; Headings.  The information set forth on the cover of such Loan Document, the table of contents, the headings, and the exhibits annexed thereto, if any, shall be deemed to be incorporated therein as a part thereof with the same effect as if set forth in the body thereof.  The headings and captions of the various articles, sections, and paragraphs of such Loan Document are for convenience of reference only and shall not be construed as modifying, defining, or limiting, in any way, the scope or intent of the provisions thereof.

10.21    Interpretation.  No provision of such Loan Document will  be construed against or interpreted to the disadvantage of any party thereto by any court or other governmental or judicial authority by reason of such party's having or being deemed to have structured or dictated such provision.

10.22    Remedies of Borrower and Guarantor.  If Borrower or Guarantor, as the case may be, will seek the approval or consent of Lender under such Loan Document, which Loan Document expressly provides that Lender's approval shall not be unreasonably withheld, and Lender will fail or refuse to give such consent or approval, the burden of proof as to whether or not Lender acted unreasonably shall be upon Borrower or Guarantor, as the case may be, provided Lender has given Borrower a written explanation for the disapproval or lack of consent.

10.23   <u>Release of any Party or Project</u>.  Lender may at any time, without releasing or impairing the liability of any Person liable upon or in respect of such Loan Document, release, surrender, substitute, or exchange any Project securing this Note and may at any time release any other Person primarily or secondarily liable for the Obligations.

10.24   <u>Attorneys' Fees</u>.   Wherever it is provided in such Loan Document that Borrower or Guarantor pay any costs and expenses, such costs and expenses will include, without limitation, all reasonable attorneys', paralegal and law clerk fees and disbursements, including, without limitation, fees and disbursements at the pre-trial, trial and appellate levels, which are actually incurred or paid by Lender at standard billable rates; provided that the foregoing reference to "reasonable" fees and disbursements (and any other such references in such Loan Document) shall be deemed to include only such fees and disbursement actually incurred at normal billing rates.

10.25   <u>Method of Payment</u>.   All amounts required to be paid by any party to such Loan Document to any other party shall be paid in such freely transferable coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts.

10.26   <u>True Copy</u>.  By executing such Loan Document, Borrower or Guarantor, as the case may be, acknowledges that it has received a true copy of such Loan Document.

[Executions begin on the next page]

**IN WITNESS WHEREOF,** Borrower has caused this Loan Agreement to be executed by its duly authorized representative as of the date first set forth above, with the intention that this instrument take effect as an instrument under seal.

**CABANA WEST, L.P.,**
an Alabama limited partnership

By:   Cabana West Partners, LLC,
       an Alabama limited liability company
       Its General Partner

By: _____(L.S.)
     Miles E. Hill, Jr.,
     Managing Member

**Address for notices:**

c/o Charter Companies
730 N. Dean Road
Suite 200
Auburn, Alabama  36830

**[Signatures continue on the next page]**

**IN WITNESS WHEREOF,** Lender has caused this Loan Agreement to be executed by its duly authorized representative as of the date first set forth above, with the intention that this instrument take effect as an instrument under seal.

**SOUTHTRUST BANK,**
an Alabama banking corporation

By: _____
Name: Robert E. Dell, Jr.
Title: Vice President

[Seal]

**Address for notices:**

SouthTrust Bank
SouthTrust Tower, 2nd Floor
112 North Twentieth Street
Birmingham, Alabama 35203
Attention:  Commercial Real Estate Dept.
Facsimile:  (205) 254-4879

*with copy to:*

SouthTrust Bank
171 17th Street, N.W.
5th Floor
Atlanta, Georgia 30363

Attention:  Mr. Robert E. Dell, Jr.
Facsimile:  (404) 214-3719

*with copy to (which alone shall not constitute notice):*

William T. McKenzie, Esq.
Burr & Forman LLP
171 17th Street, N.W.
Suite 1100
Atlanta, Georgia 30363
Facsimile:  (404) 817-3244

**[End of Signatures]**

**EXHIBIT A**

**PROJECT BUDGET**

Cabana West Apartments
Number of Units:        268

| Item | Total | Total Estimate |
|---|---|---|
| Construction Contract (Hard Cost) | | $17,673,479.00 |
| Construction Contingency | | -------------- |
| Construction Inspection Fees | | $5,500.00 |
| *Architectural Fees:* | | |
| Design/Permitting | $297,500.00 | |
| Construction Administration | $52,500.00 | |
| Plans copies, Misc. reimbursables, etc. | $4,500.00 | |
| **Subtotal** | | **$354,500.00** |
| Civil Engineering | | $73,800.00 |
| Interiors/Model Design | | $20,000.00 |
| Landscape Design | | $60,000.00 |
| Impact Fees, Permits | | $769,000.00 |
| Survey Costs | | -------------- |
| Construction Period Interest | | $775,000.00 |
| *Financing Fees:* | | |
| Construction Loan Fee | 0.5% | $90,000.00 |
| Permanent Loan Fee | | -------------- |
| Interim Financing Fees | | $35,000.00 |
| *Closing Costs & Legal Fees:* | | |
| Borrower's Counsel | $25,000.00 | |
| Lender's Counsel | $10,000.00 | |
| Title Insurance/Recording Fees | $39,830.00 | |
| Intangible Tax | $36,000.00 | |
| Mortgage Tax | $63,000.00 | |
| **Subtotal** | | **$173,830.00** |
| Land Cost | | $2,250,000.00 |
| Market Study/Marketing Consultant | | -------------- |
| Boundary & Topo Survey | | -------------- |
| Soil Borings | | $4,000.00 |
| Phase I Environmental Report | | $2,500.00 |
| Mitigation | | -------------- |
| Appraisal | | $10,500.00 |
| Estimated Taxes During Const. | | $30,000.00 |
| *Initial Operating Costs:* | | |
| Mgt. Payroll | $15,000.00 | |
| Mgt. Fees | $7,000.00 | |
| Utilities | $4,000.00 | |
| Office Supplies | $5,000.00 | |
| Office Equip | $10,000.00 | |
| Miscellaneous Rent-up Costs | $10,000.00 | |
| **Subtotal** | | **$51,000.00** |
| *Marketing:* | | |
| Advertising | $15,000.00 | |
| Brochures, Printing, Gifts, etc. | $10,000.00 | |
| Graphic Design, Web Design | $7,500.00 | |
| Open House, Groundbreaking, After | $5,000.00 | |

| | | |
|---|---|---|
| Hours, etc. | | |
| **Subtotal** | | **$37,500.00** |
| FF&E Clubhouse, Models, Exercise Equip., etc.: | | |
| Pool Furniture, Grill, Cabana, Fixtures, etc. | $20,000.00 | |
| Leasing Center, Clubroom furniture, computers | $60,000.00 | |
| Office Furniture | $10,000.00 | |
| Fitness Equip., Tanning Beds | $25,000.00 | |
| Pool Table, Big Screen TV | $5,000.00 | |
| Movie Theater Furnishings, Equip. | $15,000.00 | |
| Model Furnishings | $20,000.00 | |
| Golf Carts | $2,000.00 | |
| **Subtotal** | | **$157,000.00** |
| | | |
| Accounting Costs | | $5,000.00 |
| As-built Survey | | $6,000.00 |
| Developer Fee/Overhead | | $100,000.00 |
| Reimbusables (travel, mailing, etc.) | | $25,000.00 |
| Soft Cost Contingency/Pre-Operating Costs | | $30,000.00 |
| **Subtotal Development (Soft Costs)** | | **$5,059,630.00** |

| | |
|---|---|
| Total Project Cost (Total Hard and Soft Costs) | **$22,738,609.00** |
| Loan Amount | **$18,000,000.00** |
| Required Equity Contribution | **$4,738,609.00** |

Loan Agreement - Exhibit A

Cabana West, L.P. (Apartment Project)

**EXHIBIT B**

**FORM OF ADVANCE REQUEST**

Advance Request No: _____

Date: _____

Lender:            SouthTrust Bank
                   Commercial Real Estate Department
                   SouthTrust Tower, 8th Floor
                   420 North Twentieth Street
                   Birmingham, Alabama 35203

Borrower: _____

Loan No: _____

Project: _____

Location: _____

For Period Ending: _____

In accordance with the Construction Loan Agreement dated _____, between Borrower and Lender (the "**Loan Agreement**"), Borrower requests an Advance under the Loan in the amount of $_____. The costs to be paid with the proceeds of the Advance are as follows:

1.   **Current Payment Due For Direct Costs**            $_____
     (Enter amount shown on Form B - Subtotal Directs)

2.   **Current Payment Due For Indirect Costs**          $_____
     (Enter amount shown on Form B - Subtotal Indirects)

3.   **Total Payment Due**                               $_____
     (Enter amount shown on Form B - Total Request)

Borrower certifies that (i) all conditions precedent set forth in the Loan Agreement to the Advance herein requested have been satisfied or waived pursuant to a separate writing signed by an officer of Lender, (ii) all costs to be paid with the proceeds of the Advance herein requested have actually been incurred by Borrower and otherwise are eligible for payment in accordance with the terms of the Loan Agreement, (iii) all costs are paid for which previous Advances were made under the Loan Agreement, as specified in the Advance Requests submitted by Borrower with respect thereto, (iv) all representations and warranties set forth in the Loan Agreement are true, accurate and complete as of the date hereof, and (v) no Default or Event of Default has occurred and is continuing under the Loan Agreement.

**BORROWER NAME**

By:_____
         Authorized Representative

# EXHIBIT B

ORIGINAL

06284P00729

## AMENDMENT TO CONSTRUCTION LOAN AGREEMENT

**THIS AMENDMENT**, made as of the 14th day of September, 2006, is by and between **CABANA WEST, L.P.**, an Alabama limited partnership ("Borrower"), and **WACHOVIA BANK, NATIONAL ASSOCIATION**, a national banking association and successor by merger to SouthTrust Bank (the "Lender").

### R E C I T A L S :

A.    Lender is the owner and holder of that certain Promissory Note dated as of December 23, 2004, payable by Borrower to the order of Lender in the original principal amount of $18,000,000.00 (as heretofore amended, modified, renewed or extended, the "Note"). Proceeds of the Note have been advanced to Borrower pursuant to the terms of that certain Construction Loan Agreement between Borrower and Lender dated as of December 23, 2004 (as heretofore or hereafter amended, modified, renewed or extended, the "Loan Agreement"). All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Loan Agreement.

B.    The outstanding principal balance of the Loan as of the date of this Amendment is $17,818,776.47. In order to provide additional funds necessary to complete the Project, the Borrower has requested that the stated principal amount of the Loan be increased by the sum of $9,317,113 (the "Increase"), to a new stated principal amount of $27,5000,000. Lender has agreed to fund the Increase upon the terms and conditions set forth in this Agreement, and the parties now desire to amend the Loan Agreement as set forth herein.

### AGREEMENT

**NOW, THEREFORE,** in consideration of the foregoing Recitals, the parties hereto agree as follows:

1.    *Recitals.*  The parties hereby acknowledge the foregoing Recitals to be true and correct in all material respects.

2.    *Increase in Loan Amount.*  The stated principal amount of the Loan is hereby increased to the sum of $27,500,000.00. Accordingly, the words and figures "Eighteen Million And No/100 Dollars" and "$18,000,000.00" are hereby deleted from the Loan Agreement wherever the same may appear, and the words and figures "Twenty-Seven Million Five Hundred Thousand and No/100 Dollars" and "$27,500,000.00" are hereby inserted in lieu thereof.

3.    *Revised Project Budget.*  The construction cost budget attached to the Loan Agreement as Exhibit A is hereby deleted in its entirety, and the revised cost budget attached to this Amendment as Exhibit A-1 is hereby substituted as the applicable "Project Budget" under the Loan Agreement. Borrower agrees that the principal of the Loan shall be advanced in accordance with the terms of the Loan Agreement and the revised Project Budget attached hereto as Exhibit A-1.

1499159 v2

4.    *Additional Equity.*

(a)    The Borrower shall cause the Minimum Equity Requirement to be satisfied by the immediate injection of additional equity into the Project in an amount sufficient to cover all costs of completion in excess of the Loan amount, as increased pursuant to Section 2 above (the "Additional Equity"). As reflected in the Project Budget attached hereto as Exhibit A-1, the Borrower's Additional Equity is presently estimated to be $2,704,750.00. Nothing herein shall be deemed an assurance by Lender that the Additional Equity shall be sufficient to complete the Project, or to imply that the Minimum Equity Requirement will remain satisfied upon injection of the Additional Equity. To the contrary, the Borrower's obligation to keep the Loan in balance as set forth in Section 2.14.2 of the Loan Agreement shall at all times remain in effect.

(b)    Section 2.14 of the Loan Agreement is hereby modified to delete the existing provision for *pari passu* funding of the Borrower's Minimum Equity Requirement, and to provide that the Borrower's Minimum Equity Requirement (including the Additional Equity) must instead be expended in payment of Project costs prior to funding of the Increase.

(c)    The first $301,466.61 in Additional Equity shall be funded by Borrower in cash, with the balance of $2,403,283.39 to be funded through a clean, irrevocable standby letter of credit in favor of Lender, under which Lender will be entitled to make periodic drafts in order to pay Project costs. The account party, issuer, form and content of any such letter of credit shall be subject to the review and approval of Lender in its sole discretion.

5.    *Reporting.* In addition to the periodic reports required by Section 7.6 of the Loan Agreement, the Borrower shall provide to Lender, no later than five (5) days after Borrower's receipt thereof, true and correct copies of all commitment letters, term sheets, letters of intent, offers of sale or purchase, option contracts, purchase contracts, swap proposals, or similar materials related to any proposed financing or sale of the Project or of the equity interests in Borrower or any of its constituent entities.

6.    *Commitment Fee.* In consideration of the additional extension of credit evidenced hereby, Borrower agrees to pay to Lender a commitment fee in the amount of $10,000.00, which fee shall be due and payable by Borrower, and shall be deemed fully earned by Lender, upon the Borrower's execution and delivery of this Agreement.

7.    *Success Fee.*

(a)    Definitions. For purposes of this Section 7, the following terms shall have the meanings set forth herein:

"Applicable Percentage" shall mean (i) with respect to any Sale occurring prior to June, 2007, two percent (2%), and (ii) with respect to any Sale occurring after June 30, 2007, but before September 30, 2007 three percent (3%), and (iii) with respect to any Sale occurring after September 30, 2007, but before December 31, 2007, four percent (4%), and (iv) with respect to any Sale occurring after December 31, 2007, five percent (5%).

2

"**Net Sales Proceeds**" shall mean (i) the sum total of all payments, compensation or remuneration of any kind or character (whether in cash or in kind) payable to the seller upon consummation of any Sale, *minus* (ii) the sum total of all reasonable and customary brokerage commissions, prorations, professional fees and other closing costs payable by the seller to unaffiliated third parties in consummation of such Sale; provided, however, that under no circumstance shall Net Sales Proceeds be less than ninety-three percent (93%) of the gross amount determined under item (i) above.

"**Sale**" shall mean any sale, transfer or other disposition of any ownership interest in (i) the Project, or any portion thereof, or (ii) the equity interests in Borrower or its constituent entities, or any portion thereof.

"**Success Fee**" shall mean a fee payable to Lender in cash upon consummation of any Sale as herein set forth.

(b)     Sale of Project.  Upon any Sale of the Project as a whole, Borrower shall pay to Lender a Success Fee in an amount equal to the Applicable Percentage of the amount by which the Net Sales Proceeds derived from such Sale exceed the sum of $27,500,000.  In the event that Borrower shall elect to convert the Project to a condominium and sell individual dwelling units, then said Success Fee shall be calculated upon the aggregate Net Sales Proceeds received from the Sale of all such units, with Lender reserving the right to collect and hold in escrow a reasonable amount from proceeds of each such Sale (based upon projected sales prices).

(c)     Sale of Equity.  Upon consummation of any Sale of any equity interests in Borrower or any of its constituent entities, as a condition to Lender's consent to such sale (which may be granted or withheld in accordance with the terms of the Loan Documents) any such equity seller shall pay to Lender a Success Fee in an amount equal to the Applicable Percentage of the amount by which the Net Sales Proceeds derived from such Sale exceed the sum of $27,500,000 (or a ratable portion thereof in the case of a partial sale of equity).

(d)     Survival of Success Fee.  Any Success Fee payable hereunder shall be deemed fully earned by Lender upon the execution and delivery of this Agreement.  The obligations of Borrower hereunder with respect to payment of the Success Fee shall remain in full force and effect until such time as all Obligations of the Borrower have been fully and indefeasibly paid and satisfied, and shall be applicable to any Sale by which the proceeds of such repayment are generated.

8.     *Expenses.*  Borrower shall pay, or shall reimburse Lender for, all out-of-pocket costs and expenses incurred by Lender in connection with the preparation, negotiation and execution of this Amendment and the consummation of the transactions contemplated hereby, including, without limitation, all appraisal fees, recording fees and taxes (including intangibles taxes and documentary stamp taxes), title insurance premiums, fees of architects, engineers and surveyors, legal fees and expenses of the Lender's counsel, and fees and expenses of Lender's Consultant.

9.    *General Release.*  In consideration of the agreements of Lender set forth herein, and as a material inducement therefor, Borrower does hereby remise, release and forever discharge Lender and its affiliates, parents, divisions, subsidiaries, successors, predecessors, stockholders, officers, directors, agents, employees, attorneys, successors, and assigns (Lender and such other parties being collectively referred to herein as the "Released Parties"), of and from any and all claims, demands, liabilities, actions and causes of action of every kind or nature, whether known or unknown, suspected or unsuspected, contingent or matured, concealed, hidden, latent or patent, which may now exist or may in the past have existed, arising out of or in any way connected with any occurrences, acts, omissions, or transactions involving, directly or indirectly, the Loan Documents, any of the Obligations, or any transactions or dealings between Borrower and Lender.

10.    *Other Modifications.*  To the extent that any other Loan Document contains any provision which is inconsistent with the terms of this Agreement, the terms of this Agreement shall control, and such Loan Document shall be deemed amended hereby in all material respects. In order to effectuate the purposes of this Agreement, Borrower and Lender have also entered into that certain Note Modification Agreement of even date herewith modifying the terms of the Note, and that certain Amendment to Mortgage and Security Agreement of even date herewith modifying the terms of the Mortgage.

11.    *Miscellaneous.*

(a)    This Agreement shall in all respects be governed by and construed in accordance with the Document Protocols set forth in Article 10 of the Loan Agreement, which by this reference are incorporated herein as if set forth in full.

(b)    Borrower hereby represents and warrants to Lender that it has full power and authority to enter into this Agreement, and that this Agreement constitutes the legal, valid, and binding obligation of the Borrower, enforceable in accordance with its terms. Borrower further represents and warrants that there has not occurred, and does not exist, any event, condition, or state of facts, which, with notice or the passage of time or both, would constitute an Event of Default under any Loan Document.

(c)    As herein amended the Loan Agreement shall remain in full force and effect. From and after the date hereof, any and all references to the Loan Agreement contained in any other instrument or document shall be deemed to refer thereto as amended hereby.

(d)    The Loan Agreement and all other Loan Documents, as amended, are hereby ratified and affirmed in all respects. Borrower confirms that, as of the date hereof, it has no defenses or offsets with respect to its obligations set forth in the Loan Documents.

(e)    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(f)    This Agreement may be executed in any number of counterparts bearing the original signatures of one or more of the parties hereto, each of which shall for all purposes be deemed an original, but all of which, taken together, shall constitute one and the same Agreement. It shall not be necessary that all parties execute the same counterpart.

1499159 v2

4

(g)    Time is of the essence in the performance of each and every term, covenant, condition and agreement set forth herein.

**[No further text this page; Signature pages follow.]**

**IN WITNESS WHEREOF,** the undersigned parties have caused this Amendment to be properly executed and delivered as of the dates of notarization set forth below, but effective for all purposes as of the day and year first above written.

**BORROWER:**

CABANA WEST, L.P., an Alabama limited partnership

By:    Cabana West Partners, LLC, an Alabama
       limited liability company, its general partner

By:    _____
       Miles E. Hill, Jr., Managing Member

**LENDER:**

WACHOVIA BANK, NATIONAL ASSOCIATION,
a national banking association

By:    _____
       Print Name: _____
       Title: _____

# EXHIBIT C

# PROMISSORY NOTE

**$18,000,000.00**                                                      **December 23, 2004**

**FOR VALUE RECEIVED,** the undersigned **CABANA WEST, L.P.,** an Alabama limited partnership ("**Borrower**"), promises to pay to the order of **SOUTHTRUST BANK,** an Alabama banking corporation (together with any subsequent holder of this Note, "**Lender**"), the principal sum of **Eighteen Million and No/100 Dollars ($18,000,000.00),** or so much thereof as may have been advanced to Borrower from time to time hereunder in accordance with, and subject to the conditions of, that certain Construction Loan Agreement of even date herewith between Borrower and Lender (as the same might hereafter be amended, extended, supplemented, or restated, the "**Loan Agreement**"), together with interest and other charges as provided herein.

1.     <u>Definitions</u>.  Capitalized terms used, but not otherwise defined, in this Note shall have the meanings assigned to them in the Loan Agreement.

2.     <u>Payment Terms</u>.

(a)     During the period commencing on the date of this Note and ending on January 10, 2008 (the "**Construction Term**"), the principal of and interest on this Note shall be paid as follows:

(i)     On February 10, 2005, and on the tenth (10th) day of each successive calendar month during the Construction Term, Borrower shall pay to Lender all accrued but unpaid interest on the outstanding principal of this Note; and

(ii)     Unless the term of the Note is extended through the First Extension Term as provided in subsection (b) below, on the last day of the Construction Term (i.e., January 10, 2008), Borrower shall pay the entire principal amount outstanding under this Note, together with all accrued but unpaid interest thereon and any other charges due hereunder.

(b)     Borrower shall have the option of extending the term of this Note from the end of the Construction Term until January 10, 2009 (the "**First Extension Term**"), provided that, as of the last day of the Construction Term, the following conditions precedent have been satisfied or expressly waived by Lender in writing: (i) Borrower has given Lender not less than thirty (30) days' prior written notice of its election to extend the term of the Loan through the First Extension Term; (ii) no Default or Event of Default has occurred and is continuing; (iii) the Improvements have been completed in accordance with the Plans and Specifications, free of liens and encumbrances of any nature (except for Permitted Encumbrances), and Lender has received and approved the items described in <u>Section 3.3</u> of the Loan Agreement; and (iv) Borrower has paid to Lender an extension fee in the amount of $45,000.00 and has paid or reimbursed Lender for all expenses and costs incurred by Lender (including, without limitation, legal fees and disbursements) in connection with such extension.

(c)     If this Note is extended through the First Extension Term as provided above, then during the First Extension Term the principal of, and accrued interest on, this Note shall be paid as follows:

(i)     On the last day of the Construction Term (i.e., January 10, 2008), Borrower shall pay to Lender all accrued but unpaid interest on the outstanding principal of this Note; and

(ii)     On February 10, 2008, and on the tenth (10th) day of each successive calendar month during the First Extension Term, Borrower shall pay to Lender an amount equal to (A) all accrued but unpaid interest on the outstanding principal of this Note, *plus* (B) a level installment of principal as determined by Lender based upon the average of the first twelve (12) installments of principal that would be due under a schedule of substantially equal monthly installments of principal and interest sufficient to amortize the outstanding principal of this Note as of the commencement of the First Extension Term, in full over an assumed amortization term of three hundred sixty (360) months at an assumed rate of interest equal to the *greater of* (Y) the interest rate actually in effect under the Note as of the commencement of the First Extension Term, *or* (Z) 7.0% per annum; and

(iii)     Unless the term of the Note is extended through the Second Extension Term as provided in subsection (d) below, on the last day of the First Extension Term (i.e., January 10, 2009), Borrower shall pay the entire principal amount outstanding under this Note, together with all accrued but unpaid interest thereon and any other charges due hereunder.

(d)     Borrower shall have the option of extending the term of this Note from the end of the First Extension Term until January 10, 2010 (the "**Second Extension Term**"), provided that, as of the last day of the First Extension Term, the following conditions precedent have been satisfied or expressly waived by Lender in writing: (i) Borrower has given Lender not less than thirty (30) days' prior written notice of its election to extend the term of the Loan through the Second Extension Term; (ii) no Default or Event of Default has occurred and is continuing; (iii) the Project has achieved a debt service coverage ratio of not less than 1.20 to 1.00, calculated in accordance with Lender's standard procedures, for each month during the six (6) consecutive month period preceding the date of calculation; and (iv) Borrower has paid to Lender an extension fee in the amount of $45,000.00 and has paid or reimbursed Lender for all expenses and costs incurred by Lender (including, without limitation, legal fees and disbursements) in connection with such extension.

(e)     If this Note is extended through the Second Extension Term as provided above, then during the Second Extension Term the principal of, and accrued interest on, this Note shall be paid as follows:

(i)     On the last day of the First Extension Term (i.e., January 10, 2009), Borrower shall pay to Lender an amount equal to (A) all accrued but unpaid interest on the outstanding principal of this Note, *plus* (B) an installment of principal calculated as provided during the First Extension Phase; and

(ii)     On February 10, 2009, and on the tenth (10th) day of each successive calendar month during the Second Extension Term, Borrower shall pay to Lender an amount equal to (A) all accrued but unpaid interest on the outstanding principal of this Note, *plus* (B) a level installment of principal as determined by Lender based upon the average of the first twelve (12) installments of principal that would be due under a schedule of substantially equal monthly installments of principal and interest sufficient to amortize the outstanding principal of this Note as of the commencement of the Second Extension Term, in full over an assumed amortization term of three hundred sixty (360) months at an assumed rate of interest equal to the *greater of* (Y) the interest rate actually in effect under the Note as of the commencement of the Second Extension Term, *or* (Z) 7.0% per annum; and;

(iii)    On the last day of the Second Extension Term (i.e., January 10, 2010), Borrower shall pay the entire principal amount outstanding under this Note, together with all accrued but unpaid interest thereon and any other charges due hereunder.

(f)    If any payment of principal or interest (or both) required under this Note is due on a day that is not a Business Day (as defined below), then such payment shall be due on the next succeeding Business Day.  As used in this Note, the term "**Business Day**" means a day that is not a Saturday, Sunday, or public holiday on which commercial banks in Birmingham, Alabama, are customarily open for business.  All payments, fees, charges, and other sums due hereunder shall be paid in lawful money of the United States of America and shall be remitted to Lender at the following address:

| *Mailing Address*: | Courier Address: |
|---|---|
| SouthTrust Bank | SouthTrust Bank |
| P. O. Box 830776 | 6434 First Avenue North |
| Birmingham, Alabama 35283-0776 | Birmingham, Alabama 35212 |
| Attn:    McCracken Loan Servicing | Attn:  McCracken Loan Servicing |

or at such other address as Lender might from time to time designate in writing.  All payments made as scheduled on this Note, to the extent thereof, shall be applied first to accrued but unpaid interest due under this Note and then to the unpaid principal of this Note, any instructions from Borrower or anyone else to the contrary notwithstanding.  Any payment received by Lender before the date it is due shall be deemed to have been received on the due date solely for the purpose of calculating interest due.  If at any time Lender receives, from Borrower or otherwise, any amount applicable to the indebtedness under this Note that is less than all amounts due and payable at such time, Lender may apply that payment to amounts then due and payable in any manner and in any order determined by Lender, in Lender's discretion.  Borrower agrees that neither Lender's acceptance of a payment from Borrower in an amount that is less than all amounts then due and payable nor Lender's application of such payment shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction.  All payments made by check or draft shall be accepted subject to the condition that any such check or draft may be handled for collection in accordance with the practice of the collecting bank or banks.

(g)    Borrower will pay to Lender a late charge equal to five percent (5%) of the amount of any payment that is not received by Lender within ten (10) days after the date such payment is due under the terms of this Note.  In no case will any such late charge be less than $0.50 or more than the maximum amount allowed by applicable law.  Collection or acceptance by Lender of such late charge will not constitute a waiver of any rights or remedies of Lender provided in this Note or in any other Loan Document.  The late charge provided for herein represents a fair and reasonable estimate by Borrower and Lender of a fair average compensation for the loss that might be sustained by Lender due to the failure of Borrower to make timely payments hereunder, the parties recognizing that the damages caused by such extra administrative expenses and loss of the use of funds is impracticable or extremely difficult to ascertain or estimate.

3.    Interest Rate.

(a)    The principal outstanding from time to time under this Note shall bear interest at the per annum rate equal to LIBOR (as defined below), *plus* two and fifteen one-hundredths percent (2.15%) (the "**Monthly Rate**").  Lender shall determine the Monthly Rate on (i) the date of the initial funding of Loan proceeds under this Note and (ii) on the tenth (10th) day of each successive calendar month thereafter until such time as this Note is paid in full (or if any day is not a Business Day, then on the immediately preceding Business Day) (each a "**Monthly Rate Adjustment Date**").  The Monthly Rate, as determined by Lender on any Monthly Rate Adjustment Date, shall remain fixed until the next Monthly Rate

Adjustment Date. Lender's determination of the Monthly Rate shall be conclusive, absent manifest error. As used in this Section, the term **"LIBOR"** means, as of any Monthly Rate Adjustment Date, a per annum rate of interest (expressed as a percentage and rounded upwards, if necessary, to the nearest 0.0625%) equal to the "London Interbank Offered Rate (LIBOR)" at which U.S. Dollar deposits for a maturity of one (1) month are offered to Lender in immediately available funds in the London Interbank Market as effective for contracts entered into on the Monthly Rate Adjustment Date, as determined by Lender in accordance with its prevailing procedures in effect from time to time.    Borrower agrees that, notwithstanding that the Monthly Rate is based upon Lender's cost of funds in the London Interbank Market, Lender shall not be required actually to obtain funds from such source at any time.

(b)    If requested by Borrower pursuant to a written request delivered to Lender, upon attainment by the Project of eighty-five percent (85%) physical occupancy under leases at pro-forma rents as determined by Lender in accordance with its customary procedures, the Monthly Rate shall be reduced to the per annum rate equal to LIBOR *plus* two and five one-hundredths percent (2.05%), beginning with the Monthly Rate Adjustment Date next following such determination by Lender.

(c)    If any change in applicable law or regulations or any interpretation thereof by any Governmental Authority charged with the administration thereof shall (i) impose, modify, or deem applicable any reserve, special deposit, or special requirements against assets held by, or deposits in or for the account of, or loans by, or any other acquisition of funds for advances by Lender, (ii) impose on Lender any other conditions regarding this Note, (iii) subject Lender (or make it apparent that Lender is subject) to any tax (including, without limitation, any international interest equalization tax), levy, impost, duty, charge, fee, deduction or withholding on or from payment due from Borrower, other than income and franchise taxes of the United States and its political subdivisions, or (iv) change the basis of taxation of payments due from Borrower to Lender hereunder (other than by a change in the statutory rate of taxation of the overall income of Lender), and any of the foregoing results in an increase in the cost to Lender of maintaining the Loan at the Monthly Rate, then upon demand made by Lender to Borrower, Borrower shall pay to Lender, from time to time, as reasonably determined and certified by Lender, additional amounts that shall compensate Lender for such increased cost.  Lender will notify Borrower of any event that entitles Lender to such additional amounts and will furnish Borrower with an explanatory certificate in reasonable detail as to the increased cost as a result of any such event mentioned in this subsection. Borrower shall immediately pay such additional amounts to Lender. All such determinations by Lender that are certified to Borrower shall be presumed to be correct, absent manifest computational errors, provided they are made in good faith.

(d)    Notwithstanding anything to the contrary herein (but without limitation upon Borrower's indemnification obligations pursuant to subsection (b) above), if at any time Lender determines, in accordance with reasonable and ordinary commercial standards, that its acquisition of funds, or its pricing of loans based on the acquisition of funds, in the London Interbank Market would be in violation of any law, regulation, guideline, or order of any Governmental Authority, Lender may so notify Borrower in writing or by telephone, and upon the giving of such notice, this Note will immediately cease bearing interest at the Monthly Rate, and the outstanding principal of this Note shall thereupon commence to bear interest at the variable rate of interest equal to the Base Rate plus the Alternate Rate Spread (the **"Alternate Rate"**).   As used herein, the term **"Base Rate"** means the per annum rate of interest periodically designated and announced to the public by SouthTrust Bank (or any successor of SouthTrust Bank) as its "Base Rate", which is not necessarily the lowest rate charged by SouthTrust Bank, and the term **"Alternate Rate Spread"** means the positive or negative difference, stated as a percentage, between (i) the Monthly Rate as of the last day on which interest on this Note accrues at the Monthly Rate and (ii) the Base Rate as of such day. For example, if on such date the Monthly Rate is 6.75% and the Base Rate is 6.25%, then the Alternate Rate Spread shall be 0.50% or, if on such date the Base Rate is 7.50%, then the Alternate Rate Spread shall be -0.75%.

---

(e)    Upon the occurrence of any Event of Default hereunder, the principal amount of this Note shall automatically, without notice to or demand upon Borrower, bear interest at the per annum rate of interest equal to four percentage points (4%) in excess of the rate of interest otherwise applicable hereunder on the date such Event of Default occurs (the "**Default Rate**").  Borrower agrees that the Default Rate represents a fair and reasonable estimate by Borrower and Lender of a fair average compensation for the risk of loss that Lender will experience due to the occurrence of an Event of Default and for the cost and expenses that might be incurred by Lender by reason of the occurrence of an Event of Default, with the parties agreeing that the damages caused by such increased risk and extra cost and expenses are impracticable or extremely difficult to ascertain or estimate.  The payment by Borrower of interest at the Default Rate will not prejudice the rights of Lender to collect any other amounts required to be paid by Borrower hereunder or under any of the other Loan Documents.

(f)    All interest on the principal of this Note, whether calculated using the Monthly Rate, the Alternate Rate, or the Default Rate as a reference, shall be calculated on the basis of a 360-day year by multiplying the outstanding principal amount by the applicable per annum rate, multiplying the product thereof by the actual number of days elapsed, and dividing the product so obtained by 360.

4.    <u>Prepayment</u>.  Borrower may prepay the outstanding principal of this Note, or any part thereof, from time to time without penalty, provided that (i) any such prepayment occurs on any date that a monthly payment of interest or principal (or both) is due under <u>Section 2</u> of this Note, and (ii) concurrently with such prepayment, Borrowers pay any obligation arising under any Hedge Contract in effect at the time of such prepayment by reason of the termination, in whole or in part, of such Hedge Contract.  The loan evidenced by this Note is not a revolving credit facility, so Borrower shall not be entitled to re-borrow any principal amounts prepaid hereunder.

5.    <u>Collection Costs</u>.  Lender shall be entitled to recover all costs of collecting, securing, or attempting to collect or secure this Note, or defending any action seeking the avoidance or rescission of any payment of or security for this Note, including, without limitation, court costs and reasonable attorneys' fees actually incurred, including attorneys' fees on any appeal by either Borrower or Lender.

6.    <u>Loan Documents</u>.  This Note is the "Note" referred to in, and is issued pursuant to, the Loan Agreement. The principal of this Note shall be disbursed to Borrower in a series of advances in accordance with, and subject to the conditions of, the Loan Agreement.  This Note is entitled to all of the benefits and security of the Loan Agreement, the Security Instrument, the Guaranty, and the other Loan Documents, and all of the terms, covenants, and conditions of the Loan Agreement are hereby made a part of this Note and are deemed incorporated herein in full.

7.    <u>Events of Default</u>.  The occurrence or existence of an Event of Default pursuant to, and as defined in, the Loan Agreement, including, without limitation, Borrower's failure to pay any installment of principal or interest on this Note or any other sum due hereunder on the due date thereof, which failure continues beyond any cure period and notice requirement set forth in the Loan Agreement, will constitute an event of default under this Note (an "**Event of Default**").  Lender, at its option, upon or at any time after the occurrence of an Event of Default, may (i) declare the then outstanding principal amount of this Note, together with all accrued interest thereon and all other agreed or permitted charges owing by Borrower hereunder, to be, and the same will thereupon become, immediately due and payable without notice to or demand upon Borrower, all of which Borrower hereby expressly waives, and (ii) pursue all rights and remedies available under the Loan Documents and at law or in equity.  All rights and remedies of Lender under the terms of this Note and the other Loan Documents and applicable statutes or rules of law shall be cumulative and may be exercised successively or concurrently.

8.    <u>Usury</u>. It is the intent of Borrower and Lender in the execution of this Note and all other Loan Documents to contract in strict compliance with the usury laws governing the loan evidenced by this Note. In furtherance thereof, Lender and Borrower stipulate and agree that none of the terms and provisions contained in the Loan Documents shall ever be construed to create a contract for the use, forbearance, or detention of money requiring payment of interest at a rate in excess of the maximum interest rate permitted to be charged by the laws governing the loan evidenced by the Note. Borrower or any guarantor (including Guarantor), endorser, or other party now or hereafter becoming liable for the payment of the Note shall never be liable for unearned interest on the Note and shall never be required to pay interest on the Note at a rate in excess of the maximum interest that may be lawfully charged under the laws governing the loan evidenced by the Note, and the provisions of this paragraph shall control over all other provisions of the Note and any other instrument executed in connection herewith which may be in apparent conflict herewith. In the event any holder of the Note shall collect monies that are deemed to constitute interest and that would otherwise increase the effective interest rate on the Note to a rate in excess of that permitted to be charged by the laws governing the loan evidenced by the Note, all such sums deemed to constitute interest in excess of the legal rate shall be applied to the unpaid principal balance of the Note and if in excess of such balance, shall be immediately returned to the Borrower upon such determination. All sums paid or agreed to be paid for the use, forbearance or detention of money payable under this Note shall, to the extent allowed by applicable law, be amortized, prorated, allocated and spread throughout the full term of this Note.

9.    <u>Time of Essence</u>. Time is of the essence with respect to this Note and the performance of all obligations contained herein.

10.    <u>Waiver</u>. Borrower hereby waives, to the fullest extent permitted by applicable law, (i) all rights of exemption of property from levy or sale under execution or other process for the collection of debts under the Constitution or laws of the United States or any state thereof, (ii) demand, presentment, protest, notice of dishonor, notice of non-payment, diligence in collection, and all other requirements necessary to charge or hold the Borrower liable on any obligations hereunder, and (iii) any further receipt for or acknowledgment of any collateral now or hereafter deposited by Borrower as security for the obligations hereunder.

11.    <u>Binding Effect</u>. Lender will not by any act, delay, omission, or otherwise be deemed to have waived any of its rights or remedies under this Note or the other Loan Documents, and no waiver of any kind shall be valid unless in writing and signed by Lender. The provisions of this Note shall be construed without regard to the party responsible for the drafting and preparation hereof. Any provision in this Note that might be unenforceable or invalid under any law shall be ineffective to the extent of such unenforceability or invalidity without affecting the enforceability or validity of any other provision hereof. This Note and the obligations of Borrower hereunder shall be binding upon and enforceable against Borrower and its successors and assigns and will inure to the benefit of Lender and its successors and assigns, including any subsequent holder of this Note. Borrower agrees that, without releasing or impairing Borrower's liability hereunder, Lender may at any time release, surrender, substitute, or exchange any collateral securing this Note and may at any time release any party primarily or secondarily liable for the indebtedness evidenced by this Note.

12.    <u>Federal Tax Identification Number</u>. Borrower certifies to Lender that Borrower's Federal tax identification number is accurately stated below Borrower's signature to this Note.

13.    <u>Document Protocols</u>. This Note is governed by the Document Protocols set forth in <u>Article 10</u> of the Loan Agreement, which Document Protocols are incorporated by reference into this Note as if fully set forth herein.

---

**IN WITNESS WHEREOF,** Borrower has executed this Note, or has caused this Note to be executed by its duly authorized representative, on the day and year first above written, with the intention that this Note to take effect as an instrument under seal.

**CABANA WEST, L.P.,**
an Alabama limited partnership

By:   Cabana West Partners, LLC,
        an Alabama limited liability company
        Its General Partner

By: _____ (L.S.)
      Miles E. Hill, Jr.,
      Managing Member

**Federal Tax Identification No.:  26-0093032**

# EXHIBIT D

ORIGINAL

### NOTE MODIFICATION AGREEMENT

**THIS NOTE MODIFICATION AGREEMENT**, made and entered into as of the 19th day of September, 2006, is by and between **CABANA WEST, L.P.**, an Alabama limited partnership (hereinafter, "Borrower"), and **WACHOVIA BANK, N.A.**, a national banking association and successor by merger to SouthTrust Bank (hereinafter, "Lender").

### R E C I T A L S:

Lender is the owner and holder of that certain Promissory Note dated as of December 23, 2004, payable by Borrower to the order of Lender in the original principal sum of $18,000,000.00 (as heretofore amended, modified, renewed or extended, the "Note"). Proceeds of the Note have been advanced to Borrower pursuant to the terms of that certain Construction Loan Agreement between Borrower and Lender dated as of December 23, 2004 (as heretofore or hereafter amended, modified, renewed or extended, the "Loan Agreement"). All capitalized terms used herein without definition shall have the respective meanings thereunto ascribed in the Loan Agreement. Pursuant to that certain Amendment to Construction Loan Agreement of even date herewith between Borrower and Lender, the Loan Agreement has been amended to increase the stated principal amount of the Loan to $27,500,000.00. The parties now desire to amend the Note in order to evidence such increase upon the terms and conditions herein set forth.

### AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing Recitals, the parties hereto agree as follows:

1. *Recitals.* The parties hereby acknowledge the foregoing Recitals to be true and correct in all material respects.

2. *Confirmation of Balance.* As of the date of this Agreement, the outstanding principal balance of the Loan is $17,818,776.47, which sum is presently evidenced by the Note.

3. *Increase in Loan Amount.* The Note is hereby amended to increase the stated principal amount thereof by the sum of $9,317,113.00, to a new maximum principal amount of $27,5000,000.00. Accordingly, the words and figures "Eighteen Million And No/100 Dollars" and "$18,000,000.00" are hereby deleted from the Note wherever the same may appear, and the words and figures "Twenty-Seven Million Five Hundred Thousand and No/100 Dollars" and "$27,500,000.00" are hereby inserted in lieu thereof.

4. *Payments and Maturity.* Subsection 2(a) of the Note is hereby deleted in its entirety, and the following text is inserted in lieu thereof:

    (a)    The outstanding principal of this Note, together with interest from time to time accruing thereon, shall be paid as follows:

        (i)    On February 10, 2005, and on the same day of each successive calendar month thereafter, Borrower shall pay to

1499379

Lender all accrued but unpaid interest on the outstanding principal balance of this Note; and,

      (ii)     Unless sooner prepaid or accelerated, on March 31, 2008, Borrower shall pay to Lender the entire outstanding principal balance of this Note, together with all accrued but unpaid interest thereon and all other agreed charges due hereunder.

Subsections 2(b), 2(c), 2(d) and 2(e) are hereby deleted from the Note in their entirety, without replacement.

5.     *Miscellaneous.*

      (a)     This Amendment shall in all respects be governed by and construed in accordance with the Document Protocols set forth in Article 10 of the Loan Agreement, which by this reference are incorporated herein as if set forth in full.

      (b)     Borrower hereby represents and warrants to Lender that it has full power and authority to enter into this Agreement, and that this Agreement constitutes the legal, valid, and binding obligation of the Borrower, enforceable in accordance with its terms.

      (c)     This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, legal representatives, and assigns.

      (d)     As herein modified, the Note shall remain in full force and effect, and is hereby ratified and affirmed in all respects. Borrower confirms that it has no defenses or offsets with respect to its obligations pursuant to the Note, as herein modified. All references to the Note contained in any other Loan Document shall henceforth be deemed to refer to the Note as amended hereby.

      (e)     This Agreement may be executed in any number of counterparts bearing the original signatures of one or more of the parties hereto, each of which shall for all purposes be deemed an original, but all of which, taken together, shall constitute one and the same agreement. It shall not be necessary for all parties to sign the same counterpart.

      (f)     Time is of the essence of this Agreement and all terms, covenants, conditions and agreements set forth herein.

**[No further text this page; Signature page follows.]**

**IN WITNESS WHEREOF**, the undersigned parties have caused this Amendment to be properly executed and delivered as of the dates of notarization set forth below, but effective for all purposes as of the day and year first above written.

**BORROWER:**

CABANA WEST, L.P., an Alabama limited partnership

By:    Cabana West Partners, LLC, an Alabama
       limited liability company, its general partner

_____
Witness to Signature
Print Name: _TANYA C. DONALDSON_

       By:    _____
              Miles E. Hill, Jr., Managing Member

_____
Witness to Signature
Print Name: _Christie Harvell_

**LENDER:**

WACHOVIA BANK, NATIONAL ASSOCIATION, a national banking association

_____
Witness to Signature
Print Name: _Athina Williams_

       By:    _____
              Print Name: _Andy Raine_
              Title: _Vice President_

_____
Witness to Signature
Print Name: _C. B. Cook_

STATE OF ALABAMA    )
COUNTY OF _Lee_     )

        The foregoing instrument was acknowledged before me this _22nd_ day of September, 2006, by Miles E. Hill, Jr., as Managing Member of Cabana West Partners, LLC, an Alabama limited liability company, as General Partner of Cabana West, L.P., an Alabama limited partnership (the "Borrower" named herein). He is personally known to me or produced sufficient evidence to establish his identification.

_____
Notary Public
Print Name: _Susan Chaloupka_
My Commission Expires: _10/01/06_

Commission No.: _____

1499379                                     3

STATE OF ALABAMA      )
COUNTY OF *JEFFERSON* )

The foregoing instrument was acknowledged before me this *27th* day of September, 2006, by *ANDY RAINE*            , as *VICE PRESIDENT* of Wachovia Bank, National Association (the "Lender" named herein).  He is personally known to me or produced sufficient evidence to establish his identification.

_____
Notary Public
Print Name: *Terri M. Odom*
My Commission Expires:_____

Commission No.: _____

My Commission Expires February 16, 2010

1499379                                    4

# EXHIBIT E

# GUARANTY AGREEMENT

**THIS GUARANTY AGREEMENT** is entered into as of the 23rd day of December, 2004, by **MILES E. HILL, JR.** and **RUDOLPH H. BEAVER**, each being individual residents of the State of Alabama (separately and collectively referred to as "**Guarantor**") for the benefit of **SOUTHTRUST BANK**, an Alabama banking corporation (hereinafter referred to as "**Lender**").

## R e c i t a l s :

**CABANA WEST, L.P.**, an Alabama limited partnership ("**Borrower**"), has obtained a loan in the principal amount of $18,000,000.00 (the "**Loan**") from Lender for the purpose of financing the development of an approximately 18.12-acre parcel of real estate located in Panama City Beach, Bay County, Florida (the "**Property**"). The Loan shall be advanced to Borrower pursuant to the terms and conditions of a Construction Loan Agreement of even date herewith between Borrower and Lender (the "**Loan Agreement**"), and is evidenced by a Promissory Note of even date herewith executed by Borrower and payable to the order of Lender in the stated principal amount of the Loan (the "**Note**").

Guarantor owns a legal and beneficial interest in the Borrower (either directly or indirectly), and as a condition to making the Loan, Lender has required that Guarantor execute this Agreement in order to guarantee the obligations of Borrower to Lender pursuant to the Note and the other Loan Documents. In consideration of the benefits that will accrue to Guarantor from the acquisition of the Property, which is made possible by Lender's extension of the Loan to Borrower, Guarantor is willing to enter into this Agreement for Lender's benefit.

NOW, THEREFORE, in consideration of the foregoing recitals, as an inducement to Lender to make the Loan to Borrower, Guarantor agrees and covenants with Lender, and represents and warrants to Lender, as follows:

1.    <u>Definitions.</u>    All capitalized terms used, but not specifically defined, in this Agreement shall have the meanings given them in the Loan Agreement.

2.    <u>Guaranteed Obligations</u>.

(a)    Guarantor hereby guarantees to Lender (i) the due, regular, and punctual payment of the Loan and all interest thereon, and the Note evidencing the Loan, and all renewals and extensions of the Loan, and all other indemnities, charges, expenses, and other indebtedness now existing and hereafter incurred by Borrower to Lender in connection with the Loan of whatever nature, and (ii) the prompt performance of all other obligations of any kind or character of Borrower to Lender pursuant to the Note, the Loan Agreement, the Security Instrument, or the other Loan Documents (all indebtedness and obligations described in clauses (i) and (ii) above being collectively referred to herein as the "**Guaranteed Obligations**"). The Guaranteed Obligations shall be unlimited in nature and amount.

(b)    Without limiting the indebtedness and obligations being guaranteed by Guarantor under subparagraph (a) above, Guarantor shall at all times be liable and obligated to Lender hereunder for the payment to Lender of, and to save, defend and hold Lender harmless from, and to indemnify Lender from and against, any and all liabilities, obligations, losses, damages, costs and expenses (including, without limitation, reasonable attorneys' fees), causes of action, suits, claims, demands and judgments of any nature or description whatsoever that might at any time be imposed upon, incurred or suffered by, or awarded against Lender as a result of any of the following:

(i)    Fraud or intentional misrepresentation by Borrower or Guarantor in connection with obtaining the Loan or in complying with its obligations under this Loan Agreement, this Guaranty, or any other Loan Document;

(ii)    Failure by Borrower to remit to Lender insurance proceeds, condemnation awards, or other sums or payments attributable to the Property in accordance with the provisions of the Loan Agreement and the Security Instrument, except to the extent that Borrower did not have the legal right, because of a bankruptcy, receivership, or similar judicial proceeding, to direct disbursement of such sums or payments;

(iii)    Failure by Borrower to apply to the payment of the Obligations on the Loan or otherwise remit to Lender, all net income from the Property (after payment of reasonable and ordinary operating expenses of the Property) received by or on behalf of Borrower following the occurrence of an Event of Default, except to the extent that Borrower did not have the legal right, because of a bankruptcy, receivership, or similar judicial proceeding, to direct the disbursement of such sums;

(iv)    Failure by Borrower to pay any tax, assessment, insurance premium, ground rent, or other similar charge (including any interest and penalties thereon) against or with respect to all or any portion of the Property, or any other charge required to preserve the priority of the lien and security interest of Lender in the Property or to protect the value of the Property, except to the extent owed with respect to a period during which Lender owns the fee simple title to the Property or has direct control of the cash flow from the Property and further except to the extent not paid as the sole result of Lender's negligent failure to pay such tax, assessment, premium, ground rent, or other charge when Borrower has made all required reserve deposits with respect thereto in accordance with the requirements of the Loan Agreement;

(v)    Failure by Borrower to pay any valid mechanics, materialmen, or similar claimants' liens arising from work performed or materials furnished in connection with the Property prior to any sale or foreclosure thereof pursuant to the terms of the Security Instrument;

(vi)    Any waste of or damage to the Property caused by the willful or wanton acts or omissions of Borrower or its agents, in which case the "loss" shall be deemed to include all costs of repair, replacement, or rehabilitation of the Property;

(vii)    The willful or grossly negligent violation by Borrower of any Legal Requirement; and

(viii)    All costs and expenses incurred by Lender (including, without limitation, attorneys' fees and costs) in connection with the filing of any bankruptcy or insolvency proceeding by or against Borrower or the Property.

(c)    Interest shall accrue on Guarantor's payment obligation set forth in this Section 2 at the Default Rate specified in the Note from the time demand is made upon Guarantor for payment hereunder until the date that such payment is received.

3.    Obligations Unconditional.  This is a guaranty of payment and performance and not of collection.  The liability of Guarantor under this Agreement shall be direct and immediate and not conditional or contingent upon the pursuit of any remedies against Borrower or any other person (including, without limitation, other guarantors, if any), nor against the collateral for the Loan.  Guarantor waives any right to require that an action be brought against Borrower or any other person or to require that resort be had to any collateral for the Loan or to any balance of any deposit account or credit on the books of Lender in favor of Borrower or any other person.  In the event, on account of the United States Bankruptcy Code, as amended (the "Bankruptcy Code"), or any other debtor relief law (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, which may be or become applicable, Borrower shall be relieved of the Obligations, Guarantor shall nevertheless be fully liable therefor.  Upon the occurrence of an Event of Default under the Loan Documents, Lender shall have the right to enforce its rights, powers and remedies (including, without limitation, foreclosure of all or any portion of the collateral for the Loan) thereunder or hereunder, in any order, and all rights, powers and remedies available to Lender in such event shall be non-exclusive and cumulative of all other rights, powers and remedies provided thereunder or hereunder or by law or in equity.  If the Obligations are partially paid or discharged by reason of the exercise of any of the remedies available to Lender, this Agreement shall nevertheless remain in full force and effect, and Guarantor shall remain liable for all remaining Obligations, even though any rights which Guarantor might have against Borrower might be destroyed or diminished by the exercise of any such remedy.

4.    Reinstatement of Obligations.  If at any time all or any part of any payment made by Guarantor or received by Lender from Guarantor under or with respect to this Agreement is or must be rescinded or returned for any reason whatsoever (including, but not limited to, the insolvency, bankruptcy or reorganization of Guarantor or Borrower), then the obligations of Guarantor hereunder shall, to the extent of the payment rescinded or returned, be deemed to have continued in existence, notwithstanding such previous payment made by Guarantor or receipt of payment by Lender, and the obligations of Guarantor hereunder shall continue to be effective or be reinstated, as the case may be, as to such payment, all as though such previous payment by Guarantor had never been made.

5.    Waivers by Guarantor.  To the extent permitted by law, Guarantor hereby waives and agrees not to assert or take advantage of:

(a)     Any right to require Lender to proceed against Borrower, whether or not after notice and within any time period prescribed by Section 10-7-24 of the Official Code of Georgia Annotated, or any other similar law under any other state laws, or any other person or to proceed against or exhaust any security held by Lender at any time or to pursue any other remedy in Lender's power or under any other agreement before proceeding against Guarantor hereunder;

(b)     Any defense that may arise by reason of the incapacity, lack of authority, death or disability of any other person or persons, or the failure of Lender to file or enforce a claim against the estate (in administration, bankruptcy or any other proceeding) of any other person or persons;

(c)     Demand, presentment for payment, notice of nonpayment, protest, notice of protest and all other notices (other than as may be expressly herein required) of any kind, or the lack of any thereof, including, without limiting the generality of the foregoing, notice of the existence, creation or incurring of any new or additional indebtedness or obligation or of any action or non-action on the part of Borrower, Lender, any endorser or creditor of Borrower or of Guarantor or on the part of any other person whomsoever under this or any other instrument in connection with any obligation or evidence of indebtedness held by Lender;

(d)     Any defense based upon an election of remedies by Lender;

(e)     Any right or claim or right to cause a marshaling of the assets of Guarantor;

(f)     Any principle or provision of law, statutory or otherwise, which is or might be in conflict with the terms and provisions of this Agreement;

(g)     Any duty on the part of Lender to disclose to Guarantor any facts Lender may now or hereafter know about Borrower or the Property, regardless of whether Lender has reason to believe that any such facts materially increase the risk beyond that which Guarantor intends to assume or have reason to believe that such facts are unknown to Guarantor or have a reasonable opportunity to communicate such facts to Guarantor, it being understood and agreed that Guarantor is fully responsible for being and keeping informed of the financial condition of Borrower, of the condition of the Property, and of any and all circumstances bearing on the risk that liability may be incurred by Guarantor hereunder;

(h)     Any lack of notice of disposition or of manner of disposition of any collateral for the Loan;

(i)     Any invalidity, irregularity, or unenforceability, in whole or in part, of any one or more of the Loan Documents;

(j)     Any lack of commercial reasonableness in dealing with the collateral for the Loan;

(k)    Any deficiencies in the collateral for the Loan or any deficiency in the ability of Lender to collect or to obtain performance from any persons or entities now or hereafter liable for the payment and performance of any obligation hereby guaranteed;

(l)    An assertion or claim that the automatic stay provided by the Bankruptcy Code (arising upon the voluntary or involuntary bankruptcy proceeding of Borrower) or any other stay affecting Borrower or any of its assets provided under any other debtor relief law (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, which may be or become applicable, shall operate or be interpreted to stay, interdict, condition, reduce or inhibit the ability of Lender to enforce any of its rights, whether now or hereafter required, which Lender may have against Guarantor or the collateral for the Loan; and

(m)    Any modifications of the Loan Documents or any obligation of Borrower relating to the Loan by operation of law or by action of any court, whether pursuant to the Bankruptcy Code or any other debtor relief law (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, or otherwise.

6.    <u>Full Recourse</u>.  All of the terms and provisions of this Agreement are recourse obligations of Guarantor and not restricted by any limitation on personal liability.  Guarantor hereby acknowledges that Lender would not make the Loan but for the unsecured personal liability undertaken by Guarantor herein.

7.    <u>Joint and Several Liability</u>.  If the reference in this Agreement to "Guarantor" shall refer to more than one person or entity, then all agreements, covenants, representations, and other obligations set forth in this Agreement shall constitute joint and several obligations of all persons and entities comprising Guarantor.

8.    <u>Survival.</u>  This Agreement shall be deemed to be continuing in nature and shall remain in full force and effect and shall survive the exercise of any remedy by Lender under the Security Instrument or any of the other Loan Documents, including, without limitation, any foreclosure of or under the Security Instrument or Lender's acceptance of a deed in lieu thereof, even if, as a part of such remedy, the Loan is paid or satisfied in full.

9.    <u>No Subrogation; No Recourse Against Lender</u>.  Notwithstanding the satisfaction by Guarantor of any liability hereunder, Guarantor shall not have any right of subrogation, contribution, reimbursement, or indemnity whatsoever or any right of recourse to or with respect to the assets or property of Borrower or to any collateral for the Loan unless and until Guarantor fully satisfies the payment of the Loan, all other amounts due under the Loan Documents, and the costs and expenses for which Lender is indemnified hereunder.  In connection with the foregoing, Guarantor expressly waives any and all rights of subrogation to Lender against Borrower (except as expressly provided above), and Guarantor hereby waives any rights to enforce any remedy which Lender may have against Borrower and any right to participate in any collateral for the Loan.  In addition to and without in any way limiting the foregoing, Guarantor hereby subordinates any and all indebtedness of Borrower now or hereafter owed to Guarantor to all indebtedness of Borrower to Lender (including, without limitation, interest accruing on any principal indebtedness due from Borrower to Lender from and after the filing of any petition for

relief under the Bankruptcy Code, notwithstanding any contrary practice, custom, or ruling in proceedings under the Bankruptcy Code generally), and agrees with Lender that Guarantor shall not demand or accept any payment of principal or interest from Borrower, shall not claim any offset or other reduction of Guarantor's obligations hereunder because of any such indebtedness and shall not take any action to obtain any of the collateral from the Loan. Further, Guarantor shall not have any right of recourse against Lender by reason of any action Lender may take or omit to take under the provisions of this Agreement or under the provisions of any of the Loan Documents.

10.    Reservation of Rights.  Nothing contained in this Agreement shall prevent or in any way diminish or interfere with any rights or remedies, including, without limitation, the right to contribution, which Lender may have against Borrower, Guarantor, or any other party pursuant to (i) the Environmental Indemnity Agreement of even date herewith executed by Borrower and Guarantor for the benefit of Lender and/or (ii) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as it may be amended from time to time, or any other applicable federal, state or local laws, all such rights being hereby expressly reserved.

11.    Financial Statements.  Guarantor hereby agrees, as a material inducement to Lender to make the Loan to Borrower, to furnish to Lender promptly upon demand by Lender current and dated financial statements detailing the assets and liabilities of Guarantor certified by Guarantor, in form and substance reasonably acceptable to Lender.

12.    Rights Cumulative.  Lender's rights under this Agreement shall be in addition to all rights of Lender under the Loan Agreement, the Note, the Security Instrument, and the other Loan Documents.

13.    No Limitation on Liability.  Guarantor hereby consents and agrees that Lender may at any time and from time to time without further consent from Guarantor do any of the following events, and the liability of Guarantor under this Agreement shall be unconditional and absolute and shall in no way be impaired or limited by any of the following events, whether occurring with or without notice to Guarantor or with or without consideration: (i) any extensions of time for performance required by any of the Loan Documents or extension or renewal of the Note; (ii) any sale, assignment or foreclosure of the Note, the Security Instrument, or any of the other Loan Documents or any sale or transfer of the Property; (iii) any change in the composition of Borrower, including, without limitation, the withdrawal or removal of Guarantor from any current or future position of ownership, management or control of Borrower; (iv) the accuracy or inaccuracy of the representations and warranties made by Guarantor herein or by Borrower in any of the Loan Documents; (v) the release of Borrower or of any other person or entity from performance or observance of any of the agreements, covenants, terms or conditions contained in any of the Loan Documents by operation of law, Lender's voluntary act or otherwise; (vi) the release or substitution in whole or in part of any security for the Loan; (vii) Lender's failure to record the Security Instrument or to file any financing statement (or Lender's improper recording or filing thereof) or to otherwise perfect, protect, secure or insure any lien or security interest given as security for the Loan; (viii) the modification of the terms of any one or more of the Loan Documents; or (ix) the taking or failure to take any action of any type whatsoever.  No such action which Lender shall take or fail to take in connection with the Loan Documents or any collateral for the Loan, nor any course or dealing with Borrower or any

other person, shall limit, impair or release Guarantor's obligations hereunder, affect this Agreement in any way or afford Guarantor any recourse against Lender. Nothing contained in this Section shall be construed to require Lender to take or refrain from taking any action referred to herein.

14.    _Successive Actions._  A separate right of action hereunder shall arise each time Lender acquires knowledge of any matter indemnified or guaranteed by Guarantor under this Agreement. Separate and successive actions may be brought hereunder to enforce any of the provisions hereof at any time and from time to time. No action hereunder shall preclude any subsequent action, and Guarantor hereby waives and covenants not to assert any defense in the nature of splitting of causes of action or merger of judgments.

15.    _Representations and Warranties._  To induce Lender to make the Loan to Borrower, Guarantor represents and warrants to Lender that, as of the date hereof:

(a)    _Enforceability._  This Agreement and each of the other Loan Documents to which Guarantor is a party (collectively, the "Guarantor Documents") have been duly executed and delivered by Guarantor and constitute the legal, valid, and binding obligation of Guarantor, enforceable against Guarantor in accordance with their respective terms, except as such enforceability may be affected by applicable conservatorship, bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the enforcement of creditors' rights generally. The Guarantor Documents are not subject to any right of rescission, set-off, counterclaim, or defense by Guarantor, including the defense of usury, and Guarantor has not asserted any right of rescission, set-off, counterclaim, or defense with respect thereto.

(b)    _Intentionally Deleted._

(c)    _Power and Authority._  Guarantor has the requisite power, authority, and capacity, as the case might be, to execute and deliver the Guarantor Documents, to incur and perform the Obligations, and to carry out the transactions contemplated by the Guarantor Documents.

(d)    _Intentionally Deleted._

(e)    _No Conflicts._  Neither the execution and delivery of the Guarantor Documents, nor the fulfillment of or compliance with the terms and conditions of the Guarantor Documents, nor the performance of the Obligations (i) conflicts with or result in (or will conflict with or result in) any breach or violation of any Legal Requirement enacted or issued by any Governmental Authority or other agency having jurisdiction over Guarantor, or any judgment or order applicable to Guarantor, or to which Guarantor is subject; or (ii) requires (or will require) the consent or approval of any creditor of Guarantor, any Governmental Authority, or any other Person except such consents or approvals that have already been obtained.

(f)    _Pending Litigation or other Proceedings._  There is no pending or, to the best knowledge of Guarantor, threatened action, suit, proceeding, or investigation, at law or in equity, before any court, board, body, or official of any Governmental Authority or arbitrator against or affecting Guarantor, which, if decided adversely to Guarantor, would have, or may

reasonably be expected to have, a Material Adverse Effect. Guarantor is not in default with respect to any order of any Governmental Authority.

(g) *Solvency.* Guarantor is not insolvent and will not be rendered insolvent by the transactions contemplated by the Guarantor Documents, and after giving effect to such transactions, Guarantor will not be left with an unreasonably small amount of capital with which to engage in Guarantor's business or undertakings, nor will Guarantor have incurred, have intended to incur, or believe that Guarantor has incurred, debts beyond Guarantor's ability to pay such debts as they mature. Guarantor did not receive less than a reasonably equivalent value in exchange for incurrence of the Obligations. There (i) is no contemplated, pending or, to the best of Guarantor's knowledge, threatened bankruptcy, reorganization, receivership, insolvency, or like proceeding, whether voluntary or involuntary, affecting Guarantor and (ii)has been no assertion or exercise of jurisdiction over Guarantor by any court empowered to exercise bankruptcy powers.

(h) *Financial Information.* The financial statements of Guarantor which have been furnished to Lender are complete and accurate in all material respects and present fairly the financial condition of Guarantor, and there are no liabilities, direct or indirect, fixed or contingent, as of the respective dates of such financial statements which are not reflected therein or in the notes thereto or in a written certificate delivered with such statements. Since the date of the most recent of such financial statements, no event has occurred which would have, or may reasonably be expected to have, a Material Adverse Effect, and there has not been any material transaction entered into by Guarantor other than transactions in the ordinary course of business. Guarantor has filed all federal, state, and local tax returns that are required to be filed and has paid, or made adequate provision for the payment of, all taxes that have or may become due pursuant to such returns or to assessments received by Guarantor.

(i) *No Reliance.* Guarantor understands the nature and structure of the transactions contemplated by the Guarantor Documents, is familiar with the provisions of all of the documents and instruments relating to such transactions, understands the risks inherent in such transactions, and has not relied on Lender for any guidance or expertise in analyzing the financial or other consequences of the transactions contemplated by the Guarantor Documents and the other Loan Documents or otherwise relied on Lender in any manner in connection with interpreting, entering into, or otherwise in connection with the Guarantor Documents or any of the matters contemplated thereby.

(j) *Borrower's Representations and Warranties.* Guarantor has had an opportunity to review the Loan Documents, and none of the representations and warranties of Borrower set forth therein are false or misleading in any material respect.

16. <u>Expenses</u>. If at any time or times hereafter Lender employs counsel to commence, defend, intervene in, file a petition, complaint, answer, motion, or other pleadings or to take any other action in or with respect to any suit or proceeding relating to this Agreement or any other agreement, instrument, or document heretofore, now, or hereafter executed by Guarantor and delivered to Lender with respect to Borrower or the Obligations, or to represent Lender in any litigation with respect to the affairs of Guarantor or to enforce any rights of Lender or obligations of Guarantor or any other person, firm, or corporation who might be obligated to

Lender by virtue of this Agreement or any other agreement, document, or instrument heretofore, now, or hereafter delivered to Lender by or for the benefit of Guarantor with respect to Borrower or the Obligations, then in any such events, all of the attorneys' fees actually incurred at standard hourly rates arising from such services, and any expenses, costs, and charges relating thereto, will constitute additional obligations of Guarantor payable on demand.

     17.   <u>Notices.</u> All notices, consents, approvals, statements, requests, reports, demands, instruments or other communications to be made, given or furnished pursuant to, under or by virtue of this Agreement (a "notice") shall be in writing and shall be deemed given or furnished if addressed to the party intended to receive the same at the address of such party as set forth below (i) upon receipt when personally delivered at such address, (ii) three (3) Business Days after the same is deposited in the United States mail as first class registered or certified mail, return receipt requested, postage prepaid, or (iii) one Business Day after the date of delivery of such notice to a nationwide, reputable commercial courier service:

| | |
|---|---|
| Lender: | SouthTrust Bank<br>112 North Twentieth Street<br>2nd Floor<br>Birmingham, Alabama 35203<br>Attention:  Commercial Real Estate Loan Dept. |
| | <u>*with copy to*</u> (which alone shall not constitute notice): |
| | William T. McKenzie, Esq.<br>Burr & Forman LLP<br>171 17th Street, NW - Suite 1100<br>Atlanta, Georgia 30363 |
| Guarantor: | <u>For each Guarantor:</u> |
| | Miles E. Hill, Jr.<br>730 N. Dean Road, Suite 200<br>Auburn, Alabama 36830 |
| | Rudolph H. Beaver<br>730 N. Dean Road, Suite 200<br>Auburn, Alabama 36830 |
| | <u>*with copy to*</u> (which alone shall not constitute notice): |
| | Russell C. Balch, Esq.<br>Akridge & Balch, P.C.<br>730 N. Dean Road, Suite 300<br>Auburn, Alabama 36830 |

    Any party may change the address to which any notice is to be delivered to any other address within the United States of America by furnishing written notice of such change at least

fifteen (15) days prior to the effective date of such change to the other parties in the manner set forth above, but no such notice of change shall be effective unless and until received by such other parties. Rejection or refusal to accept, or inability to deliver because of changed address or because no notice of changed address was given, shall be deemed to be receipt of any such notice. Any notice to an entity shall be deemed to be given on the date specified in this Section without regard to when such notice is delivered by the entity to the individual to whose attention it is directed and without regard to the fact that proper delivery may be refused by someone other than the individual to whose attention it is directed. If a notice is received by an entity, the fact that the individual to whose attention it is directed is no longer at such address or associated with such entity shall not affect the effectiveness of such notice. Notices may be given on behalf of any party by such party's attorneys.

18.    <u>Severability.</u>  Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid or unenforceable under the applicable law of any jurisdiction with respect to any person or circumstance, such provision shall be ineffective to the extent of such prohibition, invalidity or unenforceability, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provisions in any other jurisdiction or with respect to other persons or circumstances. To the extent permitted by applicable law, Guarantor hereby waives any provision of law that renders any provision hereof prohibited, invalid or unenforceable in any respect.

19.    <u>Binding Obligations.</u>  This Agreement shall be binding upon Guarantor and the successors, assigns, heirs and personal representatives of Guarantor, as the case may be, and shall inure to the benefit of Lender and all subsequent holders or beneficiaries of this Agreement and their respective officers, directors, employees, shareholders, agents, successors and assigns. Nothing in this Agreement, whether express or implied, shall be construed to give any person (other than the parties thereto and their permitted successors and assigns and as expressly provided therein) any legal or equitable right, remedy or claim under or in respect of this Agreement or any covenants, conditions or provisions contained herein.

20.    <u>No Oral Modifications.</u>  This Agreement, and any of the provisions hereof, cannot be altered, modified, amended, waived, extended, changed, discharged or terminated orally or by any act on the part of Guarantor or Lender, but only by an agreement in writing signed by the party against whom enforcement of any alteration, modification, amendment, waiver, extension, change, discharge or termination is sought.

21.    <u>Entire Agreement.</u>  This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter thereof and supersedes all prior written and oral agreements and understandings with respect to such subject matter.

22.    <u>Jurisdiction, Court Proceedings.</u>  Guarantor, to the fullest extent permitted by law, hereby knowingly, intentionally, and voluntarily, with and upon the advice of competent counsel, (i) submits to personal, nonexclusive jurisdiction in the State of Georgia with respect to any suit, action, or proceeding by any person arising from, relating to, or in connection with this Agreement or the Loan, (ii) agrees that any such suit, action, or proceeding may be brought in any state or federal court of competent jurisdiction sitting in the State of Georgia, and

(iii) submits to the jurisdiction of such courts. Guarantor, to the fullest extent permitted by law, hereby knowingly, intentionally, and voluntarily, with and upon the advice of competent counsel, further agrees that it shall not bring any action, suit, or proceeding in any forum other than in the state or federal courts of the State of Georgia (but nothing herein shall affect the right of Lender to bring any action, suit, or proceeding in any other forum), and irrevocably agrees not to assert any objection which it may ever have to the laying of venue of any such suit, action, or proceeding in any federal or state court located in Georgia and any claim that any such action, suit, or proceeding brought in any such court has been brought in an inconvenient forum.

23. <u>Waiver of Counterclaim.</u> Guarantor hereby knowingly waives the right to assert any counterclaim, other than a compulsory or mandatory counterclaim, in any action or proceeding brought against Guarantor by Lender.

24. <u>Waiver of Jury Trial.</u> Guarantor and Lender, to the full extent permitted by law, each hereby knowingly, intentionally, and voluntarily, with and upon the advice of competent counsel, waives, relinquishes, and forever forgoes hereby the right to a trial by jury in any action or proceeding, including, without limitation, any tort action, brought by any of them against the other based upon, arising out of, or in any way relating to or in connection with this Agreement and the Loan, or any course of conduct, act, omission, course of dealing, statements (whether verbal or written) or actions of any person (including, without limitation, such person's directors, officers, partners, members, employees, agents or attorneys, or any other persons affiliated with such person), in connection with the Loan or this Agreement, including, without limitation, in any counterclaim which Guarantor may be permitted to assert thereunder or which may be asserted by Lender against Borrower or Guarantor, whether sounding in contract, tort, or otherwise. This waiver by Guarantor of the right to a jury trial is a material inducement for Lender to make the Loan.

25. <u>No Waivers by Lender.</u> No delay or omission of Lender in exercising any right or power accruing upon any default under this Agreement shall impair any such right or power or shall be construed to be a waiver of any default under this Agreement or any acquiescence therein, nor shall any single or partial exercise of any such right or power or any abandonment or discontinuance of steps to enforce such right or power, preclude any other or further exercise thereof or the exercise of any other right or power. Acceptance of any payment after the occurrence of a default under this Agreement shall not be deemed to waive or cure such default under this Agreement; and every power and remedy given by this Agreement to Lender may be exercised from time to time as often as may be deemed expedient by Lender. Guarantor hereby waives any right to require Lender at any time to pursue any remedy in Lender's power whatsoever.

26. <u>Time of the Essence.</u> Time shall be of the essence in the performance of all obligations of Guarantor under this Agreement.

27. <u>Governing Law.</u> This Agreement shall be governed by, and construed in accordance with, the laws of the State of Georgia, except to the extent that the applicability of any of such laws may now or hereafter be preempted by federal law, in which case such federal law shall so govern and be controlling.

28.    Counterparts.    This Agreement may be executed in any number of separate counterparts, each of which, when so executed and delivered, shall be deemed an original, but all of which, collectively and separately, shall constitute one and the same document.  All signatures need not be on the same counterpart.  The failure of any party thereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

29.    Exhibits Incorporated; Headings.    The information set forth on the cover of this Agreement, the table of contents, the headings, and the exhibits annexed thereto, if any, shall be deemed to be incorporated therein as a part thereof with the same effect as if set forth in the body thereof.  The headings and captions of the various articles, sections, and paragraphs of this Agreement are for convenience of reference only and shall not be construed as modifying, defining, or limiting, in any way, the scope or intent of the provisions thereof.

30.    Interpretation.    No provision of this Agreement shall  be construed against or interpreted to the disadvantage of any party thereto by any court or other governmental or judicial authority by reason of such party's having or being deemed to have structured or dictated such provision.

31.    Release of any Party.    Any one or more parties liable upon or in respect of this Agreement may be released without affecting the liability of any party not so released.

32.    Attorneys' Fees.    Wherever it is provided in this Agreement that Guarantor pay any costs and expenses, such costs and expenses shall include, without limitation, all reasonable attorneys', paralegal and law clerk fees and disbursements, including, without limitation, fees and disbursements at the pre-trial, trial and appellate levels which are actually incurred or paid by Lender at standard billable rates; provided that the foregoing reference to "reasonable" fees and disbursements (and any other such references in this Agreement) shall be deemed to include only such fees and disbursement actually incurred at normal billing rates.

33.    Method of Payment.    All amounts required to be paid by any party to this Agreement to any other party shall be paid in such freely transferable coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts.

*[THE REMAINDER OF THIS PAGE WAS LEFT BLANK INTENTIONALLY]*

**IN WITNESS WHEREOF**, Guarantor has executed this Agreement under seal as of the day and year first above written.

_____[Seal]
**MILES E. HILL JR.**, Individually


_____[Seal]
**RUDOLPH H. BEAVER**, Individually

**IN WITNESS WHEREOF**, Guarantor has executed this Agreement under seal as of the day and year first above written.

                               _____ [Seal]
                               **MILES E. HILL JR.**, Individually

                               _____ [Seal]
                               **RUDOLPH H. BEAVER**, Individually

# EXHIBIT  F

Wachovia Corporation
Risk Management Division
AL0413
420 North 20th Street, 7th Floor
Birmingham, AL 35203



WACHOVIA

July 26, 2007

**VIA OVERNIGHT MAIL**

Cabana West, LP
c/o Charter Companies
730 North Dean Road, Suite 200
Auburn, AL 36830

Miles E. Hill, Jr.
730 North Dean Road, Suite 200
Auburn, AL 36830

Rudolph H. Beaver
730 North Dean Road, Suite 200
Auburn, AL 36830

Russell C. Balch, Esq.
Akridge & Balch P.C.
730 North Dean Road, Suite 300
Auburn, AL 36830

> Re: **Construction Loan Agreement between dated as of December 23, 2004, between Wachovia Bank, National Association, as successor by merger to SouthTrust Bank, and Cabana West, L.P. (as amended, the "Loan Agreement"), secured by, _inter alia_, that certain Guaranty Agreement made jointly and severally by Miles E. Hill, Jr. and Rudolph H. Beaver (together, the "Guarantors") in favor of Wachovia dated as of December 23, 2004 (the "Guaranty"); all capitalized terms used herein without definition shall have the meanings thereunto ascribed in the Loan Agreement**

Gentlemen:

Wachovia is in receipt of the latest Advance Request wherein Cabana West requested an Advance of $537,920.20. As you know, all amounts available from Wachovia pursuant to the Loan Agreement have previously been funded up to the maximum principal amount of

Cabana West, L.P.,
Messrs. Hill and Beaver
July 26, 2007
Page 2

$27,500,000.00. As you also know, Cabana West's most recent Advances have been funded by periodic draws on the letter of credit (the "Letter of Credit") issued by Superior Bank to serve as the Additional Equity required of Cabana West. In conjunction with the latest Advance Request, the remaining $188,894.34 available under the Letter of Credit has been drawn. The Letter of Credit is now fully drawn, and $349,025.86 of the Advance Request remains unfunded. This unpaid amount includes the entire July 2007 interest payment that was due to Wachovia on July 10, 2007.

The failure of Cabana West to pay accrued interest on the Loan when due constitutes an Event of Default pursuant to Section 8.1.1 of the Loan Agreement. Further, you have informed Wachovia that the Improvements remain incomplete and neither Cabana West nor the Guarantors have tendered sufficient funds to complete the Project. Accordingly, Wachovia hereby declares the entire unpaid balance due on the Loan, including all accrued and unpaid interest, to be immediately due and payable and makes demand for payment thereof. This demand is made on Cabana West and the Guarantors to fulfill their respective obligations under the Loan Documents.

Please be on notice that the provisions of the Loan Documents relative to the payment of attorney's fees in addition to the due and owing principal, interest, and other charges shall be enforced, and you have ten (10) days from the date of receipt of this letter to pay all amounts owing thereunder without incurring liability for the attorney's fees. The total amount due and owing under the Note as of July 26, 2007 is principal in the amount of $27,500,000.00, plus accrued and unpaid interest in the amount of $269,270.83, for a total outstanding balance of $27,769,270.83. Interest will continue to accrue thereafter at the applicable per diem rate under the Loan Documents. This notice is provided pursuant to O.C.G.A. § 13-1-11.

Please contact me to obtain updated payoff information as of the date you intend to pay the Loan.

This letter is not an attempt to describe all Events of Default that may have occurred and are outstanding under the Loan Agreement or other loan documents. No events of default are waived by Wachovia and all rights and remedies under the loan documents and otherwise available are reserved.

Very truly yours,

D. Andrew Raine

cc:    Jeffrey T. Baker, Esq.

07/26/2007 16:05 FAX 2052545534    SPECIAL ASSETS MGMT    ☒003

Cabana West, L.P.,
Messrs. Hill and Beaver
July 26, 2007
Page 3

Jason D. Woodard, Esq.

```
DEPCTI   A391369  TF8G1714 Dep Acct Current Transaction Inq    BACTD028 07/26/07
                                                                        11:43
  Org: 028 Serv: DDA Acct: 2000683063093           C/W:  Date: 07252007

  Short Name: CABANA WEST L                      Daily Bal:        3,542.44

    Date     Serial    T/C        Amount    T/S Cap Rec  Sequence    Date/Desc
  07/25/07             226      188,894.34+ 062 001 281 0725051496 FUNDS TR CR
                       FUNDS TRANSFER  (ADVICE 2007072500051496)
                       RCVD FROM  SUPERIOR BANK     /
                       ORG=SUPERIOR BANK WIRES IN PROCESS
                       RFB=2007206111400003 OBI=
                       REF=2007206111400003 07/25/07  02:43PM ET
                       670        180,000.00- 063 753 283 1293253041 DEBIT MEMO
                       ACCOUNT TRANSFER
                       REASON: TRANSFER PER CUSTOMER'S REQUEST
                                                 DAILY BAL:       12,436.78




  Command:
  F1=Help  F3=Exit  F7=Bkwd  F8=Fwd
```

DUPLICATE

Court Name: U S DISTRICT COURT – AL/M
Division: 2
Receipt Number: 4602001088
Cashier ID: brobinso
Transaction Date: 11/05/2007
Payer Name: BURR AND FORMAN LLP
------------------------------------
CIVIL FILING FEE
  For: BURR AND FORMAN LLP
  Case/Party: D-ALM-3-07-CV-000993-001
  Amount:          $350.00
------------------------------------
CHECK
  Check/Money Order Num: 304732
  Amt Tendered:  $350.00
------------------------------------
Total Due:        $350.00
Total Tendered:   $350.00
Change Amt:       $0.00

WACHOVIA BANK ET AL V. CABANA WEST
ET AL